## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CARL NELSON,

        *Plaintiff,*

  v.

CRANE SERVICE CO., INC.

        *Defendant.*

Case No.

---

## COMPLAINT

COME NOW Plaintiff, Carl Nelson ("Plaintiff", or "Mr. Nelson), by and through undersigned counsel, for his claims against Crane Service Co., Inc. ("Defendant"), and state as follows:

1.    These Claims are brought by Plaintiff for damages against Defendant for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Maryland Fair Employment Practices Act ("FEPA"), Md. Code Ann. State Gov't., § 20-601, *et seq.*, and the Prince George's County, Md., Code § 2-222, *et seq.*, for discrimination and harassment on the basis of race; and wrongful termination and/or constructive discharge on account of his race and/or complaining about race discrimination.

## <u>JURISDICTION AND VENUE</u>

2.    Federal question subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343; 42 U.S.C. § 1988, and 42 U.S.C. § 2000e-5.

3.    Supplemental jurisdiction is proper pursuant to 28 U.S.C. § 1367.

4.    The Court has personal jurisdiction over Defendant because it conducts business throughout the State of Maryland.

5.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5, and 28 U.S.C. § 1391. A significant part of the acts and omissions alleged herein occurred within this judicial district.

## PARTIES

6.      Mr. Nelson is a Black man and was employed by Defendant from December 19, 2022, until February 28, 2023.

7.      Defendant is a District of Columbia corporation doing business in Maryland.

## ADMINISTRATIVE REMEDIES

8.      Mr. Nelson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on March 10, 2023.

9.      More than 180 days after he filed his Charge, the EEOC issued Mr. Nelson a Notice of Right to Sue, dated December 8, 2023, which Mr. Nelson received on December 18, 2023. *See* Exhibit A.

10.     Mr. Nelson has satisfied all administrative prerequisites to bringing these Claims.

## STATEMENT OF FACTS

11.     On December 19, 2022, Mr. Nelson began working for Defendant as an Operator Apprentice. Plaintiff performed his duties for Defendant in the State of Maryland, the District of Columbia, and the Commonwealth of Virginia. Mr. Nelson's first day of work was on December 20, 2022, at Defendant's Capitol Heights, Maryland shop location.

12.     Mr. Nelson's job duties typically consisted of: (1) temporary traffic control, or "flagging" duties; (2) performing maintenance in work zones; (3) installing and/or removing various devices and equipment, such as signs, arrow boards, cones, etc.; (4) clean and maintain assigned vehicles on a daily basis, including performing pre- and post-trip inspections; (5) inspect

various equipment (interior and exterior); (6) clean various equipment (interior and exterior); (7) check gauges on equipment; (8) maintain record logs; (9) maintain lubrication and cooling of oil supply; among other duties and responsibilities.

13.     To perform traffic control duties, employees must have flagger cards/certifications according to District Department of Transportation, Maryland Department of Transportation, and/or Virginia Department of Transportation regulations. Out of all of his colleagues at the time of his employment with Defendant, Mr. Nelson was the only employee to possess the required cards/certifications required to perform traffic control duties.

14.     From the beginning of his employment with Defendant and continuing until his termination, Mr. Nelson was subjected to and endured race discrimination and a hostile work environment on account of his race (Black).

15.     Among the litany of demeaning conduct Mr. Nelson endured during his brief tenure with Defendant, Plaintiff was called offensive racial slurs, such as "cookie" and "nigger", and was intimidated by a coworker (White) who displayed a firearm only in Mr. Nelson's presence.

16.     On the first day of work on December 20, 2022, David Roy, one of Mr. Nelson's coworkers (Black), stated that he had been employed with Defendant for four years. Mr. Roy was also assigned to train Mr. Nelson. Concerningly, Mr. Roy informed Mr. Nelson that Defendant's work environment is extremely racist and that if Mr. Nelson tried to file a complaint, it would not go anywhere because the owners of the company are also involved with the employees' union.

17.     On December 20, 2022, Mr. Nelson was introduced to a group of coworkers by Mr. Roy and overheard one coworker (White) use the racial slur "nigger," referring to Mr. Roy, and another coworker referred to Mr. Nelson as "cookie."

18.     On or around December 21, 2022, Mr. Nelson witnessed an Engineer Operator and supervisor, John Matisa (White), muttering "nigger" as he walked by Mr. Nelson.

19.     That same day, Mr. Nelson reported Mr. Matisa's behavior to Adam Leach (White), the yard manager and supervisor of Mr. Nelson. Mr. Leach said he would talk to Brent Loveless (White), who at that time was the Hiring Manager/ Dispatcher and oversaw all operations in the yard and dispatched oilers, truck drivers, engineers, and all other employees.

20.     Mr.  Leach then assigned Mr. Nelson to work in the lower shop, which is a garage-like location located about 50 feet away from the upper shop, where the secretary, dispatch, and other office staff work.

21.     The morning of December 22, 2022, Mr. Nelson was assigned to work in the yard to dispose of trash, clean bathrooms, and other janitorial tasks. In the afternoon he was assigned to go down to the lower shop to spray paint an 18-wheeler trailer.

22.     At around 2:00 PM that day, Mr. Nelson was laying on a "creeper" to go under the trailer to paint the underside of the trailer when an individual (White male) walked in and went towards where Mr. Nelson was working. Mr. Nelson rolled out from under the trailer and got up to introduce himself to this individual, whom he had not previously met. Without uttering a word, this individual looked at Mr. Nelson with a scowl and raised his shirt and hoodie, revealing a handgun that this individual had in a holster around his belt. The individual then started looking at his phone that he was holding in his left hand.

23.     Mr. Nelson then backed up to flee because he felt threatened, intimidated, and afraid, and took a picture of the individual who had just displayed his gun.

24.     After fleeing the scene, Mr. Nelson searched for Mr. Leach and Mr. Loveless outside. Mr. Nelson found Mr. Leach first and informed him of what had happened, and then they

both went to talk to Mr. Loveless. Upon locating Mr. Loveless, Mr. Leach and Mr. Loveless then proceeded to inform Ms. Nelson that Defendant allowed its employees to carry guns, and that Defendant does not have a gun policy. Mr. Loveless also told Mr. Nelson to "get tougher skin."

25.    Mr. Nelson then asked Mr. Loveless why he was not being dispatched. Mr. Loveless stated that Mr. Nelson was "not yet in the system" and Mr. Loveless was unable to dispatch him. Before leaving for the day, Mr. Loveless pulled Mr. Nelson aside and asked Mr. Nelson to report to the office located on Hampton Boulevard in Capitol Heights, Maryland, to meet with Diana Farmer (White), a human resources manager, and Defendant's Safety Manager, Ricky McGuire (White).

26.    On December 23, 2022, Mr. Nelson reported to the Office on Capitol Heights around 7:00 AM in the morning. Originally, Mr. Nelson was scheduled to go over a safety training with Mr. McGuire. However, Mr. Nelson was asked to show up earlier to speak to human resources and Mr. McGuire about the incidents that had transpired the days before.

27.    Ms. Farmer and Mr. McGuire informed Mr. Nelson that they would investigate the incidents. They informed Mr. Nelson that his complaint was confidential and that they would inform him of the outcome of the investigation.

28.    Mr. McGuire also confirmed that he did not believe that the company had a weapons policy.

29.    On December 24, 2022, Mr. Nelson emailed Mr. McGuire his certification/credentials, as requested, to verify Mr. Nelson's qualifications.

30.    On January 10, 2023, Mr. Nelson called Mr. McGuire to inquire about the state of the investigation and what was going on. Mr. McGuire stated "we are looking into it" and there was no update.

31.    On January 11, 2023, at approximately 11:40 AM, Mr. Nelson and a group of operators were assembling a machine. During this process, Mr. Leach asked Mr. Nelson to "go get a rope." Upon finding the rope, Mr. Nelson discovered it was tied in such a way that it resembled a noose.

32.    Mr. Nelson then returned with the rope and one of his coworkers, Jim Bo (White), made a comment to another coworker, CB (White), and Mr. Leach, stating "who told that black boy to get a rope that's messed up man! Which one of y'all told him to go get a rope?" The group of men then started laughing. Mr. Nelson also observed that CB had a gun on his belt while they were working.

33.    On January 13, 2023, Mr. Nelson witnessed Mr. Leach and a coworker, Chris (White), in the yard referring to Mr. Nelson, in a demeaning fashion, as "cookie." Mr. Nelson asked them not to use that word when referring to him. Mr. Leach and Chris informed Mr. Nelson that they were referring to him as "cookie" because another employee, Andrew Russo (White), had called him that first.

34.    Mr. Nelson was later informed by Mr. Russo that this nickname was a reference to the movie "Man of Honor," a movie in which tells the story of a Black character that was the first Navy Diver and how he experienced racial discrimination by the other divers and his superiors. During the time period the move takes place, Black Americans were not actual divers or serving any frontline role, they were hired as cooks, and they were thus given the pejorative nickname "cookies."

35.    At approximately 11:40 AM that day, Mr. Leach and Chris went to the upper shop and Chris took off his coat to show Mr. Nelson that Chris also carried a 9mm handgun with him.

Shocked, Mr. Nelson exclaimed: "Woah what's going on around here? We're at work! Why do people carry guns around here?"

36.    Chris informed Mr. Nelson that he carried a gun because of "the area" (that the shop was in) because it was "a bad neighborhood."

37.    On January 16, 2023, Mr. Nelson inquired with Ms. Farmer regarding Defendant's employee handbook and was told that the handbook was unavailable, and it was being worked on.

38.    On January 17, 2023, at approximately 8:00 AM, Mr. Nelson asked his coworker, William Gray (White), who was in Mr. Nelson's class and also a first year apprentice (the exact same level as Mr. Nelson), why Mr. Nelson was not being dispatched out to jobs on a daily basis like Mr. Gray and other employees in Mr. Nelson's position. In response, Mr. Gray told Mr. Nelson that he would work up to twelve hours a day and Mr. Nelson would not want to work those long hours.

39.    Astonished, Mr. Nelson told Mr. Gray that he did not feel it was fair to exclude him from working additional hours and he felt that he was not given the same opportunity to earn the same amount of pay as a result, given that Mr. Nelson had the same training and certifications as Mr. Gray and his other classmate Mr. Russo. Mr. Gray then told Mr. Nelson that it was out of his control.

40.    During his employment with Defendant, Mr. Nelson was one of eight Oilers and was not included in being dispatched with the other Operators. The only Black Operator was assigned to work as an Oiler and assigned under another, White Operator. The other Oilers were White men, with the exception of one, who was possibly Hispanic. The other Oilers were regularly dispatched every day and worked up to 12-hour days.

41.    Unlike the other Oilers who were dispatched, Mr. Nelson was typically assigned to work in the yard doing other kinds of work that was not developmental to his training in his apprenticeship.

42.    Mr. Nelson then asked a dispatcher, Kevin (White), why he was not added to the dispatch and asked if he would be part of it. Kevin told Mr. Nelson that he was not yet in the system but if he "wanted to do something" Kevin would send him to go get an operator in Virginia who needed a ride back to the yard.

43.    Mr. Nelson then went to pick up a coworker, Bradley Kenneth (White), in Virginia, who proceeded to inform Mr. Nelson that he frequently referred to another employee of Defendant, Andre (Black), by the racial slur "nigger."  Mr. Kenneth then asked Mr. Nelson why people care about use of the racial slur "nigger," confessed that he was teased growing up, and additionally asked Mr. Nelson why people believed in the Black Lives Matter movement.

44.    Upon hearing Mr. Kenneth's brazen use of racial slurs and racist overtones in their conversation, Mr. Nelson felt unsafe, uncomfortable, uneasy, and desired to go home.

45.    On January 30, 2023, at approximately 8:00 AM, Mr. Nelson witnessed Kory Loveless, who is Mr. Loveless' son and third-year apprentice, make the comment that "all Black people are slow" and portrayed them as lazy. In addition to Mr. Nelson, Kory made this comment in the presence of John Mutispaugh and a CDL driver whose nickname was "Poncho."

46.    On January 31, 2023, Mr. Nelson submitted a complaint to Steve Faulkner, his union representative, again complaining of race discrimination and a hostile work environment. Mr. Faulkner replied on February 3, 2023, that he had requested a meeting with Defendant to discuss the allegations.

47.    On February 10, 2023, Mr. McGuire emailed Mr. Nelson stating that he had conducted "an extensive investigation this week with employees from all the different races, religions, and genders at the D'Arcy Road location" and that Defendant would soon be rolling out "a new harassment policy as well as a strict weapons policy."

48.    On February 14, 2023, Mr. Nelson participated in a mandatory meeting with Defendant and Mr. Faulkner, where employees were told that an investigation corroborated allegations of race discrimination and harassing behavior, and thus Defendant was implementing a new harassment and weapons policy.

49.    Mr. Nelson then participated in a meeting with Mr. McGuire and human resources on February 20, 2023, where Mr. McGuire informed Mr. Nelson that his allegations of race discrimination and a hostile work environment were corroborated by other employees. They further asked Mr. Nelson to go to them directly with any further complaints, not the union. Mr. Nelson texted and emailed Mr. McGuire on February 21, 2023, and stated: "Rick, per our meeting yesterday, thank you again for your investigation findings and the individuals who cooperated to help you determine that my complaints were true."

50.    Unfortunately, the race discrimination and hostile work environment Mr. Nelson experienced did not cease. On February 27, 2023, Mr. Nelson was dispatched, assigned to truck number ST-18, and was asked to arrive at 6:30 AM. Upon arriving and inspecting the vehicle, Mr. Nelson discovered on the driver's side rear floor what appeared to be a single unused shotgun shell, causing Mr. Nelson to fear for his life.

51.    That same day, Mr. Nelson emailed a complaint to his union representative, Mr. Faulkner, who then replied that he had informed Defendant of the incident and asked that it be addressed immediately. Mr. Nelson made a further complaint that day to Mr. McGuire.

52.    Later that day and during a meeting with Mr. McGuire regarding his complaint, Mr. Nelson received a text from dispatch at approximately 2:21 PM, assigning Mr. Nelson to the yard for February 28, 2023. Mr. Nelson informed Mr. McGuire about the dispatch in the meeting and furthermore his concerns regarding Defendant permitting White employees to carry firearms, ammunition, contraband, explosives etc. Unfortunately, Mr. McGuire took no action.

53.    Thereafter at approximately 2:45 PM, Mr. Nelson informed Mr. McGuire that he was refusing to work in an unsafe and hostile work environment at the D'Arcy Road location and requested to be sent to another location. Mr. McGuire then informed Mr. Nelson that it was going to be the same situation at any other location. Mr. Nelson responded that the shotgun shell he found in his work truck was a clear threat and intimidation tactic on account of his race and that Mr. Nelson did not feel safe at the D'Arcy Road location.

54.    Mr. McGuire then informed Mr. Nelson that he would conduct an investigation and would inform dispatch about leave of absence for February 28, 2023. Mr. Nelson was then sent home before his shift ended.

55.    Later that evening after Mr. Nelson's normal shift hours (7:30 AM – 4:00 PM) at approximately 6:44 PM, Mr. McGuire emailed Mr. Nelson and claimed that he found no policy violation because he did not consider ammunition to be an explosive or a weapon by itself. In coming to this conclusion, Mr. McGuire did not investigate the conduct of the individuals responsible. Mr. McGuire further stated to Mr. Nelson: "My understanding is that dispatch expects you to arrive by 7:30am at D'Arcy road tomorrow for your assignment. Otherwise, if you choose not to show up, then we will assume that you will no longer be employed with Crane Service Company."

56.     Consistent with his previous complaint to Mr. McGuire, which was submitted the day before, Mr. Nelson did not feel safe at the D'Arcy Road location and felt like Defendant was placing his life in jeopardy by assigning him, again, to that location. Fearing for his safety, Mr. Nelson did not report to work at the D'Arcy Road location on February 28, 2023.

57.     Defendant then terminated Mr. Nelson for "job abandonment," despite Mr. Nelson informing Mr. McGuire on February 27, 2023, that he did not feel safe at the D'Arcy Road location and refused to work there. Mr. McGuire then permitted Mr. Nelson to take leave of absence.

58.     On February 28, 2023, at approximately 4:00 PM, Defendant sent Mr. Nelson a notice of separation along with last check by certified mail to his residence. The provided reason for termination in the notice stated Mr. Nelson: "did not appear for his job assignment on 2.28.23 at D'Arcy Road and he did not accept any phone calls from company representatives when he did not appear for work. Due to abandonment of his responsibilities, his actions constitute his 'resignation' from Crane Service Company."

59.     In other words, despite no previous infractions, Defendant immediately terminated Mr. Nelson, claiming it was a "voluntary quit," while also taking no substantive action to address Mr. Nelson's multiple complaints of race discrimination, harassment, and intimidation.

60.     Defendant retaliated against Mr. Nelson after he reported race discrimination, a hostile work environment, and unlawful actions.

61.     As a result of the discrimination, hostile work environment, and retaliation he experienced at the hands of Defendant and its agents, Mr. Nelson has experienced severe psychological trauma, depression, and worsening anxiety. Additionally, Mr. Nelson has sought the help of a therapist regularly since his termination. This has resulted in significant additional expenses for Mr. Nelson.

**COUNT I**
**42 U.S.C. § 2000(e)-2 TITLE VII – RACE DISCRIMINATION**
**AGAINST DEFENDANT**

62.     Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

63.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) makes it unlawful to discharge or otherwise discriminate against any individual based on race with respect to compensation, terms, conditions, or privileges of employment.

64.     Defendant is and continues to be an "employer" within the meaning of Title VII.

65.     Plaintiff was an "employee" within the meaning of Title VII.

66.     Plaintiff is Black and a member of a protected class.

67.     During his tenure with Defendant, Plaintiff was Defendant's only Black Operator at the D'Arcy Road location.

68.     Defendant allowed its employees and management to continue to harassing Plaintiff with explicit racism and threatening acts.

69.     Defendant allowed its staff and management to conduct these behaviors without repercussions, despite many complaints and attempts to address/correct their behavior from Plaintiff.

70.     When Plaintiff attempted to address these issues multiple times with members of management, Plaintiff was told to "get tougher skin" and took no steps to address his concerns directly to those who participated in the comments, aggressive behaviors, and harassment.

71.     Plaintiff followed Defendant's protocol by reporting issues properly to management (up the chain of command).

72.     Defendant allowed its staff and management to continuously display aggression and threaten Plaintiff.

73.     Defendant allowed the behavior to continue and made Plaintiff's work environment unbearable, uncomfortable, and unwelcome for any reasonable person in Plaintiff's situation.

74.     Plaintiff made requisite steps to try and remedy the situation.

75.     Defendant terminated Plaintiff because of his race, improperly classifying his termination as a "voluntary quit," to try and justify Plaintiff's termination.

76.     Defendant subjected Plaintiff to discipline for an alleged infraction that other employees were not subjected to, and which acts against Defendant's own established policy governing absences.

77.     After ignoring or downplaying, or even mocking, Plaintiff's complaints to inform Defendant of ongoing discrimination based on race that he was facing, Defendant retaliated against Plaintiff by terminating his employment based on his race.

78.     As a direct, proximate, and foreseeable result of Defendant's unlawful acts and omissions, Plaintiff suffered a loss of wages, salary, compensation and employment benefits in an amount to be proven at trial.

79.     As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided by applicable law.

80.     Defendant's unlawful conduct was egregious, outrageous, and malicious and was in conscious disregard of Plaintiff's rights; as a result, Plaintiff is entitled to punitive damages.

**COUNT II**
**42 U.S.C. § 2000e-3 TITLE VII – RETALIATION**
**AGAINST DEFENDANT**

86.     Plaintiff incorporates by reference each and every preceding paragraph, as if set forth fully herein.

87.     Plaintiff made complaints to Defendant and Defendant's management personnel regarding several instances of racist comments, aggressive behavior, and continual harassment from Defendant's employees.

88.     Defendant and its management staff belittled Plaintiff for submitting his complaints, asking him to "ger tougher skin," and refused to take appropriate action to remedy the race discrimination and hostile work environment suffered by Plaintiff.

89.     Defendant proceeded to terminate Plaintiff based on false accusations of failing to call out for his job on February 28, 2023, when in fact Plaintiff had informed Defendant and Mr. McGuire of his intention not to appear at the D'Arcy Road location on February 28, 2023, due to fearing for his safety.

90.     Further, even if it were true that Plaintiff did not call out, Defendant's own policies do not support Plaintiff's termination for what would be a first infraction.

91.     As an actual and proximate cause of Defendant' conduct, Plaintiff has suffered emotional distress, embarrassment, humiliation, and lost wages and benefits.

92.     Plaintiff seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

**COUNT III**
**42 U.S.C. § 1981 - RACE DISCRIMINATION**
**AGAINST DEFENDANT**

93.     Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

94.     The Civil Rights Act of 1964 prohibits intentional race-based discrimination in contractual relationships, such as employment agreements.

95.     During and under the terms of Plaintiff's employment with Defendant, Plaintiff had a right to be protected from discrimination based on his race, Black American.

96.     During his tenure with Defendant, Plaintiff was Defendant's only Black Operator at the D'Arcy Road location.

97.     Defendant allowed its employees and management to continue to harassing Plaintiff with explicit racism and threatening acts.

98.     Defendant allowed its staff and management to conduct these behaviors without repercussions, despite many complaints and attempts to address/correct their behavior from Plaintiff.

99.     When Plaintiff attempted to address these issues multiple times with members of management, Plaintiff was told to "get tougher skin" and took no steps to address his concerns directly to those who participated in the comments, aggressive behaviors, and harassment.

100.     Plaintiff followed Defendant's protocol by reporting issues properly to management (up the chain of command).

101.     Defendant allowed its staff and management to continuously display aggression and threaten Plaintiff.

102.     Defendant allowed the behavior to continue and made Plaintiff's work environment unbearable, uncomfortable, and unwelcome for any reasonable person in Plaintiff's situation.

103.     Plaintiff made requisite steps to try and remedy the situation.

104.     Defendant terminated Plaintiff because of his race, improperly classifying his termination as a "voluntary quit," to try and justify Plaintiff's termination.

105.    Defendant subjected Plaintiff to discipline for an alleged infraction that other employees were not subjected to, and which acts against Defendant's own established policy governing absences.

106.    After ignoring or downplaying, or even mocking, Plaintiff's complaints to inform Defendant of ongoing discrimination based on race that he was facing, Defendant retaliated against Plaintiff by terminating his employment based on his race.

107.    Defendant subjected Plaintiff to adverse and different terms and conditions of employment than his White counterparts.

108.    Defendant made employment-based decisions based on Plaintiff's race that would not have occurred but for this discrimination.

109.    Defendant intentionally gave preferential treatment to employees that were not Black, intentionally targeting for termination Black employees, including Plaintiff, while protecting White employees.

110.    Defendant intentionally deprived Plaintiff of the same terms and conditions of employment available to Plaintiff's White peers.

111.    Defendant intentionally denied Plaintiff the opportunity to work in an environment that was free from unlawful discrimination, as exemplified by the failure of Defendant to take his complaints seriously.

112.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff suffered, and will continue to suffer, physical damages including distress in an amount to be proven at trial.

113.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided by applicable law.

114.    Defendant's unlawful conduct was egregious, outrageous, and malicious and was in conscious disregard of Plaintiff's rights; as a result, Plaintiff is entitled to punitive damages.

## COUNT IV
## 42 U.S.C. § 1981 - RETALIATION
## AGAINST DEFENDANT

115.    Plaintiff incorporates by reference each and every preceding paragraph, as if set forth fully herein.

116.    Plaintiff made complaints to Defendant and Defendant's management personnel regarding several instances of racist comments, aggressive behavior, and continual harassment from Defendant's employees.

117.    Defendant and its management staff belittled Plaintiff for submitting his complaints, asking him to "ger tougher skin," and refused to take appropriate action to remedy the race discrimination and hostile work environment suffered by Plaintiff.

118.    Defendant proceeded to terminate Plaintiff based on false accusations of failing to call out for his job on February 28, 2023, when in fact Plaintiff had informed Defendant and Mr. McGuire of his intention not to appear at the D'Arcy Road location on February 28, 2023, due to fearing for his safety.

119.    Further, even if it were true that Plaintiff did not call out, Defendant's own policies do not support Plaintiff's termination for what would be a first infraction.

120.    As an actual and proximate cause of Defendant' conduct, Plaintiff has suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages and benefits.

121.    Plaintiff seeks nominal, compensatory, and punitive damages to compensate her for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of her attorneys' fees and litigation costs and expenses.

**COUNT V**
**MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA"),**
**MD. CODE ANN. STATE GOV'T., § 20-601, *ET SEQ.***
**AGAINST DEFENDANT**

122.     Plaintiff incorporates by reference each and every preceding paragraph, as if set forth fully herein.

123.     Maryland prohibits discrimination in employment based on race. Md. Code. § 20-602.

124.     Defendant is and continues to be an "employer" within the meaning of FEPA.

125.     Plaintiff was an "employee" within the meaning of FEPA.

126.     Plaintiff is Black and is a member of a protected class.

127.     During his tenure with Defendant, Plaintiff was Defendant's only Black Operator at the D'Arcy Road location.

128.     Defendant allowed its employees and management to continue to harassing Plaintiff with explicit racism and threatening acts.

129.     Defendant allowed its staff and management to conduct these behaviors without repercussions, despite many complaints and attempts to address/correct their behavior from Plaintiff.

130.     When Plaintiff attempted to address these issues multiple times with members of management, Plaintiff was told to "get tougher skin" and took no steps to address his concerns directly to those who participated in the comments, aggressive behaviors, and harassment.

131.     Plaintiff followed Defendant's protocol by reporting issues properly to management (up the chain of command).

132.     Defendant allowed its staff and management to continuously display aggression and threaten Plaintiff.

133.    Defendant allowed the behavior to continue and made Plaintiff's work environment unbearable, uncomfortable, and unwelcome for any reasonable person in Plaintiff's situation.

134.    Plaintiff made requisite steps to try and remedy the situation.

135.    Defendant terminated Plaintiff because of his race, improperly classifying his termination as a "voluntary quit," to try and justify Plaintiff's termination.

136.    Defendant subjected Plaintiff to discipline for an alleged infraction that other employees were not subjected to, and which acts against Defendant's own established policy governing absences.

137.    After ignoring or downplaying, or even mocking, Plaintiff's complaints to inform Defendant of ongoing discrimination based on race that he was facing, Defendant retaliated against Plaintiff by terminating his employment based on his race.

138.    Defendant subjected Plaintiff to adverse and different terms and conditions of employment than his White counterparts.

139.    Defendant made employment-based decisions based on Plaintiff's race that would not have occurred but for this discrimination.

140.    Defendant intentionally gave preferential treatment to employees that were not Black, intentionally targeting for termination Black employees, including Plaintiff, while protecting White employees.

141.    Defendant intentionally deprived Plaintiff of the same terms and conditions of employment available to Plaintiff's White peers.

142.    Defendant intentionally denied Plaintiff the opportunity to work in an environment that was free from unlawful discrimination, as exemplified by the failure of Defendant to take his complaints seriously.

143.    As a result of the discrimination, hostile work environment, and retaliation he experienced at the hands of Defendant and its agents, Mr. Nelson has experienced severe psychological trauma, depression, and worsening anxiety. Additionally, Mr. Nelson has sought the help of a therapist regularly since his termination. This has resulted in significant additional expenses for Mr. Nelson.

144.    As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered emotional distress, embarrassment, humiliation, and lost wages and benefits.

145.    Plaintiff seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

**COUNT VI**
**PRINCE GEORGE'S COUNTY, MD., CODE § 2-222 – DISCRIMINATION**

146.    Plaintiff incorporates by reference each and every preceding paragraph, as if set forth fully herein.

147.    Prince George's County, Maryland prohibits discrimination in employment based on race. *See* Prince George's County, Md., Code § 2-222.

148.    Defendant is and continues to be an "employer" within the meaning of Prince George's County, Md., Code § 2-186(8).

149.    Plaintiff is an "aggrieved person" within the meaning of Prince George's County, Md., Code § 2-186(2).

150.    Plaintiff is Black and is a member of a protected class.

151.    During his tenure with Defendant, Plaintiff was Defendant's only Black Operator at the D'Arcy Road location.

152.    Defendant allowed its employees and management to continue to harassing Plaintiff with explicit racism and threatening acts.

153.    Defendant allowed its staff and management to conduct these behaviors without repercussions, despite many complaints and attempts to address/correct their behavior from Plaintiff.

154.    When Plaintiff attempted to address these issues multiple times with members of management, Plaintiff was told to "get tougher skin" and took no steps to address his concerns directly to those who participated in the comments, aggressive behaviors, and harassment.

155.    Plaintiff followed Defendant's protocol by reporting issues properly to management (up the chain of command).

156.    Defendant allowed its staff and management to continuously display aggression and threaten Plaintiff.

157.    Defendant allowed the behavior to continue and made Plaintiff's work environment unbearable, uncomfortable, and unwelcome for any reasonable person in Plaintiff's situation.

158.    Plaintiff made requisite steps to try and remedy the situation.

159.    Defendant terminated Plaintiff because of his race, improperly classifying his termination as a "voluntary quit," to try and justify Plaintiff's termination.

160.    Defendant subjected Plaintiff to discipline for an alleged infraction that other employees were not subjected to, and which acts against Defendant's own established policy governing absences.

161.    After ignoring or downplaying, or even mocking, Plaintiff's complaints to inform Defendant of ongoing discrimination based on race that he was facing, Defendant retaliated against Plaintiff by terminating his employment based on his race.

162.    Defendant subjected Plaintiff to adverse and different terms and conditions of employment than his White counterparts.

163.    Defendant made employment-based decisions based on Plaintiff's race that would not have occurred but for this discrimination.

164.    Defendant intentionally gave preferential treatment to employees that were not Black, intentionally targeting for termination Black employees, including Plaintiff, while protecting White employees.

165.    Defendant intentionally deprived Plaintiff of the same terms and conditions of employment available to Plaintiff's White peers.

166.    Defendant intentionally denied Plaintiff the opportunity to work in an environment that was free from unlawful discrimination, as exemplified by the failure of Defendant to take his complaints seriously.

167.    As a result of the discrimination, hostile work environment, and retaliation he experienced at the hands of Defendant and its agents, Mr. Nelson has experienced severe psychological trauma, depression, and worsening anxiety. Additionally, Mr. Nelson has sought the help of a therapist regularly since his termination. This has resulted in significant additional expenses for Mr. Nelson.

168.    As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered emotional distress, embarrassment, humiliation, and lost wages and benefits.

169.    Plaintiff seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

## COUNT VIII
## CONSTRUCTIVE DISCHARGE
## (PLED IN THE ALTERNATIVE)

170.    Plaintiff incorporates by reference each and every preceding paragraph, as if set forth fully herein.

171.    Subsequent to the discriminatory and retaliatory acts and practices deliberately undertaken by Defendant and/or its agents, servants, and/or employees and against Plaintiff, Plaintiff was subjected to an intolerable and hostile work condition.

172.    Because he was subject to this intolerable and hostile work condition, Plaintiff was forced to not report to work on or about February 27, 2023.

173.    As a result of the discrimination, hostile work environment, and retaliation he experienced at the hands of Defendant and its agents, Mr. Nelson has experienced severe psychological trauma, depression, and worsening anxiety. Additionally, Mr. Nelson has sought the help of a therapist regularly since his termination. This has resulted in significant additional expenses for Mr. Nelson.

174.    As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered emotional distress, embarrassment, humiliation, and lost wages and benefits.

175.    Plaintiff seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Carl Nelson, respectfully requests that this Honorable Court enter judgment in his favor on all Counts of his Complaint and against Defendant, and that he be awarded the following relief:

a.      Entry of judgment in favor of Plaintiff on all Counts;

b.      Award of back pay for Plaintiff against Defendant;

c.      Award of compensatory damages for Plaintiff against Defendant;

d.      Award of punitive damages for Plaintiff against Defendant;

e.      Award of reasonable attorneys' fees and litigation costs and expenses for Plaintiff against Defendant;

f.      Award of pre- and post-judgment interest for Plaintiff; and

g.      Any other relief that this Court deems equitable, appropriate, and just.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Thomas J. Eiler*
Thomas J. Eiler, Esq., Bar No. 30622
Robert W.T. Tucci, Esq. (*pro hac vice forthcoming*)
Zipin, Amster & Greenberg, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
(301) 587-9373
(240) 839-9142 (f)
teiler@zagfirm.com
rtucci@zagfirm.com
*Counsel for Plaintiff*