**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CARL NELSON,<br><br>Plaintiff,<br><br>v.<br><br>CRANE SERVICE CO., INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 8:24-cv-00766-ABA |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... iii

I. STATEMENT OF GENUINE ISSUES OF MATERIAL FACT ..... 1

II. SPECIFIC DISPUTES AND OBJECTIONS ..... 9

III. LEGAL STANDARD ..... 11

IV. ARGUMENT ..... 13

a. Defendant Has Not Moved for Judgment as to All of Plaintiff's Claims ..... 13

b. Defendant Has Waived All Affirmative Defenses in this Matter ..... 13

c. There are Genuine Disputes of Material Fact which Preclude Summary Judgment as to Plaintiff's Causes of Action ..... 14

i. Hostile Work Environment ..... 14

ii. Constructive Discharge ..... 22

iii. Retaliation ..... 24

d. Whether Plaintiff's Mental Health Conditions Predated His Employment is Immaterial 27

V. CONCLUSION ..... 28

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 12
*Atkins v. Winchester Homes*,
2007 U.S. Dist. LEXIS 5791 (D. Md. 2009) ........ 26
*Bailey v. Md. Dep't of Hum. Servs.*,
2024 U.S. Dist. LEXIS 40720 (D. Md. 2024) ........ 17
*Ballinger v. North Carolina Agric. Extension Serv.*,
815 F.2d 1001 (4th Cir. 1987) ........ 13
*Boyer-Liberto v. Fountainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) ........ 15
*Brown v. Bratton*,
2022 U.S. App. LEXIS 33041 (4th Cir. 2022) ........ 19, 21
*Campbell v. Hewitt, Coleman & Assocs., Inc.*,
21 F. 3d 52 (4th Cir. 1994) ........ 12
*Chapman v. Oakland Living Ctr., Inc.*,
48 F.4th 222 (4th Cir. 2022) ........ 20, 22
*Coleman v. Whitley*,
2022 U.S. App. LEXIS 30391 (4th Cir. 2022) ........ 16
*Courtney-Pope v. Bd. of Educ.*,
2019 U.S. Dist. LEXIS 158056 (D. Md. 2019) ........ 12
*Delarosa v. Comsource Mgmt.*,
2021 U.S. Dist. LEXIS 163117 (D. Md. 2021) ........ 18
*Dones v. Donahue*,
987 F. Supp. 2d 659 (D. Md. 2013) ........ 22
*EEOC v. Cent. Wholesalers, Inc.*,
573 F.3d 167 (4th Cir. 2009) ........ 20
*EEOC v. Consol Energy, Inc.*,
860 F.3d 131 (4th Cir. 2017) ........ 22
*EEOC v. Sunbelt Rentals, Inc.*,
521 F.3d 306 (4th Cir. 2008) ........ 15, 17, 19
*EEOC v. Xerxes Corp.*,
639 F.3d 658 (4th Cir. 2011) ........ 19
*Evans v. Int'l Paper Co.*,
936 F.3d 183 (4th Cir. 2019) ........ 22, 24
*Foster v. Summer Vill. Cmty. Ass'n*,
520 F. Supp. 3d 734 (D. Md. 2021) ........ 12

*Fosters v. Univ. of Md. E. Shore*,
787 F.3d 243 (4th Cir. 2015) ........ 26
*Green v. Brennan*,
578 U.S. 547 (2016) ........ 22
*Guessous v. Fairview Prop. Invs., LLC*,
828 F.3d 203 (4th Cir. 2016) ........ 12
*Hammoud v. Jimmy's Seafood, Inc.*,
2024 U.S. Dist. LEXIS 94974 (D. Md. 2024) ........ 22
*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ........ 15, 17, 18
*Iko v. Shreve*,
535 F.3d 225 (4th Cir. 2008) ........ 12
*J.E. Dunn Constr. Co. v. S.R.P. Dev. Ltd. P'Ship*,
115 F. Supp. 3d 593 (D. Md. 2015) ........ 12
*King v. Rumsfeld*,
328 F.3d 145 (4th Cir. 2003) ........ 27
*Lacasse v. Didlake, Inc.*,
712 Fed. Appx. 231 (4th Cir. 2018) ........ 14
*Landino v. Sapp*,
520 Fed. Appx. 195 (4th Cir. 2013) ........ 25
*Laurent-Workman v. Wormuth*,
54 F. 4th 201 (4th Cir. 2022) ........ 15
*Madock v. McHugh*,
2011 U.S. Dist. LEXIS 92392 (D. Md. 2011) ........ 25
*McInerney v. United Air Lines, Inc.*,
463 Fed. Appx. 709 (10th Cir. 2011) ........ 25
*McIver v. Bridgestone Americas, Inc.*,
42 F.4th 398 (4th Cir. 2022) ........ 17
*Mosby-Grant v. City of Hagerstown*,
630 F.3d 326 (4th Cir. 2010) ........ 18
*Nguti v. Safeco Ins. Co.*,
2017 U.S. Dist. LEXIS 99101 (D. Md. 2017) ........ 27
*Ocheltree v. Scollon Prods., Inc.*,
335 F.3d 325 (4th Cir. 2003) ........ 17, 18, 20, 21
*Okoli v. City of Balt.*,
648 F.3d 216 (4th Cir. 2011) ........ 15
*Oncale v. Sundowner Offshore Servs.*,
523 U.S. 75 (1998) ........ 17, 18
*Payne v. Crane Co.*,
560 F.2d 198 (5th Cir. 1977) ........ 25

*Price v. Thompson*,
380 F.3d 209 (4th Cir. 2004) ........ 26
*Reid v. Dejoy*,
2023 U.S. Dist. LEXIS 82893 (D. Md. 2023) ........ 16, 18
*Roberts v. Glenn Indus. Grp., Inc.*,
998 F.3d 111 (4th Cir. 2021) ........ 16, 26
*Scott v. Harris*,
550 U.S. 372 (2007) ........ 12
*Smith v. CSRA*,
12 F.4th 396 (4th Cir. 2021) ........ 26
*Spriggs v. Diamond Auto Glass*,
242 F. 3d 179 (4th Cir. 2001) ........ 16, 18, 19
*Strothers v. City of Laurel*,
895 F.3d 317 (4th Cir. 2018) ........ 16, 19, 26
*Taylor v. Republic Servs., Inc.*,
968 F. Supp. 2d 768 (E.D. Va. 2013) ........ 28
*Timbers v. Telligent Masonry, LLC*,
2022 U.S. Dist. LEXIS 52816 (D. Md. 2022) ........ 26
*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ........ 26
*Wagner v. Dillard Dep't Stores, Inc.*,
17 Fed. Appx. 141 (4th Cir. 2001) ........ 14
*Walker v. MCI Telecomms. Corp.*,
1999 U.S. App. LEXIS 16258 (4th Cir. 1999) ........ 13
*Wannamaker-Amos v. Purem Novi, Inc.*,
126 F.4th 244 (4th Cir. 2025) ........ 13
*Webster v. Chesterfield Cnty. Sch. Bd.*,
38 F.4th 404 (4th Cir. 2022) ........ 13
*Yancy v. Becerra*,
2021 U.S. Dist. LEXIS 176417 (D. Md. 2021) ........ 26

**Statutes**

42 U.S.C. § 2000e-2 ........ 15

**Rules**

Fed. R. Civ. P. 56 ........ 11

Plaintiff Carl Nelson ("Plaintiff"), by and through undersigned counsel, hereby submits this Memorandum in Support of his Opposition to Defendant Crane Service Co., Inc.'s ("Defendant") Motion for Summary Judgment. In support thereof, Plaintiff states as follows:

## I. STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

1. After being hired by Defendant in December 2022, Plaintiff began experiencing discrimination based on his race, which included brandishing firearms and racial slurs, at Defendant's D'Arcy Road worksite. *See* **Exhibit** ("**Ex.**") **1**, Plaintiff's Decl., at ¶¶ 1–3; **Ex. 2**, Pl.'s Contemp. Notes, at 1–3; **Ex. 3**, Pl.'s Answers to Def.'s First Set of Interrogs., at 11–14.

2. On or about December 20, 2022, Plaintiff recalls: (i) an individual mumbling the word "Niggers" while walking by him; (ii) being asked where he was from and if he was Jamaican; and (iii) informing inquirers that he was "from this neighborhood" and being told that "this is a bad neighborhood". *See* **Ex. 2** at 1–2.

3. On or about that same date and time, Plaintiff informed Mr. Brent Loveless of these issues and was informed that Mr. Loveless would "take care of it". *See* **Ex. 2** at 2.

4. On or about December 21, 2022, Plaintiff was again confronted by the individual who mumbled "Niggers" at him on December 20, 2022, who told him that "you like it at Crane Service, we will fix that." *See* **Ex. 2** at 2.

5. That same day, Plaintiff was informed by Mr. David A. Roy, Jr., who witnessed the "we will fix that" comment, that "they" are racist and that "if you complain to [the] union or HR, it will be tossed to the side and you'll be on the blacklist because Rick Mazzella and Brian Mazzella are [union] board members, but they don't fire or layoff if you play it cool." *See* **Ex. 2** at 2.

6. On or about December 22, 2022, Plaintiff tried to introduce himself to a co-worker by the name of Mr. John Baldwin who "looked at [Plaintiff] raised up his hoodie/shirt to reveal a

pistol. He looked at me with disgust." **Ex. 2** at 2–3; **Ex. 4**, Pl.'s Apr. 3, 2025, Dep. Trans., at 146:13–147:22; **Ex. 5**, Pl.'s Dec. 22, 2022, Photo. of John Baldwin.

7. On or about that same date, Plaintiff informed Mr. Loveless about the brandished pistol which he believed was done to "intimidate or harass [Plaintiff] because of [his] race" and Mr. Loveless responded that Plaintiff should "[g]et tougher skin". **Ex. 2** at 2–3.

8. On December 23, 2022, Plaintiff verbally complained about unwelcome racial discrimination to Ms. Diana Farmer, part of Defendant's Human Resources team. *See* **Ex. 2** at 3.

9. Ms. Farmer informed Plaintiff that there was no weapons policy and "no worries have a good time today." *See* **Ex. 2** at 3.

10. On that same date, Plaintiff informed Mr. Rickey McGuire about his concerns and complaints and met the "same result". *See* **Ex. 2** at 3.

11. On January 10, 2023, Plaintiff called Mr. McGuire to inquire about discrimination and harassment on the telephone and Mr. McGuire informed Plaintiff that "we'll take care of it, thank you." *See* **Ex. 2** at 3; **Ex. 6**, Pl.'s Call Log Evidencing Call to Mr. McGuire.

12. On or about January 11, 2023, Plaintiff recalls operators and mechanics using racial slurs while joking, including asking Plaintiff to retrieve a tag line and stating, "who told the black boy to get a rope?" while laughing. This tag line resembled a noose. *See* **Ex. 2** at 3.

13. On or about January 13, 2023, Plaintiff overheard Mr. Adam Leach, a D'Arcy Road worksite supervisor, and Mr. Chris Thorness using racial slurs and making divisive comments, including referencing Plaintiff as "cookie". *See* **Ex. 2** at 4.

14. Plaintiff informed Mr. Leach and Mr. Thorness that he did not want them to "refer [to him] as that" and they informed him that he should lighten up. *See* **Ex. 2** at 4.

15. On January 16, 2023, Plaintiff texted Mr. Roy who agreed that individuals working at the D'Arcy Road worksite had been "talk[ing] [] racist shit" but had been doing so long before they carried firearms at work. **Ex. 7**, Jan. 16, 2023, Pl. Commc'n to Mr. Roy.

16. On or about January 17, 2023, Plaintiff spoke with "Kevin" who asked if everything was okay. Plaintiff asked "Kevin" why he asked him that and "Kevin" explained it was because Mr. Loveless, Ms. Farmer, and Mr. McGuire were stating that Plaintiff was being racially discriminated and harassed. *See* **Ex. 2** at 5.

17. On or about January 30, 2023, Mr. Kory Loveless made racialized comments in conversation with a Mr. John Mutispaugh that "[a]ll black people are slow". *See* **Ex. 2** at 7.

18. On January 31, 2023, Plaintiff submitted a written complaint regarding the ongoing racial discrimination, harassment, intimidation and use of racial slurs to his union representative, Mr. Steven Faulkner. *See* **Ex. 2** at 7; **Ex. 8**, Jan. 31, 2023, Pl. Commc'n to Mr. Faulkner.

19. On February 1, 2023, Plaintiff followed up with Mr. Faulkner regarding his complaints. *See* **Ex. 9**, Feb. 1, 2023, Pl. Commc'n to Mr. Faulkner.

20. On February 3, 2023, Plaintiff followed up with Mr. Faulkner again regarding his complaints. *See* **Ex. 10**, Feb. 3, 2023, Pl. Commc'n to Mr. Faulkner.

21. On that same date, Mr. Faulkner informed Plaintiff that he had spoken with Defendant regarding the allegations and informed Plaintiff that a meeting would be scheduled. *See* **Ex. 11**, Feb. 3, 2023, Mr. Faulkner Commc'n to Pl.

22. Plaintiff was provided the contact information for Mr. McGuire and scheduled a meeting with him for that same day. *See* **Ex. 12**, Feb. 3, 2023, Mr. Leach Commc'n to Pl.

23. Based on <u>*Defendant's*</u> internal investigative summary notes, Plaintiff identified Mr. McGuire and Ms. Lynn Perry, a third-party Human Resources consultant, that: (i) the use of racial

slurs and other derogatory comments are used "regularly and consistently at D'Arcy Road; no one day stood out from another because it is so common"; (ii) all of the operators and mechanics at the D'Arcy Road worksite were engaged in this behavior; (iii) that Brad Cannon and Andre Gilliam use the "n-word" freely at the worksite; and (iv) Plaintiff had expressed that he does not like hearing racial slurs but other employees continued to use them. *See generally*, **Ex. 13**, Feb. 3, 2023, Investig. Summ. Notes; **Ex. 14**, Mr. McGuire's Mar. 18, 2025, Dep. Trans., at 65:5–11 (highlighting Mr. McGuire's agreement that the "Summary and Recap" notes of the Investigative Summary accurately reflects the events of the February 3, 2023, meeting).

24. Further, Defendant's investigative summary notes provide: "There should be disciplinary action taken for someone involved" and that Defendant should "[f]ollow-up with Stanley McCombs based on his experience from Sept/Oct 2022". *See* **Ex. 13** at 3.

25. Following the February 3, 2023, meeting, Mr. McGuire and Ms. Alyssa Privatera interviewed other employees. *See* **Ex. 15**, Apr. 17, 2023, Decl. of Ms. Privatera, at ¶ 3.

26. Importantly, Ms. Privatera took notes during each interview. *Id.*

27. Notwithstanding that Ms. Privatera declared that the investigation took place from February 7–8, the interview form for Mr. Mike Dickensheets is dated February 1, prior to Plaintiff's complaint. *Id.* at 32.

28. Indeed, all of the interview forms identify that Defendant was "interviewing employees as a follow-up to the harassment training that was done at the end of last year" and made no reference to Plaintiff's complaints. *See generally*, **Ex. 15**.

29. The interview form of Mr. Tony White indicated that "the black fellas get a little harassment. Both on + off jobsite (N word.) They seem to stick up for themselves." *Id.* at 50.

30. Both Mr. McGuire and Ms. Privatera declared under the penalty of perjury that there was inappropriate banter that involved racial slurs at the D'Arcy Road worksite. *See id.* at ¶ 4; **Ex. 16**, Apr. 14, 2023, Decl. of Mr. McGuire, at ¶ 15.

31. On February 14, 2023, a mandatory meeting was held for Defendant's D'Arcy Road employees where Mr. McGuire informed those present that two new policies were being rolled out: (i) an Anti-Harassment Policy; and (ii) a Weapon-Free Workplace Policy. *See* **Ex. 2** at 8; **Ex. 16** at ¶¶ 20–21, p. 18–36.

32. On February 20, 2023, Plaintiff was called back into the office by Mr. McGuire and was informed that his complaints were "valid regarding race discrimination, harassment, intimidation [and/or] guns on supervisors/operators". *See* **Ex. 2** at 9.

33. Mr. McGuire went on to state that the reason for the February 14, 2023, meeting was because of Plaintiff's complaint and because the company never had related policies until his complaint. *Id.*

34. On February 21, 2023, Plaintiff emailed Mr. McGuire stating that he was thankful to him for his "investigation findings and the individuals who cooperated to help [him] determine that [Plaintiff's] complaints were true." *See* **Ex. 17**, Feb. 21, 2023, Pl. Commc'n to Mr. McGuire.

35. On February 27, 2023, Plaintiff was assigned a vehicle by Mr. Loveless to complete portions of his job duties and responsibilities. *See* **Ex. 2** at 10.

36. When the assigned vehicle appeared for Plaintiff's use, it had no gas for either the engine or a crane which was attached to the vehicle. *See id.*

37. All of the apprentices, including Plaintiff, working at the D'Arcy Road worksite used this particular vehicle. *See* **Ex. 4** at 186:12–16.

38. At about 6:44 AM on February 27, 2023, Plaintiff discovered an unused shotgun shell in his assigned vehicle. *See* **Ex. 2** at 10.

39. Plaintiff felt threatened by the presence of the shotgun shell and considered it an intimidation tactic related to his various complaints of discrimination, harassment, and the unfettered use of racial slurs at the D'Arcy Road worksite. *See* **Ex. 4** at 188:1–11, 189:10–16.

40. In his contemporaneous written notes, Plaintiff explained that he felt that the "shotgun shell was a warning from [Defendant] another form of intimidation because of my race." *See* **Ex. 2** at 12.

41. That same day, Plaintiff reported the shotgun shell incident to Mr. Faulkner. *See* **Ex. 18**, Feb. 27, 2023, Pl. Commc'n to Mr. Faulkner.

42. That same day, Plaintiff was invited to a meeting with Mr. Faulkner and Mr. McGuire. *See* **Ex. 2** at 10–12.

43. During this meeting, Plaintiff informed both Mr. Faulkner and Mr. McGuire that he did not feel safe any longer and asked to be transferred to another location and, if it could not be done, he would not work in an unsafe environment. *See id.*

44. Mr. McGuire informed Plaintiff that he could take the rest of the day off and that he would be doing an investigation by talking to both dispatch and the previous driver of Plaintiff's assigned vehicle. *See id.*

45. Further, Mr. McGuire informed Plaintiff that he could take the next day, February 28, 2023, off until completion of the investigation. *See id.*

46. Plaintiff again informed Mr. McGuire and Mr. Faulkner that the location was not safe, and Mr. McGuire informed him that "it's like that everywhere". *See id.*

47. Prior to February 28, 2023 at 9:38 PM, Plaintiff never informed either Mr. McGuire or Mr. Faulkner that he wanted to quit his employment. *See* **Ex. 4** at 195:11.

48. Plaintiff alerted Mr. McGuire and Mr. Faulkner that the discrimination and harassment was out of control. *See* **Ex. 2** at 11.

49. Defendant admits that Plaintiff alerted Mr. McGuire that the February 27, 2023, incident regarding the shotgun shell which was reported by Plaintiff was discriminatory. **Ex. 19**, Def.'s Resps. to Pl.'s First Set of Reqs. for Admis., at 3.

50. On February 27, 2023, at *6:44 PM*, Mr. McGuire sent Plaintiff an e-mail stating that dispatch expected Plaintiff to arrive by 7:30 AM the next day at the D'Arcy Road worksite, "[o]therwise, if you choose not to show up, then we will assume that you will no longer be employed with [Defendant]". **Ex. 20**, Feb. 27, 2023, Mr. McGuire Commc'n to Pl.

51. Sometime prior to 9:38 PM on February 28, 2023, Defendant mailed a Notice of Employee Separation to Plaintiff stating that Plaintiff allegedly abandoned his job or failed to appear or call. *See* **Ex. 19** at 2; **Ex. 21**, Feb. 28, 2023, Notice of Emp. Separation.

52. On March 1, 2023, Mr. John Steinhoff provided Mr. Brian Mazzella, Mr. Rick Mazzella, and Ms. Perry with a timeline he had prepared along with documents concerning Plaintiff. *See* **Ex. 22**, Mar. 1, 2023, Mr. Steinhoff Commc'n to Mgmt.

53. Mr. Steinhoff submitted this timeline and documents to Mr. McGuire on March 20, 2023. *See id.*

54. In Mr. Steinhoff's submitted timeline, he notes that "[Plaintiff] is terminated by [Defendant]". *See* **Ex. 23**, Incident Timeline by Mr. Steinhoff, at 1.

55. On February 28, 2023, at 9:38 PM, Plaintiff informed Mr. McGuire that he was turning in his letter of resignation or quitting the job with Defendant because of intolerable work conditions or treatment. *See* **Ex. 24**, Feb. 28, 2023, Pl. Commc'n to Mr. McGuire.

56. At some point on February 28, 2023, Plaintiff's therapist, Ms. Kiana Byrd, LCPC, drafted and provided a letter to Plaintiff which noted that he had been "experiencing workplace environment issues that include racism, nepotism and prejudice [sic] treatment that exacerbates his mental health condition." *See* **Ex. 25**, Feb. 28, 2023, Ltr. from Ms. Byrd; **Ex. 26**, Ms. Byrd's Apr. 7, 2025, Dep. Trans., at 58:1–22 (authenticating the letter and its purpose).

57. Throughout February 2023, Defendant's policy stated that "an absence is the failure to report . . . if an employee is absent for three consecutive days without notifying management, preferably their immediate supervisor, the employee is presumed to–to have abandoned the job, and may be terminated under the provision of voluntary quit at the discretion of management." **Ex. 27**, Def.'s Fed. R. Civ. P. 30(b)(6) April 2, 2025, Dep. Trans. at 74:15–75:12.

58. Defendant has admitted that Plaintiff was not written up for violations of its policies or procedures prior to February 28, 2023. *See* **Ex. 19** at 1.

59. Defendant has admitted that no employees were disciplined by it in relation to either Plaintiff's February 3, 2023, report regarding a hostile work environment or his February 27, 2023, report regarding the shotgun shell incident. *Id.* at 3.

60. Defendant has identified that there were "Anti-Discrimination/Harassment Policies" which were in effect from early 2022 through February 13, 2023. *See* **Ex. 27** at 26:9–21; **Ex. 28**, 2022/2023 Anti-Discrimination/Harassment Policies.

61. However, Mr. McGuire testified under oath that a separate set of policies "were in place at the time [Plaintiff] was hired." **Ex. 16** at ¶ 6, p. 10–13.

62. On February 14, 2023, Defendant rolled out a new Anti-Harassment Policy. *See id.* at ¶ 20, p. 18–20.

63. Plaintiff testified that his handwritten notes, attached hereto as **Ex. 2**, were his personal notes and were recorded contemporaneously with the events as they occurred, as evidenced by the dates on the left-hand side of the notes. *See* **Ex. 4** at 136:3–144:8 (highlighting Plaintiff's identification of his habit and practice of writing contemporaneous notes).

64. Plaintiff has retained Dr. Susan Fiester, M.D., F.A.P.A. ("Dr. Fiester") to opine as to his mental and emotional distress in this matter. *See generally*, **Ex. 29**, Dr. Fiester Expert Report.

65. Plaintiff has provided an approximation as to his economic and non-economic damages in this matter. *See generally*, **Ex. 30**, Pl.'s Supp./Amend. Answers to Def.'s First Set of Interrogs.

## II. SPECIFIC DISPUTES AND OBJECTIONS

Plaintiff will list specific paragraphs of Defendant's Statement of Undisputed Material Facts ("SUMF") below which contain disputed facts, along with record evidence.

1. SUMF ¶ 14. Plaintiff's January 31, 2023, complaint to Mr. Faulkner was not his first complaint regarding discrimination, racial slurs, derogatory comments, or a hostile work environment and, indeed, he had been making complaints for months prior to February 3, 2023. *See* **Ex. 2** at 1–5; **Ex. 6**.

2. SUMF ¶ 17. Plaintiff identified both Brad Cannon and Andre Gilliam, as well as "ALL the Operators and Mechanics", as individuals making derogatory comments and racial slurs. *See* **Ex. 13**; *see also* **Ex. 14** at 65:5–11.

3. SUMF ¶ 20. At least one interviewee was not interviewed during the period of February 7 or 8, but on February 1, 2023. *See* **Ex. 15** at 50.

4. SUMF ¶ 27. Defendant cites to no evidence that any employee of Defendant signed any documentation related to the acknowledgement of and agreement to be bound by a "new anti-discrimination policy".

5. SUMF ¶ 31. Plaintiff did raise a complaint of racial discrimination and harassment on February 27, 2023. *See* **Ex. 2** at 1–5; **Ex. 19** at 3 (highlighting that Defendant has admitted that Plaintiff's February 27, 2023, complaint was about discrimination and harassment).

6. SUMF ¶ 37. Plaintiff made no such admission per Defendant's own cited section of Plaintiff's April 3, 2025, Deposition nor in any other part of the record.

7. SUMF ¶¶ 46 and 47. Plaintiff was terminated by Defendant on February 28, 2023, prior to resigning at 9:38 PM. *See* **Ex. 19** at 2 (indicating that Defendant has admitted that it mailed a Notice of Employee Separation to Plaintiff prior to receiving his resignation); **Ex. 21**; **Ex. 23** (noting that "[Plaintiff] is terminated by [Defendant]").

8. SUMF ¶¶ 1, 2, 3, 4, 5, 6, and 48. Pursuant to Fed. R. Civ. P. 56(c)(2), Plaintiff objects that the assertions of fact in these paragraphs are not supported by admissible evidence because the underlying testimony is irrelevant to this matter and has no tendency to make a fact of consequence more or less probable according to Fed. R. Evid. 401. Plaintiff's criminal history has no relevance to this matter whatsoever as evidenced by the fact that Defendant has failed to cite any of these Paragraphs in any portion of its Argument. *See generally* Dkt. 80-1.

9. SUMF ¶¶ 25 and 26. Pursuant to Fed. R. Civ. P. 56(c)(2), Plaintiff objects that the assertions of fact in these paragraphs are not supported by admissible evidence because the underlying material is irrelevant to this matter and has no tendency to make a fact of consequence more or less probable according to Fed. R. Evid. 401. Any change in legal guidance by the State

of Maryland as it relates to carrying firearms does not bear on the facts of consequence which relate to Plaintiff's claims or Defendant's defenses.

10. SUMF ¶¶ 50, 51, 52, 53, 54, and 56. Pursuant to Fed. R. Civ. P. 56(c)(2), Plaintiff objects that the assertions of fact in these paragraphs are not supported by admissible evidence because the underlying Exhibit, the Prince George's Office of Human Rights' ("PGOHR") decision on Plaintiff's administrative claim, constitutes inadmissible hearsay and hearsay within hearsay per Fed. R. Evid. 802 and is more prejudicial than probative per Fed. R. Evid. 403. First, the statements of the PGOHR are out of court statements offered for the truth of the matter asserted and there is no applicable exception. *See* Fed. R. Evid. 802(c). Second, the ultimate question of liability should be left for the jury to determine in the first instance without reliance on PGOHR's initial investigation which the jury may accord greater weight than their own factual conclusions permitting PGOHR to usurp the jury's role as factfinder.

11. SUMF ¶ 55. Defendant has wholly failed to properly support the assertions of fact in this paragraph because it contains no citation to the record.

12. SUMF ¶¶ 8, 9, 27, 31, 32, 37, 41, 42, and 43. Plaintiff asserts that Defendant has failed to properly support the assertions of fact contained these paragraphs because they mischaracterize the evidence cited. For example, Defendants assert that Plaintiff "admitted" certain facts related to the February 27, 2023, shotgun shell incident at ¶ 37. No portion of the cited testimony supports such an assertion.

## III. <u>LEGAL STANDARD</u>

Fed. R. Civ. P. 56(a) requires a district court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact "is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Constr. Co. v. S.R.P. Dev. Ltd. P'Ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A district court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). "Importantly, 'a court should not grant summary judgment unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Foster v. Summer Vill. Cmty. Ass'n*, 520 F. Supp. 3d 734, 740 (D. Md. 2021) (quoting *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F. 3d 52, 55 (4th Cir. 1994)).

"The district court's 'function' is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Courtney-Pope v. Bd. of Educ.*, 2019 U.S. Dist. LEXIS 158056, at *15 (D. Md. 2019) (quoting *Anderson*, 477 U.S. at 249); *accord. Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 203, 216 (4th Cir. 2016). "Thus, in considering a summary judgment motion, the court may not make credibility determinations." *Id.* (collecting cases). "Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Id.* (collecting cases). Further, while the standards for awarding summary judgment apply equally in discrimination cases, even where the motive of intent of the defendant is at issue, "the Fourth Circuit has noted that in evaluating a motion for summary judgment in employment discrimination cases, courts should be careful to grant such a remedy:

> Summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense, courts must take special care in cases such as the instant one because motive often is the critical issue in employment discrimination cases."

*Walker v. MCI Telecomms. Corp.*, 1999 U.S. App. LEXIS 16258, at *11 (4th Cir. 1999) (quoting *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir. 1987)). The Fourth Circuit "has emphasized that 'the aim of summary judgment is not to determine the exact strength of a case and dispose of so-called weak cases, but instead to determine whether a rational jury *could* find in the plaintiff's favor.'" *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254 (4th Cir. 2025) (quoting *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 412 (4th Cir. 2022)).

## IV. ARGUMENT

### a. Defendant Has Not Moved for Judgment as to All of Plaintiff's Claims

While Defendant does state it is seeking *partial* summary judgment, that is exactly the relief it seeks. Defendant has moved as to the following claims: (1) hostile work environment; (2) constructive discharge; and (3) retaliation. *See generally* Dkt. 80-1. Plaintiff has brought causes of action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Maryland Fair Employment Practices Act, Md. Code Ann. State Gov't. § 20-601, *et seq.* ("MFEPA"), and Prince George's County, Md. Code § 2-222, *et seq.* ("PGHRA"). *See generally* Dkt. 1. Included in Plaintiff's causes of action is a claim for discrete discrimination related to, *inter alia*, Defendant's termination of Plaintiff on February 28, 2023. *See id.* at ¶¶ 75–76, 104–05, 107–10, 135–36, 138–41, 159–60, 162–65. Defendant has not moved on this claim and, accordingly, Defendant's Motion should be construed as a Motion for Partial Summary Judgment.

### b. Defendant Has Waived All Affirmative Defenses in this Matter

On March 24, 2025, Defendant affirmatively withdrew and waived its affirmative defenses in this matter in response to Plaintiff's Motion for Sanctions. *See* Dkt. 63. Indeed, the Court denied Plaintiff's Motion for Sanctions as moot because of Defendant's withdrawal of its affirmative

defenses. *See* Dkt. 71 at 2. Accordingly, Defendant cannot raise any affirmative defenses, to include failure to mitigate[1], the "*Faragher/Ellerth*" defense[2], and any affirmative defenses stemming from 42 U.S.C. § 2000e-5(g). This includes Defendant's reliance on *Faragher* in its brief. *See* Dkt. 80-1 at 14–15.

**c. There are Genuine Disputes of Material Fact which Preclude Summary Judgment as to Plaintiff's Causes of Action**

Plaintiff's causes of action pursuant to Title VII, Section 1981, MFEPA, and PGHRA should be construed consistently for the purposes of the motion *sub judice*. *See Jones v. Eli Lilly & Co.*, 2021 U.S. Dist. LEXIS 188903, at *19 (D. Md. 2021) ("A racially hostile working environment under Section 1981 is congruent with a hostile work environment claim under Title VII[.]"); *see also Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 221 (D. Md. 2025) ("The elements of a prima facie claim of retaliation under Section 1981 and the MFEPA are identical to those under Title VII.") (collecting cases); *see also Bryan v. Prince George's Cty., Md.*, 2011 U.S. Dist. LEXIS 71795, at *8 (D. Md. 2011)*, aff'd*, 484 F. App'x 775 (4th Cir. 2012) (explaining that Maryland courts look to Title VII when evaluating state discrimination claims).

**i. Hostile Work Environment**

"The substantive discrimination provision of Title VII makes unlawful an employer's decision to 'discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[, color, religion, sex, or national origin].'" *Laurent-Workman v. Wormuth*, 54 F.

---

[1] *See Wagner v. Dillard Dep't Stores, Inc.*, 17 Fed. Appx. 141, 153 (4th Cir. 2001) ("A failure to mitigate claim is an affirmative defense for which the employer bears the burden of proof.")

[2] *See Lacasse v. Didlake, Inc.*, 712 Fed. Appx. 231, 237 (4th Cir. 2018) ("Even if the supervisor's harassment does not lead to a tangible employment action, the employer may be vicariously liable unless the employer is able to establish a *Faragher-Ellerth* affirmative defense").

4th 201, 210 (4th Cir. 2022) (quoting 42 U.S.C. § 2000e-2(a)(1)). "An employer violates the substantive discrimination provision when it subjects an employee to a hostile work environment." *Id.* (citing *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015)). "Working conditions form a hostile work environment when they are 'permeated with discriminatory intimidation, ridicule, and insult' that 'alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). "The task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008).

"[T]o prevail on a Title VII claim that a workplace is . . . hostile, 'a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)).

Importantly, there is no dispute that the racial epithet "nigger" was used at Defendant's D'Arcy Road worksite. *See* Dkt. 80-1 at 6 ("McGuire and Privitera concluded that there was evidence of inappropriate banter back and forth between employees that occasionally involved racial slurs that was initiated by both Black and White employees."); **Ex. 13** at 1 (indicating that the use of racial slurs and other derogatory comments are used "regularly and consistently at D'Arcy Road; no one day stood out from another because it is so common"); **Ex. 14** at 186:15–187:2; **Ex. 15** at 50 (evidencing statements from Mr. White that "the black fellas get a little harassment. Both on + off jobsite (N word.) They seem to stick up for themselves."). "It is axiomatic that '[f]ar more than a mere offensive utterance, the word nigger is pure anathema to

African-Americans.'" *Reid v. Dejoy*, 2023 U.S. Dist. LEXIS 82893, at *31 (D. Md. 2023) (quoting *Spriggs v. Diamond Auto Glass*, 242 F. 3d 179, 185 (4th Cir. 2001)). "'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.'" *Id.* at *31–32 (quoting *Spriggs*, 242 F.3d at 185).

While there is no dispute that the racial epithet "nigger" was used at Defendant's D'Arcy Road worksite, Defendant attempts to characterize the use of these epithets as only occurring on a handful of occasions. *See* [Dkt. 80-1] at 16–17. However, this statement stands in bold contradiction to the multitude of documentary and testimonial evidence that the use of these epithets was anything but sporadic—it was consistent and regular. *See* **Ex. 13** at 1; **Ex. 15** at 50; **Ex. 1** at ¶ 10–14. This regular conduct was plainly unwelcome and Plaintiff reported it to Mr. Loveless on December 20, 2022, and December 22, 2022, as well as to Ms. Farmer on December 23, 2022. *See* **Ex. 2** at 1–5. Indeed, on January 10, 2023, Plaintiff called Mr. McGuire to inquire about and report on ongoing discrimination and harassment. *Id.* at 3. Further, Plaintiff told Mr. Leach and Mr. Thorness that he did not want them to "refer [to him] as that" and they informed him that he should lighten up. *Id.* at 4–5. "Conduct is 'unwelcome' when it continues after the employee sufficiently communicates that it is unwelcome." *Coleman v. Whitley*, 2022 U.S. App. LEXIS 30391, at *4 (4th Cir. 2022) (quoting *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117 (4th Cir. 2021)); *accord. Strothers v. City of Laurel*, 895 F.3d 317, 328–329 (4th Cir. 2018) ("As this Court has repeatedly held, an employee can demonstrate that certain conduct is unwelcome simply by voicing [his] objection to the alleged harasser or to the employer.").

Plaintiff found the regular use of racial epithets unwelcome. Plaintiff voiced this feeling to supervisors and co-workers. These racial epithets were made because of Plaintiff's protected

characteristic; namely, race. Indeed, Plaintiff was likewise called a "cookie" by Mr. Leach and Mr. Thorness which referenced the movie "Men of Honor" (2000) wherein an African-American was called the same term as a derogatory insult. *See* **Ex. 2** at 4. This racially charged atmosphere was exacerbated by the unrestrained possession of firearms by Defendant's employees at the D'Arcy Road worksite and their willingness to brandish them at the very sight of Plaintiff. *See id.* at 1–5; **Ex. 4** at 146:13–147:22; **Ex. 5**. "The court 'may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or **suffered harassment of a kind likely to be motived by race**.'" *Bailey v. Md. Dep't of Hum. Servs.*, 2024 U.S. Dist. LEXIS 40720, at *10 (D. Md. 2024) (quoting *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 409 (4th Cir. 2022)) (emphasis added). Here, racial slurs, name-calling, and explicitly racist comments (such as "[a]ll black people are slow") are likely motivated by race. Indeed, given this racially charged atmosphere, it is likely that the brandishing of firearms was likewise motivated by race.

Accordingly, Plaintiff can make out a *prima facie* case as to the first two elements of his hostile work environment claim under his various causes of action. The third factor for a hostile work environment is "[t]he 'severe or pervasive' element . . . [which] 'has both subjective and objective components.'" *Sunbelt Rentals, Inc.*, 521 F.3d at 315 (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003)). "First, the plaintiff must show that he 'subjectively perceive[d] the environment to be abusive.'" *Id.* (quoting *Harris*, 510 U.S. at 21–22). "Next, the plaintiff must demonstrate that the conduct was such that 'a reasonable person in the plaintiff's position' would have found the environment objectively hostile or abusive.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81–82 (1998)). The Fourth Circuit went on to explain that:

> This objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. Rather when

> determining whether the harassing conduct was objectively "severe or pervasive," we must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23; *Ocheltree*, 335 F.3d at 333. "[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81–82.

*Id.* While it is clear that "[i]n the Fourth Circuit, plaintiffs must clear a high bar in order to satisfy the severe or pervasive test[,]….ultimately, 'the question of whether harassment was sufficiently severe or pervasive is quintessentially a question of fact." *Delarosa v. Comsource Mgmt.*, 2021 U.S. Dist. LEXIS 163117, at *19 (D. Md. 2021) (quoting *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010)) (internal citations omitted).

Here, Plaintiff subjectively perceived the environment to be abusive. *See* **Ex. 1** at ¶¶ 10–16; **Ex. 3** at 11–14. Plaintiff reported the hostile work environment to his supervisors because he felt it was abusive. *See* **Ex. 2** at 1–5; **Ex. 13**. Further, Plaintiff can show that the work environment at Defendant's D'Arcy Road worksite was objectively abusive. First, as Plaintiff identified consistently through his reporting and in his testimony, the discriminatory conduct was frequent. *See* **Ex. 13** at 1; **Ex. 15** at 50; **Ex. 1** at ¶¶ 10–16. The consistent use of the racial epithet "nigger" and "cookie" at and around Plaintiff shifts the scale of severity away from a mere offensive utterance. *See Reid*, 2023 U.S. Dist. LEXIS 82893, at *31 (quoting *Spriggs*, 242 F.3d at 185). Indeed, the effects on Plaintiff related to being subjected to Defendant's hostile work environment was, and continues to be, severe. *See* **Ex. 3** at 11–14; *see generally*, **Ex. 29**. Plaintiff likewise felt physically threatened by the firearms carried freely around the D'Arcy Road worksite, including when Mr. Baldwin brandished his firearm at Plaintiff with a look of disgust simply because

Plaintiff introduced himself. *See* **Ex. 2** at 2–3. The hostile work environment which Plaintiff was subjected to had a deleterious effect on his work performance in that it fostered a sense of dread, stress, and anxiety, turning his daily routine into a constant struggle. *See* **Ex. 3** at 11–14. Third parties likewise understood that the D'Arcy Road worksite was permeated with racist rhetoric. *See* **Ex. 2** at 5; **Ex. 15** at 50; **Ex. 7**. At bottom, Plaintiff can make out a *prima facie* case for the third hostile work environment element.

Finally, the hostile work environment is imputable to Defendant. As stated *supra*, Defendant has affirmatively waived all affirmative defenses, including the "*Faragher/Ellerth*" affirmative defense. Here, Plaintiff can establish liability through two avenues. First, "[a]n employer may be liable where the victim is harassed by a co-worker only when the employer 'knew or should have known about the harassment and failed to take effective action to stop it.'" *Brown v. Bratton*, 2022 U.S. App. LEXIS 33041, at *32 (4th Cir. 2022) (quoting *Strothers*, 895 F.3d at 333). "Effective corrective action means discipline that is reasonably calculated to end the behavior." *Id.*

Further, "[t]he institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (quoting *Spriggs,* 242 F.3d at 187). "However, the mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." *Id.* (quoting *Spriggs,* 242 F.3d at 187); *see also Sunbelt*, 521 F.3d at 230 ("While the adoption of an effective anti-harassment policy is an important factor in determining whether [an employer] exercised reasonable care, the policy must be effective in order to have meaningful

value."). While "[t]here is no 'exhaustive list' or 'particular combination' of remedial measures or steps that an employer need employ to insulate itself from liability . . . Among other things, [the Fourth Circuit has] considered the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* at 669 (internal citation omitted).

Here, no employee of Defendant was disciplined[3] because of Plaintiff's reports regarding a hostile work environment. *See* **Ex. 19** at 3. Indeed, Defendant took no prompt or other action whatsoever when Plaintiff reported the existence of a hostile work environment in both December 2022 and January 2023. *See* **Ex. 2** at 1–5; **Ex. 6**; **Ex. 11** (showing that it was not until Plaintiff's union representative became involved that Defendant finally began some kind of investigation). Even after Mr. Faulkner contacted Defendant regarding the hostile work environment, Defendant simply conducted interviews and rolled out a new policy without taking any form of disciplinary action. *See generally*, **Ex. 15**. Defendant knew or should have known about the harassment and failed to take effective action to stop it. Even in matters where the employer's response to a report of harassment was more robust, the Fourth Circuit has found that there exists a jury issue for trial. *See Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 233 (4th Cir. 2022) (citing *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 177 (4th Cir. 2009)).

Further, Defendant's policies related to reporting harassment, including race-based harassment, do not provide "reasonable procedures for victims to register their complaint." *Ocheltree*, 335 F.3d at 334. During the period of early 2022 through February 13, 2023, Defendant had "Anti-Discrimination/Harassment Policies"; however, Defendant and Mr. McGuire have

[3] It is significant that after the initial February 3, 2023, meeting between Mr. McGuire, Ms. Privatera, and Plaintiff, it was noted that "[t]here should be disciplinary action taken for someone involved" and yet Defendant admits that no one was disciplined. *See* **Ex. 13**.

testified inconsistently as to which policy was in force during that period. *Compare* **Ex. 27** at 26:9–21 *and* **Ex. 28** *with* **Ex. 16** at ¶ 6, p. 10–13. Importantly, both potentially applicable policies "fail[] to place any duty on supervisors to report incidents of [] harassment to their superiors." *Ocheltree*, 335 F.3d at 334. This is important because "[i]n any case, in deciding whether a company has reasonable complaint procedures, a jury may give negative weight to the fact that a scheme does not require a supervisor, with whom complaints of [] harassment must be lodged in the first instance, to forward unresolved complaints to a higher authority." *Id.* at 335. This pitfall is contrasted by Defendant's policy rolled out on February 14, 2023, because therein Defendant commands "[a]ny manager or supervisor who is aware of conduct inconsistent with this policy or who receives a report of conduct inconsistent with this policy being directed towards another employee or an individual they supervise is to act and report the conduct immediately to Human Resources or Safety Manager" and provided a phone number for contacting the same. *See* **Ex. 16** at 18–20.

Yet for Plaintiff, Defendant failed to take prompt action in relation to his December 2022 and January 2023 complaints, failed to discipline any employees, and ultimately failed to stop the harassment which culminated in the February 27, 2023, shotgun shell incident, Defendant has failed to take "effective action", and liability can be imputed to Defendant for the D'Arcy Road worksite's hostile work environment. *Brown*, 2022 U.S. App. LEXIS 33041, at *32. At bottom, a reasonable jury, after considering the evidence contained herein and that which will be presented at trial, could return a verdict in Plaintiff's favor for his claim of hostile work environment. Indeed, there are various factual disputes as to this particular claim related to when Plaintiff reported the hostile work environment, how he reported it, to whom he reported it, the severity and pervasiveness of the work environment, the reasonableness of Defendant's policies and

procedures, and whether any action taken by Defendant was effective or ineffective. Accordingly, the Court should deny Defendant's Motion as to Plaintiff's hostile work environment claim.

**ii. Constructive Discharge**

Defendant states that Plaintiff "must show *both* 'intolerable working conditions' *and* a 'deliberate effort by the employer to force the employee to quit.'" [Dkt. 80-1] at 21 (quoting *Dones v. Donahue*, 987 F. Supp. 2d 659, 668 (D. Md. 2013)). This is a misrepresentation of the law. As explained by the Fourth Circuit:

> Critically, however, "as a result of intervening Supreme Court case law, 'deliberateness' is no longer a component of a constructive discharge claim." *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (citing *Green v. Brennan*, 578 U.S. 547, 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016)). That is, "[t]he Supreme Court now has clearly articulated the standard for constructive discharge, requiring objective 'intolerability'–'circumstances of discrimination so intolerable that a reasonable person would resign'–but not 'deliberateness,' or a subjective intent to force a resignation." *Id.* (quoting *Green*, 578 U.S. at 560).

*Chapman*, 48 F.4th at 235. Accordingly, Plaintiff "must show that (1) '[he] was discriminated against by his employer to the point where a reasonable person in [his] position would have felt compelled to resign' and (2) '[he] actually resigned.'" *Hammoud v. Jimmy's Seafood, Inc.*, 2024 U.S. Dist. LEXIS 94974, at *49 (D. Md. 2024) (quoting *Green*, 578 U.S. at 555). In a constructive discharge claim, "[t]he 'frequency of the conditions at issue' is critical to a finding of intolerability." *Hammoud*, 2024 U.S. Dist. LEXIS 94974, at *55 (quoting *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019)). Indeed, "[t]he more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Evans*, 936 F.3d at 193.

Here, Plaintiff can show that he worked in intolerable working conditions which compelled and forced him to resign. First, as explained *supra*, there is myriad evidence that Plaintiff was

subjected to a severe and pervasive hostile work environment. Indeed, this work environment was severe and pervasive because racial slurs and other derogatory comments were used “regularly and consistently at D’Arcy Road; no one day stood out from another because it is so common”. *See* **Ex. 13** at 1. The deleterious effect of these regular and consistent use of these racial slurs and derogatory comments was compounded by the physically threatening presence of firearms in the workplace, including when they were brandished at him in a transparent display at intimidation. *See generally*, **Ex. 2**; **Ex. 4** at 146:13–147:22; **Ex. 5**. This hostile environment began “basically” from Plaintiff’s very first day of employment. *See* **Ex. 4** at 161:8–14. The hostile work environment continued until the final days of Plaintiff’s employment, culminating in the February 27, 2023, shotgun shell incident. On that day, Plaintiff discovered an unused shotgun shell in his assigned vehicle for the day. *See* **Ex. 2** at 10–12. Plaintiff felt that the shotgun shell was left as an intimidation tactic and a “warning from [Defendant] another form of intimidation because of [Plaintiff’s] race.” *See id.* at 12; **Ex. 4** at 188:1–11, 189:10–16. Plaintiff recognized that the individual who had been driving the vehicle prior to him “was part of the–the whole group that was doing all the racial slurs and the joking and all that great stuff”. *See* **Ex. 4** at 185:11–22.

Plaintiff feared for his life after seeing the shotgun shell and reported it as soon as he was able, to Mr. Loveless. *See id.* at 189:17–190:20. Indeed, Plaintiff was so distraught about this incident he informed his therapist who wrote a letter dated February 28, 2023, advising him that he should not return to work. *See* **Ex. 25**. At the meeting with Mr. McGuire and Mr. Faulkner, Plaintiff explained that he believed the shotgun shell incident was motivated by his race. *See* **Ex. 2** at 10–12; **Ex. 19** at 3 (indicating the Defendant has admitted that Plaintiff reported that the shotgun shell incident was discriminatory). Mr. McGuire permitted Plaintiff to take the rest of the day on February 27, 2023, off as well as February 28, 2023, until the investigation was complete.

*See* **Ex. 2** at 11. Defendant has admitted that the investigation into the shotgun shell took less than 24 hours. *See* **Ex. 19** at 3. On February 27, 2023, at 6:44 PM, Mr. McGuire informed Plaintiff that dispatch expected him to arrive by 7:30 AM at the D'Arcy Road worksite on February 28, 2023, "[o]therwise, if you choose not to show up, then we will assume that you will no longer be employed with [Defendant]". **Ex. 20**. Faced with the impossible choice of either returning to an intolerable work environment where Plaintiff felt his life was threatened by his coworkers or resigning, Plaintiff resigned at 9:38 PM on February 28, 2023. *See* **Ex. 24** (Plaintiff noting in his resignation email that he resigned "because of intolerable work conditions or treatment").

Plaintiff's constructive discharge claim is not centered on simply "difficult or unpleasant working conditions", Plaintiff was subjected to a work environment that a reasonable person in his position would have felt compelled to resign. *Evans*, 936 F.3d at 193. There is a triable issue of fact as to Plaintiff's constructive discharge claim pursuant to his causes of action and that issue should be submitted to a jury for resolution. The Court should thus deny Defendant's Motion.

**iii. Retaliation**

Defendant presents a single argument as to why Plaintiff's retaliation claim pursuant to his various causes of action should not proceed: Defendant took no adverse action against Plaintiff. *See* [Dkt. 80-1] at 23. This is false. "To make a prima facie claim of retaliation, a plaintiff must show: (1) that she engaged in protected activity, (2) that the employer took a materially adverse action against her and (3) there is a causal connection between the protected activity and the adverse action." *Evans*, 936 F.3d at 195. Plaintiff engaged in a protected activity on each and every date[4] which he reported a discriminatory hostile work environment, harassment, or discrimination

[4] The dates are listed here *ad seriatim*: (1) December 20, 2022; (2) December 22, 2022; (3) December 23, 2022; (4) January 10, 2023; (5) January 13, 2023; (6) February 3, 2023; and (7) February 27, 2023.

to his supervisors and opposed unwelcome conduct at Defendant's D'Arcy Road worksite. *See Landino v. Sapp*, 520 Fed. Appx. 195, 198 (4th Cir. 2013) ("Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'").

Defendant did take a materially adverse action against Plaintiff: "[Plaintiff] [was] terminated by [Defendant]". *See* **Ex. 23** at 1. Importantly, at no point during the February 27, 2023, meeting with Mr. McGuire or Mr. Faulkner did Plaintiff state that he wanted to quit his employment with Defendant. *See* **Ex. 4** at 195:11. Indeed, Plaintiff requested that he be moved to a different worksite or location and remain in Defendant's employ. *See* **Ex. 2** at 11; *see also id.* at 192:21–196:7 (identifying that Plaintiff did not want to quit and that Mr. McGuire informed Plaintiff that he would look into sending Plaintiff to another location). After the February 27, 2023, meeting, Mr. McGuire informed Plaintiff that if he did not return to work the following day at 7:30 AM, Defendant "will assume that you will no longer be employer with [Defendant]". *See* **Ex. 20**. Defendant has admitted that it ended Plaintiff's employment prior to receiving his resignation email on February 28, 2023, at 9:38 PM. *See* **Ex. 19** at 2; **Ex. 21**.

"No specific words or acts are required in order to show an actual discharge". *Madock v. McHugh*, 2011 U.S. Dist. LEXIS 92392, at *72 (D. Md. 2011). "[A]n employer does not need to use the words 'fired', 'discharged,' or 'terminated' in order for a plaintiff to establish a discharge." *Id.* "Rather, 'an actual discharge occurs when the employer, by words or acts, manifests a clear intention to dispense with an employee's services.'" *Id.* (quoting *Payne v. Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977)). Indeed, "An employer cannot avoid a finding of an adverse employment action by unilaterally declaring that certain employee actions will be deemed a resignation." *McInerney v. United Air Lines, Inc.*, 463 Fed. Appx. 709, 721 (10th Cir. 2011). Notwithstanding Defendant's characterization of the record, Defendant acted on February 28, 2023, prior to ever

receiving a resignation from Plaintiff, and ended his employment. "Termination is an adverse employment action for *prima facie* purposes." *Atkins v. Winchester Homes*, 2007 U.S. Dist. LEXIS 5791, at *29 (D. Md. 2009).

Finally, Plaintiff must show a causal relationship between the protected activity and the adverse action. *Evans*, 936 F.3d at 195. "[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (quoting *Strothers*, 895 F.3d at 335). "Indeed, 'very little evidence of a causal connection is required to establish a prima facie case of retaliation.'" *Id.* (quoting *Roberts*, 998 F.3d at 127). "'[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity.'" *Yancy v. Becerra*, 2021 U.S. Dist. LEXIS 176417, at *20 (D. Md. 2021) (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Here, Defendant had clear knowledge of Plaintiff's protected activity on February 27, 2023, when Defendant admitted Plaintiff made a complaint related to discrimination to Mr. McGuire. *See* **Ex. 19** at 3.

Even assuming, *arguendo*, that Defendant was somehow not aware of the February 27, 2023, protected activity, Plaintiff's February 3, 2023, protected activity was investigated and was clearly known to Defendant. *See generally*, **Ex. 13**. On these facts *alone*, there is sufficient evidence the support a causal connection. *See Timbers v. Telligent Masonry, LLC*, 2022 U.S. Dist. LEXIS 52816, at *17 (D. Md. 2022) ("[T]emporal proximity of only a few days is clearly sufficient to support a reasonable inference of causation."); *see also Fosters v. Univ. of Md. E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015) ("[Plaintiff's] evidence of temporal proximity also tends to show causation: . . . she complained to [Human Resources] about perceived retaliation on September 21,

2007, and again on September 28, 2007, just a month before she was terminated."); *see also King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (finding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity). Plainly, Plaintiff can show a *prima facie* case of retaliation pursuant to his various causes of action.

Importantly, Plaintiff's retaliation and constructive discharge claims are the subject of a core dispute of fact which only a fact finder will be able to resolve: was Plaintiff terminated or did he resign? Plaintiff's position, as evidenced herein, is that he was terminated prior to submitting his resignation. Defendant's position is that Plaintiff simply resigned. This gridlock cannot be resolved via Fed. R. Civ. P. 56, and the dispute must be submitted to a finder of fact. Accordingly, the Court should deny Defendant's Motion.

**d. Whether Plaintiff's Mental Health Conditions Predated His Employment is Immaterial**

Defendant's final argument[5] in support of its Motion is confounding and disingenuous. Indeed, Defendant's only cited authority for this section of its Motion is in no way related to discrimination or injury law. *See Nguti v. Safeco Ins. Co.*, 2017 U.S. Dist. LEXIS 99101, at *7 (D. Md. 2017) (showing that the damages analysis relates to breach of contract damages which must be proven with reasonable particularity).

First, Plaintiff will be proffering Dr. Fiester to provide expert testimony as to Plaintiff's emotional and mental distress, the cause or exacerbation of that emotional and mental distress, and expected future treatment to a reasonable degree of medical certainty. Second, Plaintiff's treating

[5] Defendant's title for this section in its Motion references Plaintiff's past and unrelated felony convictions as somehow related to his damages. Defendant completely fails to articulate any rationale whatsoever for this position in the substantive portion of that section. Accordingly, any such argument should not be considered. *See* [Dkt. 80-1] at 23–24.

therapist testified that Plaintiff's PTSD was aggravated by his time working for Defendant. *See* **Ex. 26** at 70:11–71:2. Third, Plaintiff testified that he is seeking emotional distress damages. *See* **Ex. 4** at 92:1–4. Indeed, Plaintiff testified at length about his emotional distress damages in his answers to Defendant's interrogatories. *See* **Ex. 3** at 11–14; *see also* **Ex. 30**. Insofar as Defendant is challenging the factual basis of Plaintiff's mental and emotional distress damages, that is an issue best left to trial because Plaintiff genuinely disputes it and because expert testimony will be proffered on the issue of causation of damages.

Finally, Defendant claims that Plaintiff cannot even claim exacerbation damages for any pre-existing condition related to his causes of action. There is no citation to any case in support of this proposition, and such a statement stands in contradiction to previous awards in the Fourth Circuit. *See Taylor v. Republic Servs., Inc.*, 968 F. Supp. 2d 768, 805 (E.D. Va. 2013) (awarding the plaintiff mental and emotional distress damages for exacerbation of a preexisting condition after the conclusion of trial). For the reasons stated herein, Plaintiff has marshalled facts and evidence, including testimony from a proposed expert witness, in support of his mental and emotional damages claims.

## V. <u>CONCLUSION</u>

Based on the foregoing, the Court has ample cause to deny Defendant's Motion for Summary Judgment in its entirety and permit Plaintiff's claims and causes of action to be submitted to a jury of his peers for final adjudication.

**[SIGNATURE BLOCK ON NEXT PAGE]**

Respectfully submitted,

*/s/ Thomas J. Eiler*
Thomas J. Eiler, Esq., Bar No. 30622
Robert W.T. Tucci, Esq. Bar No. 31356
Zipin, Amster & Greenberg, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
(301) 587-9373
(240) 839-9142 (f)
teiler@zagfirm.com
rtucci@zagfirm.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of September 2025, a copy of the foregoing was served via electronic and/or first-class, postage pre-paid, mail upon:

Jake B. Mitchell, Esq. Bar No. 30736
Michael S. McNamara (*admitted pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
jake.mitchell@pillsburylaw.com
michael.mcnamara@pillsburylaw.com
*Counsel for Defendant*

*/s/ Thomas J. Eiler*
Thomas J. Eiler, Esq.