# EXHIBIT 4

Planet Depos
We Make It Happen™

**CONTAINS CONFIDENTIAL INFORMATION**

# Transcript of Carl Nelson

**Date:** April 3, 2025
**Case:** Nelson -v- Crane Service Co., Inc.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

\- - - - - - - - - - - - x

CARL NELSON, :

Plaintiff, :

v. : Case No. 8:24-cv-00766-ABA

CRANE SERVICE CO., :

INC., :

Defendant. :

\- - - - - - - - - - - - x

CONTAINS CONFIDENTIAL INFORMATION

STIPULATED PROTECTIVE ORDER

DEPOSITION OF CARL NELSON

Held Remotely

Thursday, April 3, 2025

10:05 a.m. Eastern Standard Time

Job No. 579035

Pages: 1 - 247

Reported by: Janet A. Hamilton, RDR

mean --
MR. McNAMARA: The witness.
MR. EILER: Yeah. I mean, I object as it relates to a legal conclusion, but you can answer the question.
Q It is a confusing question. So why don't I ask a new question.
MR. EILER: Yeah.
Q Sir, by producing -- or is -- back up.
You've waived the privilege that you would otherwise have that would have kept confidential your communications between you and your psychotherapist; is that right?
A Yes.
Q Okay. And the reason you waived that is because you plan to use those same communications against my client in support of your claim?
MR. EILER: Objection. Form. Same communication. That's really my only issue. Just make it very clear on the record. You can answer the question, but, yeah, my objection stands.
A I'm not sure.

Q Okay. Well, you plan to seek emotional distress damages from Crane Service in this case; is that right?
A Yes.
Q Okay. And the -- you know, your therapy with H.O.P.E. Behavioral services has -- has been -- the reason you're seeking that therapy is to try to alleviate that same emotional distress; right?
MR. EILER: Objection. Form. You can answer.
Q Maybe -- and I'm not trying to be confusing. Maybe if I take it one step at a time, it will be easier.
We're going to get into what happened at Crane Service later, but is it true that you suffered emotional distress as a result of what happened to you at Crane Service?
A Yes.
Q Okay. And you plan to seek damages for that emotional distress in your lawsuit against Crane Service?

A Yes.
Q Okay. And the records that we see -- well, let me back up.
And you sought counseling at H.O.P.E. Behavioral services because of that same emotional distress?
A Could you rephrase the question?
Q Sure. After you suffered emotional distress, you went to the therapist?
A From Crane Service?
Q Yes.
A I was already -- I was -- it was -- my therapy was ongoing.
Q Okay. Okay. Because you were suffering from emotional distress before you ever started working at Crane Service?
MR. EILER: Objection. Form.
You can answer.
A No.
Q Okay. You were suffering from post-traumatic stress disorder before you started working at Crane Service?

A It was a PowerPoint so, you know, it was what they present.

Q Okay. You thought that it did the job that it was supposed to do?

MR. EILER: Objection. Form. Asked and answered.

You can answer.

A Can you rephrase the question?

Q The training was -- was sufficient to accomplish its purpose?

MR. EILER: Objection. Form. Asked and answered.

You can answer.

A It was -- it was supposed to be given to all new hires, so I guess that's -- you know, if you're implying that did I take up the actual orientation, yeah, it did its objective. I went through it. It has successfully received a certificate of -- with Crane Service stamped on there that I successfully completed.

Q Okay. Let's do tab 21.

REMOTE TECHNICIAN: Exhibit 7.

(Nelson Deposition Exhibit 7 was marked for identification.)

Q So Exhibit 7 is a set of handwritten notes. The Bates numbers start at Nelson 11 and they finish at Nelson 23; is that correct?

A Yes.

Q Okay. And are these your handwritten notes?

A Yes.

Q When did you take them?

A During all the incidents occurred. I always take notes.

Q Was it your practice to take notes about your employment in your previous jobs before you worked at Crane Service?

A I mean, yeah. I had experience, again, you know, as a therapist. So I always took notes.

Q Okay. And I want to be a little bit more specific about my -- my "when" question.

If you look on the very first page, there is -- at the top left, there's 11/ -- looks like 1-5; is that right?

A Yes.
Q And what does that mean?
A Like I say, it says contact Brian Mazzella on the exhibit.
Q My question is the 11/15. Is that a reference to November 15th?
A Correct.
Q Okay. And is it your testimony that the -- the words to the right of 11/15 are notes that you took on November 15th?
A Yes.
Q And then if you go down to 11/17, that's a reference to November 17th; right?
A Correct.
Q And is it your testimony that you -- the -- the words to the right of 11/17 are notes that you took on November 17th?
A Correct.
Q So my question is going to be as you go through this -- and I'm going to give you a minute to read it after you hear my question, before you answer.

I want to know if your testimony is for each date in the left column, were your notes in the right-hand part of that taken on that date?

A They were all on different papers, like, you know, whatever I had my -- get my hand on at that moment. I had it on -- I had notes on napkins. I had notes on the receipts. I had notes on different stuff. And what I did was I took the notes and wrote them in the actual pad.

Q Okay. When did you write them onto this pad that we -- that's now Nelson 11 through Nelson -- sorry -- 23?

A I believe I started doing it around about December 21st or 22nd, from, you know, observing and hearing and experiencing the racial slurs.

Q Okay. So from -- does that mean from December 22nd on, the -- the notes that we see on this paper are -- were taken in the first instance, as opposed to transcribed from a napkin or some other place?

A It still did so. I mean I still did that because I didn't walk around with a book all day,

you know, so...

I wasn't expecting these things to happen as well, so when it happened I just wrote it down, you know, so I could keep in my memory, you know, throughout the day when -- so at the end of the day I could write it down.

Q Okay. So -- so did -- so were some of these notes then written on this document after the day in question?

A What date in question?

MR. EILER: Object to form.

Q Yeah. So what I mean by that is are there some notes in the right-hand column where you actually wrote the words down on a date other than the date that corresponds in the left column?

So, for example, on -- let's say Nelson 18. Why don't you go to Nelson 18.

MR. EILER: Objection. Form.

I don't know the question, Tom.

Q Are you on the page that's Bates stamped Nelson 18, sir?

A Yes.

Q So according to this, there were notes that correspond to February 14th, February 17th, and February 18th.
Do you see that?
A Yes.
Q What I'm asking is, are the -- the notes to the right of February 14th, did you write those on February 14th?
A Yes, I did.
Q And the notes that were next to -- next to 2/17, did you write those on February 17th?
A Yes.
Q And so does that -- that consistently goes through all of the notes on this document, that you actually wrote those words on the corresponding date?
A Correct. It says December -- like I say, 21st, 22nd, when the first -- you know, got it going with the racial slur.
But I backtracked from my first date I started putting it together. Like, okay, well -- you know, just started -- it made sense, you know,

November 15th, I had an interview. Brent Loveless said I would be one of the best oilers. He needed a guy that knew traffic control, but I never was sent out. So, you know, I started to take notes.

Q Okay. So why don't you go to the page that's Nelson 22.

And so is it your testimony that the words to the right of 2/28 are notes that you took on February 28?

MR. EILER: Objection. Asked and answered.

You can answer.

A On the 28th, not all of it. No.

Q What words did you write after February 28th that are in that right-hand column on that page, Nelson 22?

A The -- where you got the line drawn in there from the left where it says "for discrimination," and then it goes up and the line goes through. And it says "pretext."

Q Mm-hmm.

A That --

Q The words below that line were written later?
A Correct. That was -- that was -- that was done once I received the actual certified letter talking about --
Q So you wrote --
A It was afterwards.
Q So is it your testimony that you wrote on February 28th, "approx 4 p.m. a certified letter of separation (termination) was sent out to my residence"?
A Right.
Q You wrote that on February 28th?
A No. That's the date. That's the date that I put in when I actually received the -- I mean that's the date was dated on the actual separation letter, just saying that, you know, on this date is when it was being sent to me at this time. So that's why I wrote it that way.
Q Okay. So you didn't write any of those words on February 28?
MR. EILER: Objection. Form.

Which words? I'm trying to --
Q The words to the right of 2/28, you didn't write any of those on February 28th?
A It was on another piece of paper. The portion that's on the bottom was -- so where it says, "For discrimination," you see that line to the left?
Q Yes.
A And how it goes up and then -- and so where it says "approximately 9:38 p.m., reported Rickey follow-up e-mail."
Q Yes.
A That -- that whole paragraph was on another paper or note. So I wrote this whole paragraph after I received the actual certified letter, so I just put on, you know, the whole thing transpired all together, just so it would be shown that this is what occurred on the 28th.
Q Okay.
A Yeah.
Q So you wrote -- so I'll ask the question again. I feel like we're -- we'll eventually get

there.
All of the words on this piece of paper, Bates stamped Nelson 22, that are to the right of 2/28, were actually written after February 28th?
A Correct. The other bottom portion was on another paper. So I didn't write -- I didn't write that part yet on the book -- on the actual conversation book.
Q Okay.
MR. McNAMARA: Let's go to Tab 22.
REMOTE TECHNICIAN: Exhibit 8.
(Nelson Deposition Exhibit 8 was marked for identification.)
Q So Exhibit 8 is a document that's Bates stamped Nelson 436 through 442.
Do you see that?
A Yes.
Q Okay. And are these photos that you took?
A Yes.
Q What device did you use to take these photos?
A Cell phone.

Q What kind of cell phone do you have -- or what kind of cell phone did you use to take these photos?
A Can you rephrase the question?
Q Was it an iPhone?
A It was an Android.
Q Android?
A Yes.
Q Okay. And do you still have that phone?
A Not that particular one, no.
Q Did the -- did the photos get transferred from that phone to a new phone?
A Majority, yes.
Q Okay. The first photo on the page that's Bates stamped Nelson 436, it doesn't have a date or time stamp on that page.
Do you see that?
A The -- what you mean, of the actual photo?
Q Yeah.
A Is actually on page -- the very next page, 437.
Q So I see a new photo with a date and time

stamp of December 22nd, 2022.

A That's the same photo, it's cropped. If you have the actual time, you know, it presses out the photo itself.

Q But the -- your phone would be able to tell you not only the date but also the location?

MR. EILER: Objection insofar as it calls for speculation.

You can answer.

A I know with photos they do provide the date. I don't believe that they do location unless you manually modify it that way.

Q So who is the individual whose picture is taken in this photo on page Nelson 436?

A That's John Baldwin.

Q How do you spell that last name?

A I believe it's B-A-L-D-W-I-N, I believe.

Q John Baldwin?

A Yes.

Q And who is John Baldwin?

A He's an operating engineer.

Q At Crane Service?

A Correct.
Q Okay. And why did you take this photo?
A Well, clearly, I mean, the guy just, you know, flashed his pistol at me.
Q Is that what's shown in this photo is him flashing his pistol at you?
A Yes, sir.
Q So he doesn't have his hand on the pistol, does he?
A No. Actually before I took this photo he had it concealed, but when I introduced myself, when I -- you know, when I noticed the guy came in, I rode out and I introduced myself, you know, just being a, you know, new hire, trying to have a good, you know, code of ethics. The guy looked at me slowly and, you know, like with a disgust type face and raised his hoodie up and then turned away from me. And this is the -- the outcome of, I should say, his position after he turned away from me, caught the end of the shirt up at me. And I just took a picture of it because I felt as though that it was needed to be.

Q Okay. Could he see you taking the picture?
A I don't think he saw me, no. I left.
Q Okay. And so that's the same photo that's in Nelson 437?
A Correct.
Q Okay. And then in Nelson 438 -- oh, actually on Nelson 437, that photo, where was that?
A That's in the lower shop and --
Q At Crane Service?
A Yes, sir.
Q Okay. Did you report in writing to anyone at Crane Service the name of the individual in the pictures on 437 and 436?
A At that time I didn't know his name.
Q When did you learn his name?
A Adam told me that the guy name was John. He didn't say his last name. He said that that date.
Q You said on December 22nd that the man with the gun was named John?

A None of them had it. None of us had it.
Q Not -- one question at a time.
A Sure.
Q Did you have a commercial driver's license at that time?
A No. It wasn't required.
Q Okay. Do you know, as you sit here today, whether any of those other apprentices had a commercial driver's license at that time?
MR. EILER: Objection. Form. Asked and answered.
You can answer.
A Some had, but majority didn't.
Q How do you know that?
A They told me. Let alone they were getting assigned to the pickup trucks, not an actual 18-wheeler to take out the equipment.
Q Okay. So your first written complaint was to the union representative, Mr. Faulkner, at the end of January 2023?
A I'm sorry.
Q Is that right?

A Could you repeat -- repeat the question for me?
Q Sure.
Your first written complaint about race discrimination was made to the union rep, Mr. Faulkner, at the end of January 2023?
A Yes.
Q Okay. How long had the discrimination been going on at that point?
A What, a month, month and a half -- month or so. A little over a month.
Q Basically from the -- from the very first day you were there?
A Correct.
Q Okay. Why did you wait so long to make a written complaint?
A Well, it was all verbal. I did form complaints verbally. They kept telling me and promising me that they was going to take care of it, they were going to, you know, do an investigation, don't worry.
So I was actually giving them time to

actually come back and tell me -- let me know what their outcome was.
Q And did they?
A No.
Q Okay.
A That's why I did the written complaint.
Q And what happened after that?
A It seemed like it got worse.
Q What happened -- what happened after you turned in your written complaint to Mr. Faulkner?
A To my understanding, he forwarded to Brian Mazzella and Mr. McGuire, I believe.
Q And what was the next that you heard about anything with respect to that complaint?
A Mr. McGuire said he wanted to see me or, you know, talk to me about it. So he called me in the office just to discuss it. I believe it was on the 3rd.
Q Okay. Tell me about that discussion. Who was there?
A It was myself, Rickey McGuire, and I don't know the lady that was there. They said that she

shell in there.
Q I see. What you're saying is you certainly would have lifted the seat up.
A Correct. Like this vehicle right here, I drove this vehicle a number of times and cleaned it out.
Q Right. But I'm asking a different question. I'm not asking whether it was inevitable that you were going to clean the vehicle. I get that that's your position. I'm asking a different question.
A Sure.
Q My question is: If you had never lifted the seat, you would have never seen the shotgun shell. True or false?
MR. EILER: Objection. Asked and answered. Form.
You can answer.
A True. If I -- if I never did my job cleaning the vehicle, I wouldn't have never saw that, no.
Q What was your reaction when you saw the

shotgun shell?

A I was afraid because I took --

Q Of what?

A I took that as an extreme, serious threat. Either you going to be quiet or this is what you're going to get, that's how I took it.

Q From whom?

A I'm sorry?

From Crane Service Company themselves, possibly the owner.

Q Do you have any reason to believe that it was a particular individual who left the shotgun shell there?

A Well, they -- the guy that brought the vehicle, again, he used that vehicle over the weekend. So I don't -- I don't know. I know that he was part of the -- the whole group that was doing all of the racial slurs and the joking and all that great stuff, so, you know.

And, you know, he had a third-year apprentice with him as well, so they could have did it.

But Mr. McGuire, during that meeting in February 27th, were trying to take it away from him that he didn't do it, rather that shotgun shell was placed in a car a year, or two years or so prior, to some former employee, which that didn't sound right.

Q But other than the fact that the shell was there and you could identify the people who used the truck before, what -- what did you -- what facts suggested to you that any particular individual put the shell there?

A Well, again, I always -- I always used that vehicle as well. We -- all the apprentices used that vehicle, and after our job we have to clean the vehicle. So there was no shotgun shell ever in that vehicle prior to that date, never.

Q So you think that it was the individual who used the vehicle immediately before you who must have put the shell there?

MR. EILER: Objection. Mischaracterizes. Form.

You can answer.

A I don't -- I don't want to speculate, but that's what Crane Services need to do the investigation about, and that's what they told me that they were going to do.

Q I'm asking why you think that it was a particular -- like, do you have a name of a person who you think put the shotgun shell there?

MR. EILER: Objection. Form.

You can answer.

A No. I didn't see anyone.

Q You have no idea who put it there?

MR. EILER: Objection. Form. Speculation.

You can answer.

A No.

Q I asked a poor question. I'll ask the question this way.

Do you have any idea who put the shotgun shell there?

A No.

Q Okay. How did you -- you said you felt threatened. What do you mean by that?

A Well, I mean, from the nature of the -- you know, the whole complaining and all that great stuff and then, you know, unfortunately my nationality and the history of how this -- you know, what we know about the racism and all that great stuff. Yeah, it was clear, because back in those days certain individuals would put, like, crosses burning in front someone's house or they would put something with a noose around there, you know, just various things. And, of course, that stood out to me as one of those acts.

Q So you interpreted this shotgun shell as the equivalent of burning a cross --

THE REPORTER: I'm sorry. You spoke over.

A Oh, sorry.

Q Try to let me finish my question before you answer.

So do I understand you correctly that you interpreted the shotgun shell there as the equivalent of burning a cross, the Ku Klux Klan burning a cross in a black person's front yard?

MR. EILER: Objection. Mischaracterizes

testimony of a witness.
You can answer.
A Yes.
Q And you viewed the shotgun shell being left in that truck as the equivalent of the Ku Klux Klan hanging someone in effigy in a black person's yard?
MR. EILER: Objection. Mischaracterizes.
You can answer.
A I'm saying that there are different acts that, yes, the Ku Klux Klan or whoever is racial, you know, racist, their conduct is a number of what they call scoffing, you know, and as well as an intimidating tactic. So, yes. I did take that as an intimidation tactic, of course. Who wouldn't?
Q Did you fear for your life after you saw the shotgun shell?
A That's why I did the complaining.
Q Is that why you left Crane Service's employment?
MR. EILER: Objection. You can answer the

question. Form.
A Well, I didn't leave. I -- I was supposed to be transferred, but by that never was going to happen, ultimately I actually wrote an e-mail without knowing that I was already terminated prior before I wrote my e-mail.
Q So you feared for your life after you saw the shotgun shell. What did you do next immediately after you saw the shotgun shell other than taking the picture?
A Well, I had to take the company's gas card back. So I went -- you know, drove back to the office. I put the diesel into there so I could, you know, gas up the crane, you know, where I was being dispatched, and I talked to Mr. Loveless. I told Mr. Loveless that I was going to do some complaining. Yeah, but we were already late. I was already late to the job site because of, you know, the guy didn't bring the vehicle on time. So I was already about an hour or so late.
Q So these -- the office that you went to, was that D'Arcy Road?

A Correct.

Q So you reported to D'Arcy Road in the morning in Prince George's County, Maryland; right?

And that's -- and you saw the shotgun shell at a gas station that was very close by the D'Arcy Road office; right?

A Yes.

Q But my question is after you saw the shotgun shell and you feared for your life, what did you do?

A I took the gas card back. I went straight.

Q Back to the D'Arcy Road --

A Yes. I gassed the vehicle up, and all that great stuff, you know. I took the vehicle back. I went back to take the gas card back. Then when I took the gas card back, I briefly told Mr. Loveless that I will be doing some complaining about this shotgun shell. He was shocked that it was a shotgun shell in the vehicle.

Q Okay.

A So I told him verbally that I will be doing a complaint, and then I went to the job site.

Q You drove -- which was in Ashburn, Virginia?

A Correct.

Q About an hour's drive away?

A About.

Q And you worked on that job site for a shift?

A For whatever task that I had to do, yeah. Once I completed the task, I left.

Q So why did you continue on with your work that day if you feared for your life?

A I'm sorry. I'm confused what you're implying.

Q Well, you said you feared for your life after you saw the shotgun shell. Why did you continue working?

A I complained.

Q I understand you complained, but then after you complained, you continued working. So

my question is, why did you continue working after you feared for your life?

A Sure. No worries. A union member cannot just quit a job. We can't just quit a job. We have to go through channels to get permission. Can't just -- that would have -- if I would have just quit, you know, sir, I would have been thrown out of the apprenticeship program, and I didn't want to risk my career. So I did it proper channels. I complained and stuff like that, was taking the proper channels.

Q What channels did you have to go through before you left?

A Well, first I complained, and then we had a meeting. And then they said that they was going to do an investigation, see if I can be transferred to another location, but Mr. Faulkner was letting them know that I can't just quit a job. He was letting Mr. McGuire understand that that -- that I can't just quit. I have to actually do a written resignation and I got to get approval from them because it's about the

circumstances of your resignation -- your resignation.

So you can't just quit a job without any repercussions. You have to get permission or it has to be -- how can I put it? I guess the A-okay to do so by Faulkner as well as Berry Gilroy.

Q Did you tell Mr. Faulkner that you wanted to be transferred to a different company?

A I asked them what was the options. He told me that I can't be transferred to a different company. That's not how it go. I might -- I told him for the most part that I just didn't feel safe there, you know, and, you know, he just told me I can't just quit.

That was the whole conversation. I can't just up and quit. I got to do a written thing. You know, but, I mean, he had to contact Berry to do that.

Q Berry?

A Yeah. Berry was the dispatcher for the Local 77 for the JATC, so he allowed Mr. McGuire to -- he told Mr. McGuire to go ahead and do his

investigation because he kept promising us he was going to do an investigation. He actually gave me leave while he do his investigation so he actually gave me the 28th off until they do their investigation, as well as he was going to see if I could get transferred to another location of Crane Services, one of the other locations.

Q But this all happened after you told Mr. Faulkner and Mr. McGuire that you wanted to quit?

A I never told them I wanted to quit. I told them what was the -- I told them that this place don't make me feel safe. So, of course, that sound like I'm about to quit. So they just went into the store. Mr. Faulkner was explaining it to myself and as well as to Mr. McGuire that I can't just up and quit. He was telling us the process and how it go. And, again, Mr. McGuire was saying, okay, well, you know, let me do the investigation, this and that and the third because I had to do a written. I had to write them to say why or however you -- I'm leaving. I can't just

up and leave.

So he was just explaining that, but, again, Mr. McGuire, you know, said he was going to do his investigation about it, gave me leave and he was going to actually look into sending me to another location instead of the D'Arcy Road location.

MR. McNAMARA: Let's get Tab 27.

REMOTE TECHNICIAN: Exhibit 11.

(Nelson Deposition Exhibit 11 was marked for identification.)

Q So Exhibit 11 is an e-mail that was produced natively. It's Bates stamped Nelson 975, and it's an e-mail thread between you and Rickey McGuire, with cc's to Berry Gilroy and Steve Faulkner.

Do you see that?

A Yes.

Q And Mr. McGuire wrote to you on February 27th at 6:44 p.m. That's the same day that you found the shotgun shell; right?

A Yeah, that evening. Correct.

Q Okay. And he said: "I just left you a voicemail message to follow up on our earlier conversation."

Do you see that?

A Yes.

Q Did you reply to his -- did you call him back after he left you that voicemail message?

A No. I didn't get it until, you know, after -- like the next day or so.

Q Do you know why it took so long for you to get a voicemail?

A I'm not sure. Maybe the data or however you have the phone. Like even today, I don't even -- my e-mail when people send me e-mails, they don't pop up. You know, I might see it a day or hours later.

Q Okay.

A Yeah.

Q So you wrote back to him on Tuesday, February 28th, at 9:38 p.m., and you said: "I'm turning in my letter of resignation/quitting the job with Crane Service because of intolerable work