EXHIBIT 26

Planet Depos
We Make It Happen™

# Transcript of Kiana Byrd

**Date:** April 7, 2025
**Case:** Nelson -v- Crane Service Co., Inc.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

\- - - - - - - - - - - - - - x

CARL NELSON, :

Plaintiff, :

v. : Civil Action No.

CRANE SERVICE CO. : 8:24-cv-00766-ABA

INC., :

Defendant. :

\- - - - - - - - - - - - - - x

Deposition of KIANA BYRD

WASHINGTON, D.C.,

Monday, April 7, 2025

1:19 P.M. EST

Job No.: 579040

Pages: 1 - 76

Reported By: Sarah Parker

A Yeah, yeah.
Q If you go back to February, it looks like you saw him on February 15th, 2023?
A Uh-huh.
Q And my calendar tells me that's a Wednesday. And if you turn to the next session, that was February 22nd, which was also a Wednesday?
A Uh-huh.
Q So exactly one week later. And then after that, it shows that you saw him on March 1, which is also a Wednesday --
A Yes.
Q -- do you see that? Okay.
A Uh-huh.
MR. MCNAMARA: Let's mark this as Exhibit 2. I only have one copy.
(Speaking quietly.)
That copy is just for Tom.
(Whereupon, the above-referenced document was marked as Exhibit 2.)
BY MR. MCNAMARA:

Q Take a minute, Ms. Byrd, to read Exhibit 2. Tell me when you've had a chance to read that.
A I've read it.
Q Do you remember writing this?
A Yes.
Q Tell me about what -- the circumstances that led up to this. What was the lead-in to you writing this?
A It may be the instance where he reported to me that he found -- I'm not sure. I think this is the instance where he reported that he found, like, a firearm, or like a bullet, or some type of weapon or ammunition in a work vehicle.
Q Like a shotgun shell?
A Yes.
Q Did he tell you where in the vehicle it was?
A No.
Q Why did you write this?
A In an effort to keep him and everybody else safe.

Q This is -- this is a Tuesday at a point in time when your regular sessions with him were on Wednesday?
A Uh-huh.
Q Do you remember how you learned about this incident with the shotgun shell?
MR. EILER: Objection, form, mischaracterizes testimony.
You can answer.
A I don't remember.
Q Do you remember if he talked to you outside of one of your regularly scheduled weekly sessions?
A He may have.
Q You say, "He may have." Do you remember one way or the other?
A I think we met. I think we met.
Q In a telehealth?
A I think so. Yes, we had a phone call. We had a phone call.
Q You look like your recollection is coming back. I want to give you the chance to tell me as

MR. EILER: And just, as always, it's best practice to help our lovely court reporter here today that we try and not do any cross talk. And with that I'm going to continue.

BY MR. EILER:

Q So do you believe that Mr. Nelson's depression was aggravated by his time at Crane Service Company?

MR. MCNAMARA: Object to form.

A Yes.

Q Do you believe that Mr. Nelson will need to continue seeing you for medical treatment related to his triggered stressors?

A Yes.

Q How long do you believe he will need to continue seeing you?

A Hard to determine.

Q What factors might be used to make that determination?

A The presentation of symptoms, the intensity of symptoms, the way the symptoms impact functioning.

Q Apologies, brief indulgence.
Have you ever diagnosed anybody with PTSD before?
A Yes.
Q How often do you do it?
A I may have did a couple of diagnoses when I first came over to H.O.P.E., so maybe the last time I diagnosed was at the end of 2021, but before that, I used to diagnose weekly, like regularly.
Q And was that when you were working -- I'll withdraw the question.
At this point in time does Mr. Nelson still present with symptomology consistent with posttraumatic stress disorder?
MR. MCNAMARA: Object to form.
A Yes.
Q And do you believe, based on your personal knowledge and experience working with Mr. Nelson, that his symptomology presenting of posttraumatic stress disorder was aggravated by his time as Crane Service Company?

MR. MCNAMARA: Object to the form.
A I agree with the fact that it was.
MR. EILER: I'm going to take a two-minute break just to go over the notes and then I think I'll be done.
(Back on the record at 2:50 p.m.)
MR. EILER: I have no further questions for you, Ms. Byrd. Thank you for your time attendance in today's deposition.
MR. MCNAMARA: So we should take a minute to tell you what's going to happen now. So she'll produce a transcript and it will -- you have two options, which you don't have to make a decision right now, but you can if you want to.
One option is to do what's called "waive signature," which means the transcript that she produces will be the final transcript and it can be used in certain circumstances that are dictated by the Federal Rules, which could include reading it to the jury potentially.
The other option is that from the time she finishes the transcript, it gets sent to you. You

have 30 days to review it and make any changes. You can make changes either because she transcribed something wrong, or you can actually change a substantive answer.

If you change a substantive answer, then you sign what's called an "Errata," to say, Here's what I changed. Then, if you're questioned at trial about any of those changes, you can also be questioned not just the original answer, but why you made the change.

Most people do what's called "reserve signature," which means they're going to wait and then see the transcript before they're going to -- to get the opportunity to fix something that was wrong in there, but --

THE WITNESS: That's the option I'm going to choose.

MR. EILER: You also have the option to waive and sign, which will be waiving the right to review it and signing without having to go through the Errata. The choice is yours.

THE WITNESS: So if you-all send it to me