EXHIBIT 29

**SUSAN J. FIESTER, MD**
**Psychiatry, Forensic Psychiatry**

**7401 Westlake Terrace #1204**
**Bethesda, MD 20817**

**301.365.4980 (Office)**
**301.469.8772 (Fax)**

April 21, 2025

Robert Tucci, Esquire
Zipin, Amster, & Greenberg LLC
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910

Re: Carl Nelson v. Crane Services Co.

Dear Mr. Tucci,

At your request, I evaluated Mr. Carl Nelson to determine if he suffers from any psychiatric or psychological symptoms or disorders or other psychological damages related to allegations of racial discrimination, retaliation and improper termination.

To this end, I performed a comprehensive psychiatric evaluation of Mr. Nelson by telephone on March 26, 2025 for approximately three hours, on April 1, 2025 for approximately two hours, on April 6, 2025 for three hours and on April 9, 2025 for two and one-half hours. Mr. Nelson was in a private location in a townhome he shares with several roommates, and I was in my home office in Bethesda, MD during the examination. I also reviewed documents including: Complaint (24 pp); Answers With Affirmative Defenses (17 pp); Plaintiff's Answers to Defendant's First Set of Interrogatories (20 pp); medical records index (5 pp); medical records from Hope Behavioral Program from 8/19/21 – 1/21/25 (290 pp); transcript of deposition (rough draft) of Carl Nelson of 4/3/25 (243 pp) (large); transcript of deposition of Kiana Byrd of 4/7/25 (32 pp) (large); medical letter by Kiana Byrd, LCPC of 2/28/23 (5 pp); Economic Report from George Barrett, MBA of 42125 (27 pp) (672 pp total). Finally, I discussed potentially conducting a collateral interview of his aunt, Ms. Wanda Meredith, with whom he was living during the time of the discrimination but who is not available because she is undergoing treatment for Stage IV cancer.

At the beginning of my examination of Mr. Nelson, I explained the purpose of the examination and the fact that my findings are not confidential. I explained that the findings my evaluation will be released to his attorney/the attorney(s) for the defense and may be revealed during depositions or court hearings. I explained that I was not acting as a treating physician and that patient/doctor confidentiality does not apply to the examination. The client consented to allowing me to examine him and release my findings to his attorney/the attorney(s) for the defense.

## I. BACKGROUND INFORMATION

Mr. Nelson was born on April 11, 1982 in Clinton, MD and is 43 years old. He is single and has a domestic partner of eight months with whom he lives. He was married to Ms. Cornelia Long from 2003 until the divorce was finalized in 2008. Ms. Long, age 41, is studying to be an LPN. They had no children together. Mr. Nelson was incarcerated for a good deal of the time they were married. After his divorce, he was involved in a relationship with Ms. Nicole Barlett for about ten years. She is 48 years old and is massage therapist. They couple lived together but had no children. Ms. Bartlett was his business partner when he lived in PA.

Mr. Nelson's mother and father were not married. His father never lived with his mother or helped raise him. His mother, Ms. Frederika Nelson, is 63 and is divorced for her husband of twelve or fifteen years who later died. Mr. Nelson never knew him. She is currently not in a relationship. She has a high school diploma and worked for the Federal Government as a secretary for most of her life. She recently lost her job in the DOGE cutbacks. She lives in Virginia but is moving back to Brandywine, Maryland to live with relatives. She is in good health. His father is an unknown age. He has not been in touch with him since childhood and has no knowledge of him. He was is retired from military service. He did not drink or abuse substances. Mr. Nelson spoke with his father in 2002 when he was 21. He told Mr. Nelson that his maternal grandmother did not want him to be in contact with his son. Mr. Nelson has no interest in developing a relationship with him.

Mr. Nelson has no full biological siblings. His mother had one child by a boyfriend about nine years after Mr. Nelson was born. His half-sister, Ms. Crystal Nelson, age 36, works at a hospital as a CNA and lives with her husband in Walkersville, MD. Mr. Nelson is not close to her as he had minimal contact with her, seeing her only periodically when his mother would visit his grandmother with whom he lived. His maternal grandmother lived in Brandywine, MD and raised him after the age of 13 or 14 in order to try to reform him from the "gang life."

Mr. Nelson's mother's pregnancy with him was normal. He was the product of a full-term pregnancy and was born by vaginal delivery. His developmental milestones were reportedly normal. When Mr. Nelson was born, his mother lived in Forestville, MD for a year, then Capitol Heights, MD for a few years and then returned to Forestville when he was five. She was working in a government position at the Pentagon. He was cared for by a babysitter until he went to kindergarten. He would see his maternal grandmother frequently. His mother moved because of drug dealing in the building where they lived. There was a shooting of seven or eight black men by two Caucasian men in front of their apartment building. Mr. Nelson witnessed the aftermath on his return home with his mother shortly after the shooting.

During his early childhood years, Mr. Nelson's mother was physically and mentally abusive to him. She would strike him with switches and extension cords or spoons on a daily basis. He feels she was abusive to him because she could not handle him as he

was very destructive of property. He also had no regard for life. He would sometimes torture animals. He would shoplift. She kept his behavior and her abuse of him secret from the authorities. He sustained bruises and cuts but no more severe injuries from the physical abuse.

Mr. Nelson attended kindergarten and elementary school through the sixth grade in Forestville. He liked school but was a troubled child. He was hyperactive and had behavioral difficulties which led to frequent discipline. He was suspended for behavioral problems (fighting) but was never expelled. He was referred for counseling and evaluated by a psychiatrist at Kaiser Permanente where he was diagnosed with ADHD. He was treated with no medication. His mother received instructions to “keep him active.” He participated in karate, football and track and field. He attended summer camp every year. Academically, he received A’s and B’s and an occasional C. When he was eight, his best friend, who was in a wheelchair and sold crack cocaine for the older gang members, was shot in the head in front of his elementary school.

By the seventh grade, his behavior worsened, and his grades deteriorated. He was sent to live with his grandmother when he was 15 (tenth grade). His grades were C’s and D’s. He was held back for one year in the ninth grade because of truancy.

Mr. Nelson attended high school in Temple Hills, MD. He continued to get into trouble by fighting and participating in a gang. He had been smoking cigarettes since he was 12 and drinking alcohol since the age of five. He started smoking marijuana on a daily basis during the eighth grade and was also dealing crack cocaine. When he was in the ninth grade, his mother moved back to Forest Hills, and he did not attend school. for a year. No one followed up on his truancy. He eventually returned to school for his second ninth-grade year. At that time, he was sent to live with his grandmother remove him from the negative influence in the community.

It was a relief to live with his grandmother. He was sent to a Free State Challenge Program at the age of 16, a disciplinary school similar to military boot camp. He had been arrested and charged (as a juvenile) with theft of less than $1,000 and assault with a deadly weapon (gun) in PG County. At the program, he received psychiatric treatment. He had not been eating and was losing weight because his mother was not giving him food. He had to steal food to survive. The charges occurred when he and his friends “jumped” a man who had previously jumped them. After they shot at him, Mr. Nelson entered the store to steal food and was arrested on his exit.

His six-month residence at the facility was “life changing.” He was taught patience and discipline and realized that he had something to live for. As a child, he did not care about living. During the program, he received his driver’s license but failed the GED test. After his release, he lived at the Job Corps campus in Harper’s Ferry for three months. There, he studied for and passed the test for his GED. He returned to his grandmother’s house and started working at the golf course at Andrews Air Force Base.

He had stopped using drugs while in the program. After finishing Job Corps, he started using marijuana again and drinking about half a pint of liquor daily.

Mr. Nelson enjoyed working and was treated well at the golf center where he washed golf carts. After working there for a year or two, he returned to Job Corps to acquire an electrical diploma and at the age of 18, was accepted for an apprenticeship with Local 26 working for Trulin Electrical Company and MONA at various job sites. He was still living with his grandmother. He continued to be a member of a gang (until he was 34 or 35 years old).

At some point, while working as an electrical apprentice, the master electrician left a live wire exposed instead of placing a gang box on the wire. When Mr. Nelson touched the wire, he was electrocuted and could not release his grip. Another apprentice kicked the ladder out from under him so he would fall and release his grip. He was seen in the ER and released. Remarkably, he had no burns or other serious injuries but returned frequently to get checked over the next week and half. He received physical therapy in the aftermath because his hand was affected.

After this incident, he decided to start doing low voltage installations so he left MONA and started working for a security company installing phone cables, cameras and intercom services for businesses and homes. He was still living with his grandmother (age 21/22).

When he was 18, he became involved with Cornelia who had been a friend. They married in December 2003 when he was 22. She moved to live with him at his grandmother's home. He was arrested in 2004 for possession and carrying a weapon without a license (see Legal section). He was incarcerated for six months at Leesburg Penitentiary and served the remainder of his sentence for 15 months at Schuylkill Federal Prison Camp.

While incarcerated, he witnessed violence including inmates being getting stabbed, men raping other men and having consensual sex. He learned that white gangs such as Aryan Nations Brothers and other neo-Nazi groups were fighting with the black gangs for control in the prison. They were trying to kill the inmates from DC because there had been a race war in the prison in Lorton which rippled out across the Federal prison system (when Lorton was closed, the DC inmates were sent to Federal prisons). He was fearful for his life and vigilant. Life improved when he was transferred to the prison camp. He played on the basketball and flag football teams and attended church every Sunday. He made craft gifts for his family and friends. He was paid about $25 per month for his work. It was a minimum-security prison with no fences, more like a college campus than a prison. The inmates were mainly white-collar criminals (75% white collar/Caucasian). His wife visited once and his mother and grandmother, never. He would keep in touch with them by phone. He was never physically or sexually assaulted while in prison and had no disciplinary problems.

Mr. Nelson had stopped his psychotherapy after he returned from boot camp at the age of 16. He received no psychological or psychiatric treatment while residing in prison or prison camp. As part of his probation, he was required to take classes on alcohol and substance abuse and attend AA meetings.

After his release in 2006 Mr. Nelson returned to live at his grandmother's house. Despite being on probation, he returned to his former lifestyle but decided to acquire some practical skills. He attended several trade schools through an ex-offender program (barber school for six or eight months and bartenders school for two or three months) over the course of the next year. He started bartending at parties and cutting hair on the side. He also did minor electrical work (installing ceiling fans, plugs and switches). He was divorced in 2008.

In 2009, Mr. Nelson was arrested during a traffic stop in Maryland and charged with possession with intent to distribute cocaine and ecstasy. He was incarcerated for two years in Hagerstown State prison. His tenure there was less difficult in terms of the racial environment, but there was some gang activity, and he witnessed people getting stabbed and killed and being flown out for medical care. He stayed out of trouble by working and playing sports and attending church. He had no disciplinary problems in prison. He smoked marijuana when it was available as he did while previously incarcerated in the Federal prison. He had no visits. He was never the victim of an assault or other violence in prison.

Mr. Nelson was released in 2011. He had been dating Nicole for a few months prior to being incarcerated. When released, he moved to live with her in Waldorf, MD. He was on parole running concomitantly with probation for five years. He attended school full time for a year at Lincoln Tech to get certification and licensure as an electronics system technician. His girlfriend was supporting them. He went back to using marijuana and drinking daily and also used ecstasy intermittently. After a year of training, he received a certificate as an electronics system technician; however, as the school had committed fraud (stealing money from the Federal government), the certificate was deemed not legitimate. Mr. Nelson then attended the National Massage Therapy Institute in Falls Church, VA for a year and a half. He paid the tuition through a school loan (the first was for Lincoln Tech). Nicole was his classmate. He stayed out of trouble while he was on probation and parole for five years.

He graduated from massage school in 2013, and he and Nicole both worked on a contract basis with a chiropractor, Dr. Jacobs, in VA. After two months, he started his own business which was successful. He incorporated his spiritual beliefs into his massage practice. He finished his probation in 2016. His grandmother who had loved him unconditionally despite his misbehaviors, passed away in April 2016. When she passed, he started reading the Bible and changing his behavior. He closed his business, and he and Nicole moved to State College, PA so she could be close to her aging mother who lived there and was quadriplegic. After moving to State College, he started a new massage business. He was no longer associated with gang members, and his girlfriend gave up exotic dancing. Nicole's mother died in September 2017, and he and Nicole separated after. He

was homeless, living in his car and sometime in his office space after they separated, hoping that she would recover from her grief and that they could resume the relationship. The business was successful until July 2018.

In July 2018, Mr. Nelson was arrested and detained. Bond was set at $150,000 cash. He was incarcerated awaiting trial until February 2020 in the Center County Detention Center. His incarceration experience was more difficult than in the past because he had been diagnosed with GERD in 2013 and was receiving treatment with Dexilant brand medication and lifestyle interventions. Prior treatment with several other PPI's (Nexium. Prilosec, etc.) was not successful. While incarcerated, he suffered from symptoms of GERD and lost weight because the staff refused to provide him with a proper diet or the correct medication. It took a year to get the problem solved after he had a consultation with a GI specialist. He was not assaulted or otherwise harassed while incarcerated and had no behavioral problems.

It was especially devastating and a test of his faith when he was charged in 2018 because he had turned his life around and was no longer engaged in gang-related or other criminal activities. He was using marijuana frequently to help with sleep and appetite reduction but no other substances.

He was released in February 2020 when the bond terms were changed after a successful motion regarding the violation of his constitutional rights. He was out on bond living with his aunt until his trial in September 2020. On the day of the trial, he took a plea for time served and three years' probation. He wrote the Supreme Court about what he felt was prosecutorial misconduct (he alleges there was no hard evidence for the charges). The pandemic had its onset while he was incarcerated in 2020 and was worried that he was at high risk because of his asthma, but he was released in February 2020 and there were no cases of Covid in the facility to his knowledge.

After his release, he was living with his aunt. He got a job in traffic control on construction sites and highways for ROADTEK. While working there, he alleges he was written up for "no reason" and was terminated. There were no threats to his life, and he was not verbally harassed or abused while working for ROADTEK.

In July 2022, Mr. Nelson got a union position with Local 77 as an operating engineer apprentice. His first job was with Keller North America as an apprentice oiler. They would assist operator/engineers at various construction sites by setting up work sites (installing foundations, crane services to install generators, etc.). His specific job was in the Leesburg, VA area building foundations for data centers. He left in October 2022 when apprentices were being laid off, and the union sent him to work for Crane Services.

In his personal life, he was attending church and socializing with friends who were not gang members, who were married and fathers. They would shoot pool and darts. He continued reading the Bible regularly. He was getting stronger in his knowledge, reforming his life and helping others. He kept a positive mental attitude even in the midst of negativity. He was not dating because he did not trust women for a while because of the

rape accusation. He did not use marijuana and drank minimally. He was saving money and hoping to have his own place sometime in the future.

Currently, he reads the Bible in church and in hospitals (as part of a ministry group) and in the shopping centers as a volunteer evangelic activity.

## II. MEDICAL HISTORY

Mr. Nelson had childhood onset asthma. He was treated with unknown medications including inhalers and treatments with nebulizers and required trips to the ER for acute asthma attacks about twice a year.

He had the onset of GERD symptoms in 2012/2013. He was treated with various PPI's but had side effects to all but Dexilant. He has been treated with this medication since 2015 (with the exception of about a year while he was incarcerated). His symptoms are under good control with medication and lifestyle changes. He stopped drinking at that time.

He has no other medical problems. He has never had any fractures. He has never suffered head trauma, loss of consciousness, concussions or seizures.

## III. HISTORY OF PSYCHIATRIC/PSYCHOLOGICAL TREATMENT

Mr. Nelson first received psychological treatment was when he was an adolescent. He recalls seeing a therapist in New Carrolton, MD. He does not recall the name of the person he saw at Kaiser or the frequency of sessions. He attended sessions for about a year or two. He does not feel the therapy was of benefit. He received no psychotropic medications. He has no knowledge of why the therapy stopped.

His next treatment occurred around 2011 when he was in his early 30's. He saw Sheila West, a private practitioner, shortly after being released from Hagerstown prison. He wanted to recover from his incarceration. He saw her once a week initially and then every two weeks. She recommended he see a psychiatrist to receive medication for PTSD for his nightmares and for anxiety and referred him to a mental health center in Charles County. He did not follow through with her recommendation because he did not feel he needed medication. By 2013, he enrolled in massage school and discontinued therapy because his mental state was much better, and he felt he no longer needed treatment. He was working as a massage therapist which he found to be very therapeutic, was receiving massages and was involved in a relationship at the time.

Mr. Nelson's next treatment was with Ms. Kiana Byrd at Hope Behavioral Health beginning in 2021. He has been seeing her for individual psychotherapy since. Initially, he met with her every other week. Since the incident at Crane, the frequency of sessions has increased. She recommended that he see a clinician (NP) there, Ms. Gabrialla Amaya for psychotropic medication. He was prescribed an SSRI, sertraline, 50 mg a day,

Trazodone for sleep and Prazosin 1 mg at night for nightmares, recently increased to 2 mg.

Since being treated with medication and psychotherapy, the anxiety and depression have improved by only about 25%. He is learning receiving coping skills and techniques for managing his anxiety and depression and traumatic symptoms and is getting out to visit museums and parks, but despite treatment, he keeps ruminating about the incidents and continues to have sleep problems and other symptoms of trauma, depression and anxiety including panic attacks. He had been wearing a mask in order to hide from the world and not going out. He did not trust anyone and was isolating. He is now less isolated and no longer wearing a mask or hiding his face.

## IV. HISTORY OF ALCOHOL/SUBSTANCE USE

Mr. Nelson started drinking when he was a child. He was drinking regularly by the age of 12 or 13. Over the next twenty years, he would drink daily about a few small cups of liquor or a 40 oz beer. He drank while incarcerated when alcohol was available. He stopped drinking in 2013 but more recently drinks about once a month, a minimal amount of alcohol.

Mr. Nelson used illicit drugs (marijuana) daily from the age of 12 until 2020 (on and off when incarcerated but not during his most recent incarceration). He used ecstasy every other day for about a year in 2008. He never deliberately used cocaine although it was on his hands while packing it during the time he was dealing cocaine (throughout his life).

## V. LEGAL HISTORY

Mr. Nelson's first legal problem occurred in 2004 in DC when he was arrested and convicted and sentenced to 2.5 years of incarceration. He served from August 2004 to spring 2006, first at the Lewisburg Penitentiary (for about four to six months) and then at the Schuylkill, PA, a minimum-security Federal prison camp.

He next had two guilty pleas in Maryland in January 2009 and in October 2009). The plea for the first charge was two years of incarceration and an option to appeal. The second charge occurred after he had been convicted, and his case was on appeal. His new attorney advised him to take a plea in order to avoid potential exposure to a twenty-year sentence, so he took the plea of three years in addition to the original two. Despite this, the judge sentenced him to 20 years with 17 years suspended and five years' probation. He was incarcerated in Hagerstown, MD state prison facility for a total of two or 2.5 years.

Mr. Nelson was on probation at the time for a nolo plea in PA in 2018). He was incarcerated for a year and a half at Center County Detention Center in State College, PA while awaiting trial because his bond was set for $150,000 cash. He planned to go to trial, but after jury selection, the prosecutor offered a plea deal. He had been out on bond for six months before trial and was working with ROADTEK after the PA Supreme Court found that the terms of the bond were a violation of his rights (judicial misconduct), and

the bond was reduce to $1000 of which he paid $1. He took the plea because his aunt was upset over his attorney's strategy and the fact that she had previously been accused of prosecutorial misconduct and lost her license when she was a prosecutor. He was facing 40 years if convicted because of his two prior felonies. He was sentenced to three years of probation and time served. He also lost his massage license.

His business partner, Ms. Bartlett took over his business and their joint funds. She took the money ($25,000 in a joint business account), furniture, a safe containing cash and his mother's ashes. His massage business was destroyed. His phone was seized, and he was not allowed to have contact with his family for about six months. His probation was completed on February 10, 2024.

## VI. INCIDENTS

Mr. Carl Nelson alleges that Crane engaged in violations of Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Maryland Fair Employment Practices Act ("FEPA") and the Prince George's County, Md., Code § 2-222 for discrimination and harassment on the basis of race and that he was wrongfully terminated and/or constructively discharged on the basis of his race and/or his complaint related to alleged race discrimination. Mr. Nelson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on March 10, 2023.

Mr. Nelson is an African American man who was employed by Crane Service Company Inc. from December 19, 2022 through February 28, 2023 as an Operator Apprentice. He worked at various locations in the State of Maryland, the District of Columbia and the Commonwealth of Virginia. He was first assigned to report to the Capitol Heights, MD shop location. His job duties typically consisted of: (1) temporary traffic control, or "flagging" duties; (2) performing maintenance in work zones; (3) installing and/or removing various devices and equipment, such as signs, arrow boards, cones, etc.; (4) cleaning and maintaining assigned vehicles on a daily basis, including performing pre- and post-trip inspections; (5) inspecting various equipment (interior and exterior); (6) cleaning various equipment (interior and exterior); (7) checking gauges on equipment; (8) maintaining record logs; (9) maintaining lubrication and cooling of oil supply.

To perform traffic control duties, employees must have flagger cards/certifications according to District of Columbia, Maryland and Virginia Department of Transportation regulations. Mr. Nelson was the only employee in his group of apprentices who possessed this certification for all three areas.

From the beginning of his employment with and continuing until his termination, Mr. Nelson alleges he was subjected to race discrimination and a hostile work environment based on his race (Black). He alleges that he was called offensive racial slurs such as "cookie" and "nigger" and was intimidated by Caucasian coworker who displayed firearms in his presence in a threatening manner.

On his first day of work, December 20, 2022, Mr. David Roy, a Black co-worker who had been employed with Crane for four years was assigned to train Mr. Nelson. Mr. Roy informed Mr. Nelson that the work environment was “extremely racist” and that if Mr. Nelson tried to file a complaint, it would go nowhere because the owners of the company were involved with the employees’ union.

On December 20, when Mr. Roy introduced Mr. Nelson to a group of coworkers, he overheard a Caucasian coworker refer to Mr. Roy as “a nigger.” Another coworker referred to Mr. Nelson as “cookie.” He was extremely shocked to hear and be the object of such racial slurs even though he had been warned about it. On December 21, 2022, Mr. Nelson overheard a Caucasian Engineer Operator and supervisor, Mr. John Mutispaugh muttering “nigger” as he walked by. That same day, Mr. Nelson reported Mr. Matisa’s behavior to Mr. Adam Leach, the Caucasian yard manager who was Mr. Nelson’s supervisor. Mr. Leach said he would talk to Mr. Brent Loveless (Caucasian) who at that time was the Hiring Manager/Dispatcher overseeing all operations in the yard and who dispatched oilers, truck drivers, engineers and all other employees.

On December 22, Mr. Leach assigned Mr. Nelson to work in the yard to dispose of trash, clean bathrooms and perform other janitorial tasks which Mr. Roy had been performing. In the afternoon, he was assigned to go to the lower shop to spray paint an 18-wheeler trailer. The lower shop is a garage-like location about 50 feet away from the upper shop, where the secretary, dispatch and other office staff work.

At around 2:00 PM, Mr. Nelson was lying on a “creeper” in order to paint the underside of a trailer when a Caucasian male, Mr. John Baldwin, walked into the room and walked towards Mr. Nelson. Mr. Nelson rolled out from under the trailer and got up to introduce himself as he had not previously met Mr. Baldwin. Without uttering a word, Mr. Baldwin looked at Mr. Nelson with a look of disgust on his face and raised his shirt and hoodie, revealing a handgun in a holster attached to his belt. The individual then started looking at his phone which he was holding in his left hand and ignored Mr. Nelson.

Mr. Nelson immediately backed up, took a picture of the man who had been leaning over toward him with the gun showing and ran out of the room because he felt threatened and fearful. He then searched for Mr. Leach and Mr. Loveless. He informed Mr. Leach of the incident, and they both spoke with Mr. Loveless who informed Mr. Nelson that Crane allowed its employees to carry guns (the state of Maryland allows only concealed carry) at the worksite and that they did not have a formal “gun policy.” Mr. Loveless told Mr. Nelson to “get tougher skin.” He then asked Mr. Loveless why Mr. Nelson had not been dispatched. Mr. Loveless stated that Mr. Nelson was “not yet in the system.” Later that day, Mr. Loveless asked Mr. Nelson to report to the office located on Hampton Boulevard in Capitol Heights, Maryland, to meet with Ms. Diana Farmer, a Caucasian HR manager, and Mr. Ricky McGuire, the Caucasian Safety manager the next day. He was already scheduled to meet with them for a routine safety orientation along with two other newly hired individuals.

On December 23, 2022, Mr. Nelson reported to the office in Capitol Heights around 7:00 AM. Mr. McGuire did the safety training. When the training was finished, he spoke with Ms. Farmer and Mr. McGuire about the incident the day before. (They were having a Christmas party at the time). They informed Mr. Nelson that they would investigate the incidents, reassured him that his complaint was confidential and told him that they would inform him of the outcome of the investigation. Mr. McGuire also confirmed that he did not believe that the company had a formal weapons policy.

Mr. Nelson reports that when he was given safety training, he had been provided with a handbook which states that weapons were prohibited on the worksite. He was also given an orientation Power Point about harassment and received a certificate of anti-harassment training on December 19. After his complaint on December 22, he received a copy of the policy of weapons by email from the safety orientation on December 23 or 24.

On December 24, 2022, Mr. Nelson emailed Mr. McGuire with his certification and credentials, as requested, to verify his qualifications.

Mr. Nelson was off work on Christmas day. He was living with his aunt, seeing his friends regularly and attending church and reading the Bible regularly. He was enjoying his life. He had become law-abiding citizen and had not been involved with any gang-like activities or associating with any gang members since 2020.

After he returned to work, he was assigned to show up at the location but received no dispatches because he was still not in the system. He observed that the other apprentices who were Caucasian were being sent out on job assignments. He remained on site and was tasked with washing and cleaning the cranes when jobs were finished for the day. He wanted to be assigned to the construction site so he could learn how to assemble and dissemble and operate cranes, the primary activities of his apprenticeship.

On January 10, 2023, Mr. Nelson called Mr. McGuire to inquire about the state of the investigation. Mr. McGuire stated, “We are looking into it.”

On January 11, 2023, at approximately 11:40 AM, Mr. Nelson and a group of operators were assembling a machine at the Darcy location. During this process, Mr. Adam Leach, his supervisor and yard manager, asked Mr. Nelson to “go get a rope.” It was a routine request (a “tag line” to connect to a mechanical device like an HVAC unit so it won’t swing in the wind when it is being craned is required for many jobs). He said the rope “down further in the yard nears some parts.” When Mr. Nelspm went to the location to retrieve the tag line, he discovered that the rope was already knotted in a manner to resemble a mini-noose. When Mr. Nelson returned with the rope, one of his Caucasian coworkers, Mr. Jim Bo, commented to two other Caucasian coworkers, Mr. CB and Mr. Leach, “Who told that black boy to get a rope that’s messed up, man! Which one of y’all told him to go get a rope?” The group of men then started laughing among themselves and at Mr. Nelson. Mr. Nelson also observed that Mr. CB was carrying a gun on his belt as he could see the gun when Mr. CB went up a ladder to perform work on the crane. At When he

found the rope tied into a noose, he was shocked and felt he could not trust his supervisor who had sent him to get the “noose.” He talked to his therapist and to his probation officer that day to find out if it was legal for a worker to be carrying a gun on a worksite because he did not want to be around guns while on probation). He did not make a second complaint at that time because he was still waiting to hear back about his initial complaint.

On January 13, 2023, While standing in the yard, Mr. Nelson heard Mr. Leach and a Caucasian coworker, Mr. Chris, who were standing next to him, referring to Mr. Nelson in a demeaning fashion as a “cookie.” Mr. Nelson requested that they refrain from using that word when referring to him. Mr. Leach and Mr. Chris informed Mr. Nelson that they were using the word “cookie” to refer to him because a (Caucasian) employee, Mr. Andrew Russo, had used that term previously. They had called another black man, Mr. David Roy, “Dildo Dave” after they attached a sex toy to the windshield wiper of his truck. Mr. Roy told Mr. Nelson about that incident on his first day of work. The dildo was not discovered until his mother took the truck to the shop to get it serviced, and the service person told her she had “a fake penis” on the windshield.

Mr. Russo later informed Mr. Nelson that this “nickname” (cookie) was a reference to “Man of Honor,” a movie which tells the story of the first black Navy Diver (coincidentally named Carl) who experienced racial discrimination at the hands of his coworkers and superiors. During that time, black Americans were allowed to serve in the military only as cooks and were thus given the pejorative nickname, “cookie.” Mr. Russo was making what Mr. Nelson felt was a pathetic “excuse” to try to justify using a racially offensive term in referring to him.

At approximately 11:40 AM that day, Mr. Leach and Mr. Chris came to the upper shop where Mr. Nelson was working. Mr. Chris took off his coat to show Mr. Nelson he was carrying a 9 mm handgun. Mr. Nelson was shocked and exclaimed: “Whoa! What’s going on around here? We’re at work! Why do people carry guns around here?” Mr. Chris informed Mr. Nelson that he carried a gun because the area in which they were working was “a bad neighborhood.” Mr. Nelson took a picture of this incident to document it.

On January 16, 2023, Mr. Nelson asked Mr. Farmer about his employer’s employee handbook. He was told that the handbook was unavailable as it was being revised. He wanted to know about the employer’s gun policy.

On January 17, 2023, at approximately 8:00 AM, Mr. Nelson asked a Caucasian co-worker, Mr. William Gray, also a first-year apprentice working at the same level, why he (Mr. Nelson) was not being dispatched to work sites as were Mr. Gray and Mr. Russo, his apprentice classmates who were Caucasian. Mr. Gray told Mr. Nelson it was because he would not want to work the long hours required (up to twelve hours a day). Mr. Nelson told Mr. Gray he did not feel it was fair to exclude him from dispatches as he was not being given an opportunity to earn similar wages to the other employees despite having similar training and certifications as Mr. Gray and Mr. Russo. Mr. Gray then told Mr. Nelson that it was out of his control.

During his employment with Crane, Mr. Nelson was one of eight "oilers" in various stages of their three-year apprenticeships. All the other apprentices who were Caucasian (and were being dispatched regularly). The only black operator was assigned to work as an oiler and assigned to work under a White operator. (He was being paid as an operator but was not being assigned to do that work). The other oilers were Caucasian men, with the exception of one, who was possibly Hispanic. The other Caucasian oilers were dispatched on a daily basis and worked up to 12-hour days. In stark contrast, Mr. Nelson was typically assigned to work in the yard performing activities that were not appropriate to the training sought during his apprenticeship and was only working eight-hour shifts.

Mr. Nelson then asked a Caucasian dispatcher, Mr. Kevin, why he was not being dispatched. Mr. Kevin told Mr. Nelson that he was not yet in the system. He also commented that if Mr. Nelson "wanted to do something," he would assign him to give another operator a ride back to the yard from Virginia. He agreed to this assignment and drove to pick up the Caucasian coworker, Mr. Bradley Kenneth, in Virginia (Mr. Kenneth was the employee who had placed the dildo to the windshield of the black employee). While riding back to the site, Mr. Kenneth told Mr. Nelson that he frequently referred to a black coworker, Mr. Andre, by the racial slur "nigger." Mr. Kenneth then asked Mr. Nelson why people cared about the use of the racial slur, "nigger." He confessed that he had been teased growing up and asked Mr. Nelson why people believed in the Black Lives Matter movement. As a result of this conversation with racially hostile content, Mr. Nelson felt unsafe.

Two weeks later, Mr. Nelson was still not being dispatched. On January 30, 2023, he was dispatched for the first time to a site in Southwest DC. The man working at that location was Mr. John Mutispaugh, the man Mr. Nelson reported in December for making the N-word slur. Mr. Loveless knew about the complaint. At the site, at approximately 8:00 AM, Mr. Nelson heard Mr. Cory Loveless, the Caucasian son of the dispatcher, and Mr. Brent Loveless, who was a Caucasian third-year apprentice, comment that "all Black people are slow" and portray Black people as "lazy." He directed the comments to Mr. Andre Gilliam, another black truck driver who worked for Crane. He made the comments in front of Mr. Nelson and in the presence of Mr. John Mutispaugh, the man who made the 'nigger comment.' Mr. Nelson said he did not appreciate them using such racist comments to his face on the worksite. They responded by saying they were friends with Mr. Gilliam who "would not take it that way." After this racist incident which he found highly disturbing, on January 31, 2023, Mr. Nelson submitted a formal written complaint (his first written complaint after several verbal complaints to the supervisory personnel at Crane Services) to Mr. Steve Faulkner, his union representative, complaining of race discrimination and a hostile work environment. In the meantime, he had been sent out on only two dispatches.

On February 3, 2023, Mr. Faulkner replied that he had requested a meeting for Mr. Nelson with Mr. McGuire to discuss the allegations. Mr. Nelson met with Mr. McGuire on February 10. At that meeting, he told Mr. Nelson that he was shocked that the incident occurred and apologized. He said they did not have a weapons policy but they were going to "look in to it." On February 10, 2023, Mr. McGuire emailed Mr. Nelson stating that he had conducted "an extensive investigation with employees from all the different races,

religions and genders at the D'Arcy Road location" and that they would soon be rolling out "a new harassment policy as well as a strict weapons policy." He did not directly address Mr. Nelson's complaint in order to keep it confidential. Mr. Nelson felt some sense of hope that the work environment might change after this action.

On February 14, 2023, Mr. Nelson participated in a mandatory meeting run by Mr. Faulkner and the owner of Crane Services, Mr. Ricky Mazella, in which all the employees at D'Arcy Road were informed that an investigation corroborated allegations of race discrimination and harassment, and that Crane Services was implementing a new harassment and weapons policy. They planned to post a sign and give the employees a copy. The sign was a weapons policy and the other was anti-harassment policy.

Mr. Nelson participated in a meeting with Mr. McGuire and an HR representative on February 20, 2023, during which Mr. McGuire informed Mr. Nelson that other employees had corroborated his allegations of race harassment and discrimination and a hostile work environment. They requested that Mr. Nelson inform them and the union of any further complaints. Mr. Nelson texted and emailed Mr. McGuire on February 21, 2023: "Rick, per our meeting yesterday, thank you again for your investigation findings and the individuals who cooperated to help you determine that my complaints were true."

Unfortunately, the race discrimination and hostile work environment Mr. Nelson experienced continued unabated. On February 27, 2023, Mr. Nelson was dispatched and was assigned to truck number ST-18. He was asked to arrive at 6:30 AM. Upon inspecting the vehicle, Mr. Nelson discovered on the driver's side rear floor what appeared to be a single unused shotgun shell. (He took a picture of it and left the shell in the truck and drove it to Ashburn, VA because it was the only vehicle available in the yards). He was in shock. His first thought was of the movie "Mississippi Burning," a movie in which crosses were being burned and objects were being place at black persons' homes in order to intimidate them and place fear in their hearts. This caused Mr. Nelson to fear for his life. That same day, Mr. Nelson emailed a complaint to his union representative, Mr. Faulkner, who later told Mr. Nelson that he had informed Mr. McGuire of the incident and asked that it be addressed immediately. Mr. Nelson made a further verbal complaint that day to Mr. McGuire who already had the emailed complaint from Mr. McGuire.

Later that day, during a meeting with Mr. McGuire, Mr. Nelson received a text from dispatch at approximately 2:21 PM, assigning him to the D'Arcy yard for February 28, 2023. Mr. Nelson informed Mr. McGuire about the shotgun shell he found in the truck the prior day and about his continued concerns about allowing employees to carry firearms, ammunition, contraband, explosives, etc. Mr. McGuire reiterated the company policy and said he would look into the matter further. He said the shotgun shell had been left there by a former employee who had not worked there for a more than a year. Mr. Nelson was surprised because the trucks are cleaned every day, and it would have been obvious that there was a shotgun shell in the truck.

Mr. Nelson was trying to find a solution to the ongoing problem of his hostile work environment and the demeaning comments and covert threats he was experiencing. Mr.

McGuire promised to do an investigation and gave Mr. Nelson the next day off. During that meeting, Mr. Nelson also informed Mr. McGuire that he refused to work in an unsafe and hostile work environment at the D'Arcy Road location and requested that he be assigned to another location. Mr. McGuire informed Mr. Nelson that the environment at the other locations would be similar. Mr. Nelson told Mr. McGuire that he believed the shotgun shell in his work truck was a threat and an intimidation tactic which was based on his race and that he did not feel safe at the D'Arcy Road location. Mr. McGuire informed Mr. Nelson that he would conduct an investigation and would inform dispatch that Mr. Nelson was to be on "leave of absence" for February 28, 2023. Mr. Nelson was then sent home before his shift ended. At approximately 6:44 PM that day, after his shift ended at 4:00 PM, Mr. McGuire emailed Mr. Nelson and claimed that he found no policy violation because he did not consider ammunition to be an explosive or a weapon by itself. He stated, "My understanding is that dispatch expects you to arrive by 7:30 AM at D'Arcy Road tomorrow for your assignment. Otherwise, if you choose not to show up, then we will assume that you will no longer be employed with Crane Service Company." The union representative was not copied on the email. The union representative told Mr. Nelson to give his employers a chance to correct the situation, and if they did not, he could submit a formal resignation letter stating that he could no longer work at that site because of intolerable working conditions.

Mr. Nelson felt his life was being threatened at the D'Arcy Road location. Fearing for his safety, he did not report to work there on February 28, 2023. At approximately 4:00 PM, Crane sent Mr. Nelson a notice of separation by certified mail to his residence alleging that he had abandoned his job and included his last check by certified mail. The termination notice stated that Mr. Nelson "did not appear for his job assignment on 2.28.23 at D'Arcy Road and he did not accept any phone calls from company representatives when he did not appear for work. Due to abandonment of his responsibilities, his actions constitute his 'resignation' from Crane Service Company." Mr. Nelson claims his not showing up at his worksite that day was a "voluntary quit" because the company took no substantive action to address his multiple complaints of race discrimination, harassment and intimidation.

He realized that the company was trying to force him to return to work and continue working at the D'Arcy site so sent an email of resignation later that day at 9:50 PM.

Since being unemployed, Mr. Nelson has become depressed and isolated himself from others. His aunt could not grasp what was happening. They were forcing him to put in job applications and threatened him with evicting him because he could not pay for his rent or food. He was facing being homeless. He was about to lose his mode of transportation because he could no longer pay his car loan. He was so depressed that he had a hard time seeking jobs. A few months after he was fired, in April or May, Ms. Byrd suggested he apply for SSI disability and prepared the application. He feels he was not able to work. He was always tired and fatigued from his depression and sleep problems and had difficulty focusing.

Mr. Nelson could not get unemployment because Crane alleged that he quit even when he showed the timing of his resignation email and Crane's email which he reports was not time stamped.

He applied for jobs and for Commercial Driver's License training (a license for Class A and Class B) which were also union positions but was not approved for training. The union offered one assignment, but he no longer had transportation (his car was repossessed) and could not access the job location by public transportation because the starting time for the position was so early.

He was homeless beginning in February 2024. He was getting food stamps and cash assistance but it was only $300 per month. Two or three months ago, he met his current girlfriend on the street while he was living in car or on the street. He purchased the car from a legal settlement so he would have a place to sleep after he was evicted. Previously, he was sleeping in a tent Clinton, MD at the Park 'n Ride. His girlfriend encouraged him to remove his mask and invited him into her residence in LaPlata, MD when it was 20 degrees in the winter. He has been temporarily living with her since. The relationship is going well despite the fact that she suffers from psychiatric disorder and is disabled (she is receiving treatment for schizophrenia). The apartment is in LaPlata, MD. He has gradually been getting out more. He and his girlfriend go to museums, the Botanical gardens, the park, and take hikes and walks. These activities are helping him recover.

## VII. CURRENT AND PRIOR PSYCHIATRIC DISORDERS

Mr. Nelson may have suffered from ADHD as a child/adolescent. He recalls his elementary school counselors saying they felt he had it. It is not known whether he had any specific testing but was not treated for this condition.

### A. Posttraumatic Stress Disorder (PTSD) (PAST)

Mr. Nelson has likely suffered from PTSD since childhood. He was exposed to trauma which can cause PTSD during childhood and adolescence as well as in his early adult life (viewing and participating in gang fights, witnessing shootings and stabbings on the street, being shot at, being incarcerated and viewing violence and sexual assaults while in jail). He was exposed on multiple occasions over decades (until the age of 35) to actual or threatened death and serious injury in the following ways: directly experiencing the traumatic events and witnessing, in person, the events as they occurred to others and learning that the traumatic events occurred to a close family member or close friend (several cousins). In cases of actual or threatened death of a family member or friend, the events must have been violent or accidental.

He had the presence of the following intrusion symptoms associated with the traumatic events, beginning after the traumatic events occurred: recurrent, involuntary, and intrusive distressing memories of the traumatic events; recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic events; dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the

traumatic events were recurring (images of a drive-by he experienced at the age of four or five - he would have a vision/image of the bodies lying in front of the house with smoke coming out from the burns of the bullets); intense or prolonged psychological distress at exposure to internal or external cues that symbolized or resembled an aspect of the traumatic events.

He had persistent avoidance of stimuli associated with the traumatic events, beginning after the traumatic events occurred, as evidenced by: avoidance of or efforts to avoid distressing memories, thoughts or feelings about or closely associated with the traumatic events; avoidance of or efforts to avoid external reminders (he did want to go to that location after he and his mother moved; he did not want to talk about the violence he witnessed; he did not to spend time at home with his mother because of her abuse; he spent a lot of time with other friend's families where they fed and supported him) that arouse distressing memories, thoughts or feelings about or closely associated with the traumatic events.

He had negative alterations in cognitions and mood associated with the traumatic events, beginning or worsening after the traumatic events occurred, as evidenced by the following: persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "There is danger everywhere (as a result of racism)." "The world is completely dangerous;" persistent, distorted cognitions about the cause or consequences of the traumatic events that lead the individual to blame himself/herself or others (he blamed himself for the abuse at home because his mother always accused his father of being a "dog and a no good guy" and told Mr. Nelson he would "be just like him"); persistent negative emotional state (e.g., fear, horror, and anger); feelings of detachment and estrangement from others (toward Caucasian persons and toward his mother); persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction and loving feelings he reports that he "went numb" emotionally as a result of the physical abuse during childhood and continued to numb his feelings when he was involved with the gangs).

He had marked alterations in arousal and reactivity associated with the traumatic events, beginning or worsening after the traumatic events occurred, as evidenced by :irritable behavior and angry outbursts (he was destructive and acted out ; he would overreact to even the slightest insult; he had no control of his anger and emotions and was impulsive) typically expressed as verbal and physical aggression toward people and objects (he was aggressive towards bullies at school; he was involved in gang fights and other aggression); reckless or self-destructive behavior (being in a gang, using drugs and alcohol); violating the law); hypervigilance (around his mother and when involved with the gangs); sleep disturbances (e.g., difficulty falling and staying asleep and restless sleep - he was using marijuana to get to sleep).

The duration of the disturbance was more than one month (onset when he was four or five and continued up through 2011 when he started therapy and learned about what was happening to him emotionally).

The disturbance caused clinically significant distress and impairment in his occupational functioning, intimate life and social relationships, and he used substances to control the symptoms and was involved in gang life. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition. The PTSD was Chronic and complex in that it had its origins in multiple traumas.

With psychotherapy, his PTSD symptoms improved. He started getting massage, doing meditation and reading the Bible. He avoided gangs and gang members, did not engage in illegal activities and reduced his substance intake. Even after what he felt was his wrongful incarceration in 2018, he continued to read the Bible, was able to tolerate his incarceration and did not have a recurrence of PTSD symptoms. By then, he was also a massage therapist and continue to engage in activities that promoted his recovery from his early life trauma and later struggles (meditation, aromatherapy, healthy nutrition and exercise). He stopped the psychotherapy after four to six months because he was feeling much better.

He restarted the psychotherapy in 2020 after being released. He had a recurrence of some of the PTSD symptoms and was "a little depressed" but did not meet criteria for PTSD or Major Depressive Disorder. He needed to talk about the incident to understand why he had been accused of a crime he did not commit and develop coping skills for handling the emotions related to his prosecution and in incarceration. He did not have clinically significant distress or impairment in his functioning (he worked regularly) although it took a while for him to trust women and date again. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

### B. <u>Posttraumatic Stress Disorder (PTSD) (PRESENT)</u>

While working at Crane, Mr. Nelson was exposed to threatened death/serious injury by directly experiencing the traumatic events (exposure to guns, threatening behavior related to the guns, finding a bullet in work truck and finding a noose).

He had the presence of following intrusion symptoms associated with the traumatic events, beginning after the traumatic events occurred: recurrent, involuntary and intrusive distressing memories of the traumatic events (the event s would pop into his mind at any time, they happened frequently and in many different circumstances). "It was on my mind all the time, being in fight or flight;" recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event (he would have a flashback of what happened as a child, along with images and a feeling of running from something at work);

He had intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic events (if the thought about the fact that Caucasian employees were carrying guns at work; if he saw someone with baggy sweatshirt or other clothes that could conceal a gun; after finding the noose, he

was always upset that he had to go get equipment especially rope); he was distressed when exposed to the people he knew were carrying guns which could occur at any time on the worksite; he saw them daily; he would get stressed out and upset; he had marked physiological reactions to internal or external cues that symbolized or resembled an aspect of the traumatic events (his heart would race; he would feel panicky, breathe heavily, occasionally sweat).

He had persistent avoidance of stimuli associated with the traumatic events, beginning after the traumatic events occurred, as evidenced by one or both of the following: avoidance of or efforts to avoid distressing memories (at home he would isolate himself or exercise in order to try to not to expose himself to anything that would trigger the thoughts) or feelings about or closely associated with the traumatic events; an avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s) (he could not avoid going to work where he was exposed to the people and places; he did not want to talk about it to anyone but his therapist and his probation officer; he told his aunt when the events occurred so they would know about the situation in case something bad happened or he went missing) but did not discuss it after.

He had negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic events occurred, as evidenced by two (or more) of the following: persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., I can't trust the work situation to be safe as he had thought in the past: even after leaving he could no longer trust management or employers if they were Caucasian; he generalized it, feeling "No one can be trusted" and even when shopping, was on the alert thinking management could be armed. He was distressed because he knew his traumatic symptoms which had been largely put to rest were returning.

He had a persistent negative emotional state (e.g., fear, horror - he could not believe what was happening, anger and shame for the way he was being treated in public and for being helpless to do anything about it); markedly diminished interest or participation in significant activities (he did not go out with friends, didn't exercise, didn't go bowling or go to the movies; he was "completely shut down;" his therapist had to force him to go to the museum garden near the Capitol, so he could start to experience being around strangers); feelings of detachment or estrangement from others (he could not connect with even his family members and wore a mask when he went out in order to distance himself from others; he didn't want anyone to know who he was; he was hiding behind a gaiter or a medical mask); persistent inability to experience positive emotions (he could not feel happiness, satisfaction or loving feelings).

He had marked alterations in arousal and reactivity associated with the traumatic events, beginning or worsening after the traumatic events occurred, as evidenced by: hypervigilance (he was constantly on the watch); exaggerated startle response; problems with concentration (he had trouble focusing enough to complete tasks; he was distracted;

his mind would wander; he was not reading the Bible as much because he could not focus when reading); sleep disturbance (had had difficulty falling and staying asleep and restless sleep most nights such that he got minimal sleep).

The duration of the disturbance is more than one month (onset after seeing the gun and continued during the time he was employed, did not improve even after he left because he worried they might try come after him and retaliate further.

The disturbance caused and continues to cause clinically significant distress and impairment in his social functioning (he isolated himself), occupational functioning ( he was so traumatized that he was not sure he was capable of work despite actively seeking jobs) and familial functioning (he isolated himself from family members who did not understand what he was experiencing). The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition. His symptoms have improved by about 25% as a result of treatment with sertraline and psychotherapy.

### C. Major Depressive Disorder

Mr. Nelson was first given the formal diagnosis of MDD in 2021 (he believes a prior therapist may have diagnosed him with depression.) He did not care for his own life or for life in general. He did not know what love and happiness were.

He denies being depressed during his childhood and adolescence. He enjoyed sports and other activities. The first time he experienced significant depression was when he was incarcerated in 2004. His depression was at its worst at the beginning of his incarceration and improved over time to the point where he was no longer significantly depressed after about a year. During his other incarcerations, he was initially depressed and had difficulty sleeping as a result of nightmares and hyper alertness about the jail environment, but he got involved in activities and played sports and accommodated to the situation which improved when he was transferred to less secure facilities. He had learned how to manage the situation and "do his time."

In 2004, he had the following symptoms present during the same two-week period which represented a change from previous functioning: depressed mood most of the day, nearly every day, as indicated by subjective report (e.g., feels sad, hopeless); markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by subjective account) (initially, he had no interest but decided to participate in activities; he did arts and crafts, took courses on budgeting and other life skills; significant weight gain because his ability to exercise was taken away, and the depression and anxiety of being incarcerated led to a 25-pound weight gain; insomnia (it was worse because he did not have as much access to marijuana which helped him sleep and reduced his anxiety).

The symptoms caused clinically significant distress or impairment in social, occupational, or other important areas of functioning. The depression lasted for several weeks or longer

until he was able to learn about the prison environment and adapt to it. He never received treatment while incarcerated. The episode is not attributable to the physiological effects of a substance or another medical condition.

During his second incarceration, he was not really depressed because he knew what to expect and how to handle it. During his third incarceration, he lost his grandmother's ashes and his business, money and furniture. It was also a more difficult situation because the jail would not provide him with the diet and medication necessary to treat his GERD condition.) The depression cleared after a few months.

He was not suffering from symptoms of a Major Depressive Disorder at the time he started working for Crane. In fact, he was elated as he was a member of the union and was to be an apprentice in training for becoming an engineer. He felt he had a very positive future ahead of him.

After experiencing harassment and discrimination while working at Crane, Mr. Nelson developed symptoms of a Major Depressive Disorder.

He has the following symptoms present during the same two-week period and representing a change from his previous functioning; at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure: depressed mood most of the day, nearly every day, as indicated by subjective report (e.g., felt sad, empty, hopeless) and observation made by others (e.g., he was tearful at times at home); markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by either subjective account); significant weight loss (his doctor told him that he had lost 30 pounds from his previous weight of 200 pounds after being fired despite eating three meals a day from food stamps and church meal programs for the homeless); insomnia every day (he had severe difficulty falling asleep every day); physical agitation (paced the floor); fatigue or loss of energy nearly every day (did not feel like he had the energy to do anything); feelings of worthlessness nearly every day (felt demeaned, was unemployed and was fearful he would not find another job); diminished ability to think or concentrate, nearly every day (trouble reading the Bible).

The symptoms caused clinically significant distress and impairment in his social, occupational and familial functioning. The episode is not attributable to the physiological effects of a substance or another medical condition. At least one major depressive episode is not better explained by a psychotic disorder, and there has never been a manic or a hypomanic episode.

He had a Major Depressive Disorder, Recurrent, Moderate which went into remission within a few months.

His grandmother died after he was released from jail the second time in 2016. He had normal grief after.

D. **Panic Disorder**

Mr. Nelson believes he may have had panic attacks as a child and when he was being abused and witnessing violence. As an adult, he had panic attacks while incarcerated whenever there was an episode of violence in the jail. He did not have panic attacks after his release in 2016 when he was no longer involved in gang activity.

He started to have panic attacks while working at Crane. The first was when the employe flashed his gun. After, he had them whenever he was exposed to firearms, when he was exposed to the noose and after seeing the bullet. He was having them at home and at times would wake up with a panic attack. After he found the bullet, the panic attacks were more frequent and would occur at night several times a week. He still has panic attacks at night waking him.

He had recurrent unexpected panic attacks. A panic attack is an abrupt surge of intense fear or intense discomfort that reaches a peak within minutes, and during which time the following symptoms occur (the abrupt surge occurred from both a calm state and an anxious state): palpitations, pounding heart and accelerated heart rate; sweating; shaking of his hands; sensations of shortness of breath (he kept the asthma inhaler with him at all times - his doctor and the pharmacist both told him to stop using it so much because he was using it for panic attacks which he initially thought were asthma attacks); chest discomfort; nausea; feeling unsteady and light-headed; derealization (feelings of unreality); and a fear of dying (thought he was having asthma attacks).

At least one of the attacks has been followed by one month (or more) of the following: persistent concern or worry about additional panic attacks or their consequences (e.g., having an asthma attack or a stroke, not breathing) and a significant maladaptive change in behavior related to the attacks (e.g., he tried to avoid places and situations which he associated with the occurrence of panic attacks; he would stay in the house or go for a ride on a country road where he was alone).

The disturbance is not attributable to the physiological effects of a substance (e.g., a drug of abuse, a medication) or another medical condition).

The disturbance is not better explained by another mental disorder (e.g., the panic attacks do not occur only in response to in response to reminders of traumatic events, as in posttraumatic stress disorder; or in response to separation from attachment figures, as in separation anxiety disorder).

E. Antisocial Personality disorder
F. Mr. Nelson meets DSM-V TR criteria for Antisocial Personality Disorder up through the after of approximately 35

He had a pervasive pattern of disregard for and violation of the rights of others, occurring since age 15, as indicated by the following: failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;

impulsivity and failure to plan ahead (when younger); irritability and aggressiveness as indicated by episodes of physical fights or assaults; reckless disregard for the safety of self or others (gang activities); lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated or stolen from another.

The individual is at least 18 years of age and there is evidence of conduct disorder with onset before age 15. The occurrence of antisocial behavior is not exclusive during the onset of schizophrenia or bipolar disorder.

He met criteria for Conduct Disorder. He had a repetitive and persistent pattern of behavior in which the rights of others or major age-appropriate societal norms or rules are violated as manifested by the presence of the following over 12 months: he bullied, threated and intimidated others, often initiated physical fights; used a weapon that can cause serious physical harm to others (knife, bat, gun, brass knuckles); was physically cruel to people and animals; deliberately engaged in fire setting with the intention of causing serious damage; deliberately destroyed other's property other than by fire setting; stole items of nontrivial value without confronting a victim (shoplifting); often stayed out at night despite parental prohibitions beginning before age 13; ran away from home overnight at least twice while living in the parental or parent surrogate home; was often truant from school (but not until after the age of 13).

The disturbance in behavior caused clinically significant impairment in his social, academic and occupational functioning. He meets criteria for Child-onset type (prior to the age of 10) and had moderate symptoms.

Per the DSM, antisocial personality disorder has been associated with low socioeconomic status and urban settings. The diagnosis may at times be misapplied to individuals in settings in which seemingly antisocial behavior may be part of a protective survival strategy (e.g. formation of youth gangs in urban areas with high rates of violence and discrimination). Child abuse and neglect, unstable or erratic parenting or inconsistent parental discipline may also increase the likelihood that conduct disorder will evolve into antisocial personality disorder.

Since 2016,he has demonstrated no symptoms characteristic of ASPD. He reformed his behavior and lifestyle such that he no longer meets these criteria. In patients who achieve remission, the mean age is 35. When he was released from jail in 2011 at the age of 30, he went immediately to college then massage school and started getting work skills.

Prior to becoming employed with Crane Company, Mr. Nelson did not have active symptoms of PTSD (except for sleep problems, nightmares and slight hypervigilance), depression or Panic Disorder. He was not generally anxious. In fact, he was excited to be starting a new position where he would be trained for potentially stable and lucrative employment (he notes that many crane operators make $250,000 per year.)

While working for Crane, he developed PTSD and had a recurrent episode of Major Depressive Disorder as well as a dramatic worsening of the frequency of panic attacks.

## VIII. SUMMARY AND CONCLUSIONS

Mr. Nelson's work environment at Crane ultimately became unbearable after being subjected to harassment (racial, veiled threats of violence) and discrimination. After he was fired for "cause," he developed three major psychiatric disorders, with some symptoms and dysfunction being present up through the current time. In addition to developing major psychiatric disorders, he also experienced numerous other negative psychological consequences of the harassment, discrimination and improper firing.

After being racially harassed and experienced veiled threats of violence which caused him to fear for his life and then experiencing racial discrimination and retaliation after he complained about this treatment, Mr. Nelson developed symptoms of three major psychiatric disorders, PTSD, Major Depressive Disorder and Panic Disorder. After he was improperly fired "for cause," his symptoms and dysfunction worsened dramatically.

He had a diminished ability to cope with things in life. He was constantly stressed and upset. He was frustrated because the harassment continued unabated and anything and everything he did including reporting and following guidelines set by the company, his efforts to instigate changes to protect himself were to no avail. He became increasingly anxious and traumatized, fearing for his life and safety on a daily basis.

In association with his depression, he developed anhedonia and had reduced enjoyment of his life and activities. He found it much harder to do his volunteer work and enjoy his friends and social activities. It was harder to support his aunt who had cancer. He was so isolated that he never came out of his room and socialize with the family. They could not understand why he was just sitting in his room. The social isolation accompanying the depression started in February after he found the shotgun shell.

He had an erosion of his self-esteem as he was being constantly subjected to comments that were directed at making him feel inferior or intimidating him. Because his efforts to fight back in the form of complaints fell on deaf ears, he eventually felt a loss of self-respect.

He was initially more frustrated than angry but after he was told he would be off for the day, and was then fired for not showing up at the worksite) he felt lied to and betrayed.

He experiences severe embarrassment and humiliation. He was being subjected to racial harassment and discrimination and frank threats to this safety. He was humiliated because everyone at the worksite knew about the harassment and threats. It was hard for him to go to work because he knew everyone was aware of the verbal abuse he was experiencing in public and was being threatened and demeaned and that nothing was being done to protect him. He felt helpless that his employers were feeling like they could get away with the harassment and discrimination and continued harassing and abusing him and even threatening his life.

Previously in his life, he had experienced some racial harassment in the correction system at the hands of CO's and gangs in jail. He even experienced that at his worksite in the past in traffic control where he would occasionally hear a racial comment. He had a change in attitude towards others. He became generally suspicious that Caucasian persons might be harboring ill feeling towards him. It has been harder to trust people since.

He felt betrayed because he assumed that the people who employed him would provide a safe worksite but failed to do so. He felt in constant potential danger and any promised to correct the situation when he brought it to their attention were ignored. He eventually felt out of control, helpless and hopeless that he situation would ever change. He felt violated and damaged by the racial slurs and demeaning comments by his coworkers.

He did not really want to talk about the situation because it was too embarrassing. He became alienated from his family and socially withdrew. He was distressed because his employers never criticized his work performance. He never received a reprimand, was always on time, and performed his work assignments. He is disgusted because hie employers are subsequently alleging that they had to reprimand him.

He has had severe financial consequences (loss of job, loss of pay and benefits and loss of the apprenticeship opportunity) he is dealing with the impact of his being fired on his future employability. He lost what he describes as "one of the top paid jobs in America." he worries it will have a negative impact on his reputation in his field of works and in the union. He worries that if he were to go to another job site, everyone would be aware of his prior situation .

During the time he was being harassed and after being fired, he developed a low libido. He did not even have interest in sexual activity. In addition, he developed muscle tension in his neck associated with his anxiety.

Mr. Nelson requires more intensive psychotherapy and pharmacotherapy to address his ongoing symptoms of anxiety, trauma and depression. He will require individual psychotherapy by a PhD level or LICSW-level therapist experienced in dealing with depression and trauma-related disorders. He would likely receive most benefit from an African American therapist given his experience of racial harassment and his general distrust of Caucasians. It will not be easy to find an appropriate therapist with the required level of skills to provide this care. He should also be evaluated and treated by a psychiatrist (MD) with expertise in psychopharmacology and experience in treating trauma-related and depressive disorders. Additional medication trials are indicated. Treatment should occur until his disorders are in remission. Once he achieves remission, he should continue pharmacotherapy for six to twelve months.

He will incur the direct costs of treatment sessions as well as the costs of laboratory testing and medications. He will also incur indirect costs of transportation to and from appointments and time lost for sessions and travel to and from sessions.

With appropriate and more intensive treatment, and with restoration of stability in his life (stable living environment and other necessities of life), Mr. Nelson's condition should improve over the next one to two years depending of his response to pharmacotherapy and more focused psychotherapy. He should receive individual psychotherapy weekly (including EMDR/Trauma-based CBT) and psychopharmacology with initial evaluation and monthly sessions until stabilized and in remission then quarterly.

Sincerely,

Susan J. Fiester, MD