# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CARL NELSON,
    *Plaintiff*,

    v.

CRANE SERVICE CO., INC,
    *Defendant*

Civil Action No.
No. 24-cv-766-ABA

## MEMORANDUM OPINION

Carl Nelson worked for Crane Service Co., Inc. ("Crane") from December 2022 to February 28, 2023. He contends he experienced repeated racial epithets and felt threatened by coworkers carrying firearms in the workplace, which he claims constituted racial discrimination, harassment, and retaliation by Crane. Crane, for its part, conducted an extensive workplace investigation and revised its employment policies based on its findings and has filed a motion for summary judgment. For the reasons explained below, Crane may be entitled to judgment after a trial, including based on its investigation and the question of whether the epithets and other conduct are attributable to Crane itself. But there are sufficient disputes regarding the underlying events as well as the promptness and effectiveness of Crane's response to Mr. Nelson's complaints that Crane has not shown an entitlement to pretrial judgment as a matter of law. The summary judgment motion will be denied, and the case will be set for trial.

I.    BACKGROUND ........................................................................................ 2

II.   STANDARD OF REVIEW ...................................................................... 10

III.  DISCUSSION .......................................................................................... 10

    A. Harassment Claims (Counts 1, 3, 5, and 6) ......................................... 11

        1.   Whether a reasonable jury could conclude that the evidence establishes "severe or pervasive" harassment .................................. 11

        2.   Whether Crane's remedial action entitles it to summary judgment ............ 14

            a) Legal standard for attributing co-worker harassment to an employer: remedial measures reasonably calculated to end the harassment .......... 15

            b) Application ................................................................................ 17

                i.   The evidence of complaints in December 2022 creates disputes of fact about the promptness of Crane's investigation ........................ 18

                ii.  Whether Crane's February 2023 actions were reasonably calculated to end the harassment ................................................... 22

    B. Retaliation (Counts 2 and 4) ................................................................. 26

        1.   Constructive Discharge .................................................................. 26

        2.   Whether Mr. Nelson has established that he was subject to an adverse employment action ....................................................... 28

    C. Damages .................................................................................................. 29

IV.   CONCLUSION ........................................................................................ 30

## I.    BACKGROUND[1]

Carl Nelson is a black man, ECF No. 1 ¶ 6; ECF No. 80-1 at 9, who was employed by Crane beginning in December 2022. ECF No. 80-4, Declaration of Rickey McGuire ("McGuire Decl.") ¶ 9; ECF No. 81-2, Declaration of Carl Nelson ("Nelson Decl.") ¶ 1. On Mr. Nelson's first day at Crane, he participated in an orientation that included anti-

---

[1] Because Crane, the defendant, has moved for summary judgment, the Court construes all facts, and all reasonable inferences drawn from those facts, in the light most favorable to Mr. Nelson. Accordingly, the Court recounts the factual record in that light. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

harassment and anti-discrimination training. ECF No. 80-6, Deposition of Carl Nelson ("Nelson Dep.") 132:13–133:2. Crane's "Anti-Discrimination/Harassment Policies" at that time stated that employees "who feel they have been subjected to, or witnessed, any [violation of the policies] should immediately notify their respective supervisor or, in the absence of the supervisor, the EEO officer." ECF No. 82-13 at 3.

Mr. Nelson attests that, on December 20, 2022, his first full day at Crane, he heard a white co-worker mumble the n-word while walking passed him. ECF No. 81-3 at 2.[2] He contends that, on or about that same day, he reported this issue to Brent Loveless, his supervisor and the Dispatch Manager, who said he would "take care of it." *Id*. at 3. Mr. Nelson testified that, on December 22, when he attempted to introduce himself to a white co-worker, John Baldwin, Mr. Baldwin looked at Mr. Nelson with disgust and lifted up his hoodie, flashing his gun. ECF No. 80-6, Nelson Dep. 145:22–147:22. Mr. Nelson contends that he reported the incident to Mr. Loveless the same day, stating that he believed it was done to "intimidate or harass [Plaintiff] because of [his] race." ECF No. 81-3 at 3–4. Mr. Nelson contends Mr. Loveless told him to "[g]et tougher skin." *Id*. at 4.

Mr. Nelson contends that before the company Christmas party on December 23, 2022, he also made a verbal complaint to Diana Farmer, a member of Crane's HR team,

---

[2] Many of the facts on which Mr. Nelson relies to contest Crane's motion for summary judgment appear in allegedly contemporaneous notes written by Mr. Nelson. ECF No. 81-3. Although the notes themselves likely do not constitute admissible evidence, Mr. Nelson's declaration incorporates these notes into his declaration—stating, under penalty of perjury, that the "factual statements contained" in those notes "are true and accurate to the best of [his] personal knowledge." ECF No. 81-2 ¶ 6. Accordingly, the Court need not decide at this time whether the underlying notes would in fact be admissible at trial (as opposed to Mr. Nelson's testimony about the facts described therein) and will consider these facts as incorporated into Mr. Nelson's declaration.

that he believed he was experiencing racial discrimination and harassment based in part on the brandishing of the gun. *Id.* at 4. He contends Ms. Farmer responded, "We don't have a weapons policy, no worries have a good time today." *Id.* Mr. Nelson also contends that he told Crane Vice President and Safety Manager, Rickey McGuire, that day about his concerns and Mr. McGuire responded with the "same result." *Id.* Mr. Nelson contends that on January 10, 2023, he called Mr. McGuire to "inquire [about his reports of] discrimination and harassment," and Mr. McGuire informed him, "We'll take care of it, thank you." *Id.*

Mr. Nelson states that on January 11, 2023, one of the white employees told him to grab the "tag line" and, when he returned with it, someone stated "who told the black boy to get a rope?" to which everyone laughed. *Id.* Mr. Nelson alleges that the tag line was a rope that looked like a miniature noose. *Id.* On January 13, Mr. Nelson allegedly heard a supervisor and an employee using racial slurs and referring to Mr. Nelson as "cookie." ECF No. 81-3 at 5. They allegedly told him that they were referring to him as "cookie" as a reference to the "Men of Honor" movie in which an African American Navy diver was discriminated against because of his race. *Id.* Mr. Nelson told them that he did not want to be referred to as that and they told him to lighten up. *Id.* On January 27, when Mr. Nelson requested a safety harness, he contends Mr. Loveless said, "What you're a monkey now climbing on poles?" *Id.* at 7. On January 30, 2023, Mr. Loveless's son, who was also a Crane employee, allegedly made a comment to another employee that "all black people are slow." *Id.* at 8.

On January 31, 2023, Mr. Nelson submitted a written complaint alleging race-based discrimination and other misconduct at Crane, by emailing his local union representative, Steven Faulkner. ECF No. 80-6, Nelson Dep., 157:17–158:1; ECF No. 81-

9 at 2. In the email, he alleged that the company was allowing employees to carry concealed weapons at work and that one employee intentionally showed him his gun by raising his shirt as a means of intimating and bullying him on the basis of his race. ECF No. 81-9 at 2. In his January 31 complaint, he alleged that employees frequently called him racial slurs, including the n-word and "cookie," and made statements such as "black people are so slow" and "who made the black guy grab a rope." ECF No. 81-9 at 2. Finally, he alleged that the company was refusing to train him properly because he is "a black man with dreadlocks." *Id*. Mr. Nelson did not name any individuals in this email, *id*., and in a separate email told Mr. Faulkner that he was not aware of the names of the individuals, ECF No. 81-10 at 2.

On February 3, Mr. Faulker emailed the President of Crane, Brian Mazzella, informing him that Mr. Nelson had made a hostile work environment complaint. ECF No. 80-3, Declaration of Brian Mazzella ("Mazzella Decl.") ¶ 3; ECF No. 80-9 at 2–3. Mr. Mazzella and Mr. McGuire met with Mr. Nelson that same day to discuss his claims and committed to investigating the allegations. ECF No. 80-6, Nelson Dep. 162:13–164:5. Crane then conducted an extensive investigation, interviewing twenty-three employees. That investigation revealed that various Crane employees had made inappropriate statements including racial slurs (though some employees claimed they were jokes), and also that various employees were bringing firearms to work. ECF No. 80-1 ¶ 20; ECF No. 80-7, Deposition of Rickey Steven McGuire ("McGuire Dep.") 188:5–192:7; ECF No. 80-4, McGuire Decl. ¶¶ 16, 18; ECF No. 81-16, Declaration of Alyssa Privitera ("Privitera Decl.") ¶ 4. *See* ECF No. 81-16 at 4–52, Investigation Interviews. The interviews did not directly corroborate Mr. Nelson's allegations that the

guns they were used to threaten or intimidate him or any other employee. ECF No. 80-4, McGuire Decl. ¶ 18.

On February 14, Crane held a mandatory training for all employees and distributed an updated anti-discrimination/harassment policy and a new firearms policy. ECF No. 80-6, Nelson Dep. 165:6–18; ECF No. 80-4, McGuire Decl. ¶¶ 20–21. On February 20, Mr. McGuire and a human resources representative met with Mr. Nelson to share with him the findings of their investigation and allegedly told him that the investigation had corroborated his complaints. ECF No. 80-6, Nelson Dep. 169:17–170:4. Mr. McGuire testified that, during the meeting, Mr. Nelson told Mr. McGuire that he liked the new policies and that he "felt things were better all around," and thanked them for "addressing all of his concerns." ECF No. 80-4, McGuire Decl. ¶ 23. The next day, Mr. Nelson sent an email expressing his appreciation for their investigation, stating, "Per our meeting yesterday, thank you again for your investigation findings and the individuals who cooperated to help you determine that my complaints were true." ECF No. 82-2; *see also* ECF No. 80-6, Nelson Dep. 169:12–170:19; ECF No. 80-4, McGuire Decl. ¶ 23.

A week later, on February 27, 2023, Mr. Loveless issued dispatch instructions to Mr. Nelson and assigned him a truck to use for that day. ECF 80-5, Declaration of Brent Loveless ("Loveless Decl.") ¶¶ 2–3; ECF No. 80-6, Nelson Dep. 179:16–19. As Mr. Nelson began cleaning trash out of the assigned truck, he saw a "single shotgun shell" on "the drivers side rear floor (under the seat)." ECF No. 82-3 at 2; *see also* ECF No. 80-6, Nelson Dep. 181:2–182:6. Mr. Nelson took a picture of the shell casing and emailed it to Mr. Faulkner (the union representative) at 12:27 p.m. with a request that a grievance be filed on his behalf under the "weapons free workplace and anti-harassment policy." ECF

No. 82-3 at 2. After he sent the email, Mr. Nelson proceeded to drive to his assigned job site. ECF No. 80-6, Nelson Dep. 190: 7–20.

Shortly thereafter, Mr. Faulkner emailed Mr. Mazzella the picture of the casing and stated that Mr. Nelson has "once again expressed serious concerns over the perceived lack of enforcement of the new firearms policy recently implemented." ECF No. 80-12 at 2–3.[3] Later that day, Mr. Nelson met with Mr. McGuire and Mr. Faulkner regarding the shotgun shell casing. ECF No. 81-3 at 12; ECF No. 80-7, McGuire Dep. 149:18–20. Mr. Nelson states that, during that meeting, Mr. Nelson informed Mr. McGuire that he felt like the shotgun shell case was left in the truck intentionally as a warning or form of intimidation because of his race and that he no longer felt safe working at his assigned location, and asked to be reassigned to one of Crane's other locations. *Id*. at 12–13. Mr. Nelson states that he told Mr. McGuire that, if he could not be transferred, he would not work in an unsafe environment. *Id*. at 12. Although Mr. Faulkner's February 27 email to Mr. Mazzella (ECF No. 80-12), which prompted the meeting, specifically described Mr. Nelson as having alleged a violation of the "firearms policy," *id*. at 2, Mr. Nelson contends that the meeting also discussed Mr. Nelson's allegation that someone may have placed the shotgun shell in the truck as another instance of race-based harassment. ECF No. 81-3 at 12–13. Mr. Nelson states that he reiterated that he did not feel safe at the assigned location and that Mr. McGuire responded, "it's like that everywhere." *Id*. at 12. He contends that Mr. McGuire told him

---

[3] The timestamp on Mr. Faulkner's email (ECF No. 80-12) says 5:41 p.m., but it appears that likely is a Coordinated Universal Time (UTC) stamp, presumably meaning Mr. Faulker sent his email at 12:41 p.m. ET, about 15 minutes after receiving Mr. Nelson's email.

that he could have the rest of February 27 as well as February 28 off and that the company would investigate the shotgun shell casing. *Id.*

Mr. McGuire states that Crane then proceeded to investigate the shotgun shell casing "that afternoon." ECF No. 80-4, McGuire Decl. ¶ 26. John Steinhoff, Crane's Controller, testified that, in investigating Mr. Nelson's complaint about the shotgun shell, he reviewed "security camera footage from that morning concerning the truck that Mr. Nelson drove" and he "didn't see anyone behaving different and/or anything that seemed out of the ordinary." ECF No. 80-13, Deposition of John Steinhoff ("Steinhoff Dep.") 159:17–160:4; ECF No. 82-7 at 2. Mr. McGuire states that "Crane Service found no evidence that the shotgun shell was left in the truck intentionally, let alone left there for a reason motivated by racial animus, and therefore determined that no further action was needed." ECF No. 80-4, McGuire Decl. ¶ 27. He stated that an investigation did not determine who placed the shotgun shell in the truck or why it was placed there. ECF No. 80-7, McGuire Dep. 150:2–7. But based on its investigation, "Crane Service determined that the most likely explanation for the abandoned shotgun shell was that a prior regular user of that truck was one of the several employees at Crane Service who frequently shoots clay pigeons for recreation, and that this employee accidentally left the shotgun shell in the truck." *Id.* ¶ 28.

At 6:44 p.m., Mr. McGuire called Mr. Nelson and then sent him an email reporting back in response to Mr. Nelson's concern about the shotgun shell. ECF No. 82-5 at 2. He wrote:

> I just left you a voicemail message to follow up on our earlier conversation. After our discussion, I reviewed our weapons policy, and ammunition by itself is not a weapon nor an explosive, so there is no policy violation. My understanding is

that Dispatch expects you to arrive by 7:30 am at D'Arcy Road tomorrow for your assignment. Otherwise, if you choose not to show up, then we will assume that you will no longer be employed with Crane Service Company.

*Id.*

Mr. Nelson concedes that Crane investigated his complaint that the presence of the shotgun shell in the truck did not violate Crane's (new) *firearms* policy. But he contends this email reflects that Crane did not investigate his concern that the presence of the shotgun shell constituted a violation of Crane's *anti-discrimination* policy.

Mr. Nelson did not arrive for work on February 28, 2023. The facts of what happened that day are not in dispute, although, as discussed below, the parties do dispute their legal significance. *See* § III.C, *infra*. At some time prior to 9:38 pm, Crane sent Mr. Nelson a "Notice of Employee Separation" stating that it was construing his failure to report to work on February 28 as a "voluntary quit" due to "abandoned job / failed to appear or call." ECF No. 82-4 at 3, Request No. 5; ECF No. 82-6 at 2. At 9:38 pm on February 28, Mr. Nelson emailed Crane stating, "I'm turning in my letter of resignation/quitting the job with Crane Service because of intolerable work conditions and or treatment." ECF No. 82-9 at 2. Thus, both Crane and Mr. Nelson understood that Mr. Nelson had ceased his employment with Crane on February 28, 2023 (though, as discussed below, Mr. Nelson contends that (a) because Crane's "Notice of Employee Separation" was sent before Mr. Nelson's resignation email, the former controls and the latter should be disregarded, and (b) even if Mr. Nelson resigned that resignation should be treated as a constructive discharge).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotox*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita Elec.*, 475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party (here, Plaintiff, Mr. Nelson). *Matsushita*, 475 U.S. at 587–88; *Sedar*, 988 F.3d at 761.

## III.    DISCUSSION

Mr. Nelson's complaint contains seven counts that all boil down to a claim that he was subjected to racial discrimination and retaliation at Crane, in violation of Title VII, 42 U.S.C. §§ 2000e-2 & 2000e-3 (Counts 1 & 2), 42 U.S.C. § 1981 (Counts 3 & 4), the Maryland Fair Employment Practices Act (Count 5), and Prince George's County Code §

2-222 (Count 6).[4] Crane contends it is entitled to summary judgment on all of Plaintiff's claims.

### A.    Harassment Claims (Counts 1, 3, 5, and 6)

#### 1.    Whether a reasonable jury could conclude that the evidence establishes "severe or pervasive" harassment

"To demonstrate . . . a racially hostile work environment, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (*quoting Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)). Given that the Maryland Fair Employment Practices Act "is the state law analogue of Title VII and its interpretation is guided by federal cases interpreting Title VII," *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 408 n.1 (D. Md. 2015) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481 (2007)), and Prince George's County, Md., Code § 2-222 "largely tracks the language of [Title VII]," *Staves v. Prince George's Cnty. Bd. of Educ.*, Case No. 19-cv-02262-LKG, 2023 WL 2648794, at *6 (D. Md. Mar. 27, 2023) (citing *Bryan v. Prince George's Cnty., Md.*, Case No. 10-cv-02452-DKC, 2011 WL 2650759, at *8 (D. Md. July 5, 2011)), the same elements apply. Crane argues that it is entitled to summary judgment on Mr. Nelson's discrimination and harassment claims

---

[4] The last count, erroneously numbered 8, is entitled "Constructive Discharge (Pled In The Alternative)." ECF No. 1 at 23. It is not pled as a separate cause of action but rather serves to make clear that Mr. Nelson contends that his employment ended either as a result of termination or constructive discharge, not a voluntary resignation.

because he has failed to establish the "severe" and "pervasive" element of a hostile work environment claim. ECF No. 80-1 at 20–24.

"To show that harassment was severe or pervasive, a plaintiff must show that he perceived, and a reasonable person would perceive, the work environment to be abusive." *Amirmokri v. Balt. Gas and Elec. Co.*, 60 F.3d 1126, 130–31 (4th Cir. 1995) (quoting *Beardsley v. Webb,* 30 F.3d 524, 530 (4th Cir. 1994); citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993)). "Courts determine 'whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) (*quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)); *Goffe v. Johns Hopkins Health Sys. Corp.*, Case No. 25-cv-695-GLR, 2015 WL 3489893, at *3 (D. Md. June 2, 2015)) (internal quotation marks omitted). The Fourth Circuit and several other Circuits have repeatedly held that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the n-word] by a supervisor in the presence of his subordinates." *Boyer-Liberto*, 786 F.3d at 280 (*quoting Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001); *citing Ellis v. Houston,* 742 F.3d 307, 325–26 (8th Cir. 2014); *Ayissi-Etoh v. Fannie Mae,* 712 F.3d 572, 577 (D.C. Cir. 2013); *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 24 (2d Cir. 2012); *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1116 (9th Cir. 2004)).

Crane makes two specific arguments on severeness/pervasiveness.

The first argument is evidentiary. The bulk of the evidentiary support for Mr. Nelson's claims is in the form of notes handwritten by Mr. Nelson. There is no dispute that the handwritten notes that are in the record (ECF No. 81-3) were not written contemporaneously with the events they describe. Instead, Mr. Nelson testified that he (1) took notes "[d]uring all the incidents" described in the notes, ECF No. 80-6, Nelson Dep. 136:11, (2) later copied those original notes onto the pages constituting ECF No. 81-3 (purportedly verbatim, but that is disputed), and (3) then discarded the original notes despite them constituting his supposed diary of the events in question. Crane points out, correctly, that a party opposing summary judgment must identify *admissible* evidence. *See, e.g.*, *Smith v. McGraw*, Case No. 10-cv-02310-AW, 2012 WL 603238, at *4 (D. Md. Feb. 23, 2012) (*citing Greensboro Pro. Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F. 3d 962, 967 (4th Cir. 1995)) (inadmissible hearsay cannot support or defeat a motion for summary judgment). Crane also points out, correctly, that even if the handwritten notes were contemporaneously made, the notes themselves likely constitute inadmissible hearsay, at least if offered by Plaintiff. But, as noted above, the Court need not decide whether the notes themselves constitute admissible evidence because Mr. Nelson has averred, under penalty of perjury, that the "factual statements contained" in those notes "are true and accurate to the best of [his] personal knowledge." ECF No. 81-2, Nelson Decl. ¶ 6. In other words, he has incorporated the factual assertions in the handwritten document into the declaration itself. Accordingly, the Court will consider the factual assertions contained in those handwritten notes as part of the summary judgment record.

Crane's other argument regarding severeness/pervasiveness is substantive: that considering the full evidentiary record, including Mr. Nelson's declaration and notes, no

reasonable jury could conclude that the "unwelcome conduct . . . based on the plaintiff's . . . race" was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment." *See Boyer-Liberto*, 786 F.3d at 271. The Court disagrees. Considering the facts in the light most favorable to Mr. Nelson, as the nonmovant, the Court concludes that a reasonable factfinder could find that the alleged harassment was severe and pervasive. In particular, Mr. Nelson contends that supervisors and co-workers alike used the n-word as well as other racial epithets, such as "monkey" and "cookie," both in his presence and directed at him on an almost daily basis. *See, e.g.*, ECF No. 81-3 at 2–8. He also contends that Mr. Baldwin, a co-worker, brandished his weapon at Mr. Nelson while looking at him with disgust and that his co-workers made him get a rope that looked like a miniature noose and then made fun of him for holding it. *Id.* Reviewing all the incidents Mr. Nelson contends that he witnessed, within the span of approximately two months of employment, there were at least eight incidents of unwelcome conduct based on race. *See id.*

For these reasons, Crane is not entitled to summary judgment on this basis.

### 2.    Whether Crane's remedial action entitles it to summary judgment

Crane next argues that, even if a reasonable jury could conclude that Mr. Nelson experienced severe and pervasive race-based harassment, the harassment cannot be attributed to Crane because, once Mr. Nelson brought his concerns to Crane's attention through a formal complaint on January 31, 2023, it conducted an extensive investigation and revised/created multiple workplace policies in response. Mr. Nelson disputes whether the remedial actions were sufficient to defeat his claims, at least at the summary judgment stage.

> **a)** **Legal standard for attributing co-worker harassment to an employer: remedial measures reasonably calculated to end the harassment**

Liability under Title VII for harassment is only imposed upon an employer who had "actual or constructive knowledge of the allegedly harassing conduct," and took "'*no* prompt and adequate remedial action to correct it.'" *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (*quoting Mikels v. City of Durham*, 183 F.3d 323, 329 (4th Cir. 1999)) (emphasis in original). "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *Id.* (*quoting EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 319 (4th Cir. 2008)). "'The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination.' 'However, the mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably.'" *Id.* (*quoting Spriggs,* 242 F.3d at 187; *citing Sunbelt*, 521 F.3d at 320) (internal citations omitted). Therefore, the Court must consider whether Mr. Nelson has presented sufficient evidence to demonstrate that Crane's responses to his

complaints "were not reasonably calculated the end the harassment and, therefore, that liability for the harassment may be imputed to it." *Id.*[5]

In making this determination, the Court must "consider[] the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* "[T]he mere fact that harassment reoccurs in the workplace, either by the same offender or different offenders, does not, *ipso facto,* allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment." *Id.* (*citing Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 676 (10th Cir. 1998)). Instead, even if harassment reoccurs, the question remains whether the prior remedial action was "reasonably calculated to end the harassment." *Id.* The reoccurrence may bring into question whether the remedial action was adequate, *i.e.*, whether it was reasonably calculated to end the harassment. But harassment is not necessarily imputed to an employer simply because remedial action turns out to have

---

[5] During discovery, a dispute arose over the adequacy of Crane's answers to interrogatories regarding its affirmative defense. *See* ECF No. 58. To resolve that dispute, Crane agreed to "withdraw[] its affirmative defenses." ECF No. 63. Mr. Nelson argues that Crane's waiver of affirmative defenses means Crane is foreclosed from arguing that its investigation was reasonably calculated to end the harassment. *See* ECF No. 81 at 18–19. He points to language in cases such as *Lacasse v. Didlake, Inc.*, 712 Fed. Appx. 231, 237 (4th Cir. 2018), stating, "Even if the supervisor's harassment does not lead to a tangible employment action, the employer may be vicariously liable unless the employer is able to establish a *Faragher-Ellerth* <u>affirmative defense</u>" (underline emphasis added). But Crane is not relying here on the *Faragher-Ellerth* affirmative defense. Plaintiff has the burden to prove that the harassment he contends he suffered is imputed to Crane. Crane's withdrawal of "affirmative defenses" does not affect whether Plaintiff is able to prove that Crane is liable for the harassment he contends he suffered.

been "'ineffective in stopping the harassment.'" *Id.* at 670 (quoting *Knabe v. Boury Corp.,* 114 F.3d 407, 411–12 n.8 (3d Cir. 1997)).

Likewise, when harassment reoccurs, the question also re-arises "whether the *next* employer response is reasonable"; in that circumstance, the reasonableness of the employer's response to the reoccurring harassment depends, for example, on "whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective." *Id.* (*Adler*, 144 F.3d at 676–77) (emphasis added). And, whether in response to an initial incident of harassment or a reoccurrence, "an employer is not required to terminate a [particular] perpetrator except where termination is the only response that would be reasonably calculated to end the harassment." *Id.* at 670 (quoting *Adler*, 144 F.3d at 676–77).

### b)    Application

To review, these are the basic pertinent aspects of the chronology, in the light most favorable to Mr. Nelson:

- Mr. Nelson contends he complained to his supervisor as early as December 20, 2022 and to HR and others as early as December 23 (though Crane disputes that). ECF No. 81-3 at 3–4.

- Five weeks later, on January 31, 2023, Mr. Nelson submitted a written complaint to his local union representative, alleging race-based discrimination and other misconduct. ECF No. 80-6, Nelson Dep., 157:17–158:1; ECF No. 81-9 at 2.

- The union representative passed the complaint along to Crane on February 3, and Crane launched its investigation immediately thereafter, including interviewing twenty-three Crane employees on February 7 and 8, 2023. ECF

No. 80-3, Mazzella Decl. ¶ 3; ECF No. 80-4, McGuire Decl. ¶¶ 14–15; ECF No. 80-9 at 2–3.

- Crane hosted a mandatory training on its updated anti-discrimination/harassment policy and its new weapons policy on February 14. ECF No. 80-6, Nelson Dep. 165:6–18; ECF No. 80-4, McGuire Decl. ¶¶ 20–21.

- Mr. Nelson contends that he found the shotgun shell in the truck on February 27, 2023, which as discussed above he perceived as having been placed there as a racist threat, and which he contends was inadequately investigated. ECF No. 81-3 at 11–13; ECF No. 81 at 26.

Crane argues that any harassment by Mr. Nelson's co-workers cannot be attributed to Crane because it took action promptly after receiving Mr. Nelson's January 31 complaint. ECF No. 80-1 at 24–27. Crane is correct that there is substantial evidence that its investigation was undertaken promptly after the January 31 complaint and was extensive and thorough. Put differently, a reasonable jury could readily find that Crane's February 2023 investigation was "reasonably calculated to end the harassment" and thus that "liability for the harassment" may not be "imputed to it." *See Xerxes*, 639 F3d at 669. But on the summary judgment record, the Court concludes that a reasonable jury could also reach the opposite conclusion, and thus Crane is not entitled to summary judgment on Plaintiff's discrimination claim, for two reasons.

### i.    The evidence of complaints in December 2022 creates disputes of fact about the promptness of Crane's investigation

First, the evidence of complaints in December 2022 creates disputes of fact about the promptness of Crane's investigation. As noted above, there is the evidence that Mr.

Nelson complained about a race-based hostile work environment as early as December 20 or 23, 2022. Specifically, Mr. Nelson attests that on December 20, 2022, he told Mr. Loveless that he had heard a white co-worker mumble the n-word and that co-workers had stated that Mr. Nelson was from a bad neighborhood. ECF No. 81-3 at 2–3. He attests that on December 22, he told Mr. Loveless about an unidentified white coworker, later identified as Mr. Baldwin, who "looked at me" and "raised up his hoodie/shirt to reveal a pistol" while "look[ing] at me with disgust," which he described to Mr. Loveless as "brandish[ing] to intimidate or harass me because of my race." *Id.* That was the incident when, according to Mr. Nelson, Mr. Loveless "brush[ed] off" the complaint "like it's accepted" and said, "Get tougher skin." *Id.* Mr. Nelson further attests that on December 23, 2022, just prior to a company holiday party, he verbally reported to a human resources representative, Ms. Farmer, that he "truly believe[d]" that he was the victim of "racial discrimination" and "harass[ment] by supervisors/operators," some of whom were "brandishing guns to intimidate because of my race." *Id.* at 4. He states that Ms. Farmer "brush[ed] me off stating, 'We don't have a weapon policy, no worries have a good time today.'" *Id.* He reports that he also "complained" to an unidentified "union shop steward" who responded, "Let [Ms. Farmer] handle it," and that he also told Mr. McGuire but received the "same result." *Id.* Mr. Nelson also contends he conveyed an additional complaint on January 10, 2023. *Id.* ("Called Ricky McGuire (safety) inquire discrimination and harassment on telephone approximately 2:36 pm he stated, 'We'll take care of it, thank you.'").

Crane disputes much of those factual contentions, and there is evidence from which a reasonable jury could conclude that the only complaint that put Crane on notice of a hostile work environment was Mr. Nelson's January 31 complaint. But the evidence

is sufficient that a reasonable jury alternatively could conclude that Mr. Nelson made complaints including in December 2022. That leads to the question: Is the existence of complaints in December 2022 material to his discrimination claim? In other words, given that the evidence in the record reflects that Crane Service did not begin its investigation until approximately February 7, 2023, would that delay permit a jury to conclude that Crane's investigation was not sufficiently "prompt" to avoid imputation of the employees' conduct to Crane? The Fourth Circuit's analysis in *Xerxes* instructs that the answer to that question is "yes."

In *Xerxes*, before the start of the plaintiffs' employment, the company had an anti-discrimination and harassment policy in place that instructed employees to report any violations to their "supervisor, Plant Manager, . . . or a member of Xerxes' Compliance Committee." *Id*. at 662. Two of the plaintiffs alleged that they began experiencing racial harassment shortly after beginning their employment in April and October 2005 and that they reported multiple instances of this harassment to their supervisor as they occurred. *Id*. at 662–63. However, the supervisor did not submit a formal written complaint to the company until February 2006, when an incident was reported to both him and the plant manager. *Id*. at 663. Immediately following the February 2006 incident, the plant manager met with the offending employee, the offending employee apologized to the plaintiffs, and the plant manager held a meeting with all shift employees to review the anti-harassment policies, warning them that future misconduct would result in disciplinary actions. *Id*. The Fourth Circuit held that there was a genuine dispute, sufficient to be material to the claims and defenses, regarding whether the company was put on notice of the alleged harassment prior to February 2006 given the *Xerxes* plaintiffs' allegations that they had reported incidents

to their supervisor in the three to eight months prior, which brought the promptness of the remedial action into question. *Id*. at 670–71.

Similar to *Xerxes*, Crane's original anti-harassment policies required employees to submit allegations of harassment to their supervisor, which Mr. Nelson contends he did as early as December 20, 2022 to Mr. Loveless, and did not require that the submission be in writing. ECF No. 82-13 at 3; ECF No. 81-3 at 3. Thus, Mr. Nelson argues that Crane was on notice as of that date. Alternatively, Mr. Nelson argues that Crane had notice of his alleged harassment as early as December 23, 2022, when he reported the harassment to Mr. McGuire and Ms. Farmer. ECF No. 81-3 at 4. Crane contends it was not aware of any allegations until February 3, 2023, when Mr. Faulkner passed along the written complaint. ECF No. 80-3, Mazzella Decl. ¶ 3; ECF No. 80-9 at 2–3. Accordingly, Crane argues that it took prompt remedial action in response to the February 3 allegations by conducting an investigation between February 7 and 8, adopting an updated anti-discrimination policy and a new weapons policy, and conducting a mandatory training for all employees on the new policies on February 14. ECF No. 80-1 ¶ 20; ECF No. 80-1 at 24–27. But based on Mr. Nelson's factual contentions, he argues that the actions were approximately seven weeks delayed. ECF No. 81 at 26.

Even if Crane was on notice in December 2022, a reasonable jury might still conclude that Crane's investigation in February 2023 was reasonably "prompt" within the meaning of *Xerxes*. But because there are factual disputes over whether Mr. Nelson put Crane on notice in December 2022, and because a reasonable jury might conclude that a seven-week delay was unreasonable, there are genuine disputes pertinent to the "promptness" inquiry under *Xerxes*. Combined with the factual disputes described in

the next section about whether the February 2023 investigation was sufficiently thorough and effective to have been reasonably calculated to end the harassment, summary judgment on Plaintiff's discrimination claims will be denied.

ii.    **Whether Crane's February 2023 actions were reasonably calculated to end the harassment**

The February 2023 investigation that Crane Service conducted was extensive and thorough. It entailed not only a deep dive into the facts, including interviews with twenty-three employees, but also entailed revisions to one company policy, its discrimination and harassment policy, and the creation of a new policy about firearms (prohibiting them from being carried on company property). And Mr. Nelson largely does not dispute those facts. Indeed, following the February 2023 investigation, he wrote to Mr. McGuire, thanking him for his "investigation findings and the individuals who cooperated to help [him] determine that [Plaintiff's] complaints were true." ECF No. 82-2 at 2. But whether Mr. Nelson at the time considered the investigation to have been thorough does not entirely answer the pertinent question in the current posture, which is whether "a reasonable jury could conclude that [Crane's] response to the reports of harassment in the workplace was not 'reasonably calculated to end the harassment.'" *Xerxes*, 639 F.3d at 675 (quoting *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 177 (4th Cir. 2009)).

Mr. Nelson argues that a reasonable jury could conclude that Crane's response was inadequate for three reasons: (1) "no employee of Defendant was disciplined because of Plaintiff's reports regarding a hostile work environment," ECF No. 81 at 25; (2) the workplace policies in place before February 2023 did not "'place any duty on supervisors to report incidents of harassment to their superiors,'" *id.* at 26 (quoting

*Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003)); and (3) "the February 27, 2023, shotgun incident" and Crane's reactions to his complaint about the shotgun shell that he discovered in the truck show that "any action taken by Defendant was . . . ineffective," *id*. at 26–27.

On the first point, the Fourth Circuit in *Xerxes* explained that "[t]he fact that formal disciplinary action, such as suspension or termination, was not taken against [two of the employees] at that time is an insufficient basis for concluding that Xerxes' response was unreasonable." 639 F.3d at 671. But Plaintiff is correct that the absence of any discipline of particular employees is relevant to the adequacy of Crane's response under the *Xerxes* imputation analysis. On the second point, it is the *new* policies, adopted in February 2023, that are principally relevant to the adequacy of Crane's February 2023 response. *See id*. at 670.

But what to make of Plaintiff's third point, about the shotgun shell and Crane's investigation into that incident? There is no dispute that Mr. Nelson found the shotgun in the truck that was assigned to him. But the parties draw polar opposite inferences from that fact. Mr. Nelson infers that someone left the shotgun shell in that truck as a threat and then arranged for that truck to be assigned to Mr. Nelson on that day. ECF No. 81-3 at 12–13; ECF No 81 at 28. He testifies that he interpreted the shotgun shell being left in his truck as being an intimidation tactic similar to when the Ku Klux Klan would burn a cross on a black person's front yard or hang a noose somewhere for them to see. ECF No. 80-6, Nelson Dep. 187:21–188:11, 189:10–16. And in his notes he wrote, "shotgun shell was a warning from [Defendant] another form of intimidation because of my race." ECF No. 81-3 at 12. Mr. McGuire states that Crane investigated the shotgun shell casing and concluded "that the most likely explanation for the abandoned shotgun

shell was that a prior regular user of that truck was one of the several employees at Crane Service who frequently shoots clay pigeons for recreation, and that this employee accidentally left the shotgun shell in the truck." ECF No. 80-4 ¶ 28. Crane adds that the shotgun shell was "in a pile of trash under the seat of the truck," rendering it implausible that the shell could have been placed in the truck intentionally, let alone as a form of "race-based harassment." ECF No. 80-1 at 24. Crane also contends that its response was "proportional to the seriousness and frequency" of the alleged offenses such that it was reasonably calculated to stop and did stop any continued harassment. ECF No. 80-1 at 27.

In *Xerxes*, the Court found that the continued harassment following the adoption of a new anti-harassment policy was not imputable to the employer because the organization responded to each allegation of continued harassment with increasingly progressive measures to address the harassment, including employee counseling, the suspension of two employees, and a verbal and written warning posted around the building that future misconduct could result in termination. *Id*. at 672. Even when the harassment escalated to direct racially charged messages a year later, the company responded by attempting an internal investigation and, when they could not determine the source of the messages, referring the incident to the local Sheriff's Office and instructing all employees that they were expected to come forward with any information pertinent to the Sheriff's investigation. *Id*. at 672–73. Accordingly, even though the company's actions did not put an immediate end to the harassment, the swift and thorough enforcement of the anti-harassment policy displayed that it was "reasonably calculated the end the harassment." *Id*.

24

Crane argues that the shotgun shell casing alone is insufficiently linked to Mr. Nelson's race and that Mr. Nelson's "perceived violation of Crane Service's newly developed firearms policy" does not sufficiently allege that Crane had actual or constructive knowledge of any ongoing harassment. ECF No. 80-1 at 23–27. While the shotgun shell casing alone may lack a direct racially discriminatory link, there are genuine disputes regarding how the shotgun shell ended up in the truck, and by extension whether it got there in a way that reflects that the February 2023 investigation and policy changes were not reasonably calculated to bring an end to the harassment that Mr. Nelson contends he experienced. Mr. McGuire states in his declaration that Crane determined that the shell most likely ended up there because "a prior regular user of that truck was one of the several employees at Crane Service who frequently shoots clay pigeons for recreation." *Id.* ¶ 28. But the record leaves various questions unanswered, including who that person was, when that person had last used the truck, how Crane became confident that that was the source of the shell, how that particular truck ended up assigned to Mr. Nelson on that day, etc. *See* ECF No. 81-5, Nelson Dep. 186:12–16.

In addition, there are genuine factual disputes arising from the fact that Mr. Nelson alleged that the shell's presence in the truck violated not only Crane's newly adopted firearms policy, but also its anti-discrimination policy. Mr. Nelson told his union representative that he believed the casing was a violation of both the weapons and anti-discrimination policies, ECF No. 82-3 at 2, but the union representative's email only mentions a concern about the weapons policy. ECF No. 82-3 at 2; ECF No. 80-12 at 2–3. In any event, Mr. Nelson alleges that during the meeting that day, he informed Mr. McGuire directly that he believed the casing to be a violation of the anti-discrimination

25

policy. EF No. 81-3 at 12. Considering the evidence in the light most favorable to Mr. Nelson, during the February 27 meeting, Mr. Nelson put Crane on notice of his belief that the incident was a violation of the anti-harassment policies and thus required Crane to enforce its policies accordingly. *See* ECF No. 81-3 at 12–13. Unlike the multi-day investigation conducted at the beginning of February, Mr. McGuire emailed Mr. Nelson within approximately four hours that the investigation had been completed, but only mentioned having reviewed the *weapons* policy to determine that "ammunition by itself is not a weapon nor an explosive, so there is no policy violation." ECF No. 82-5 at 2.

It appears to the Court that Crane's investigations, both in early February 2023 and in connection with the discovery of the shotgun shell, likely were sufficiently prompt and thorough to have been reasonably calculated to end the harassment. But the Court is constrained at the summary judgment stage to construe all the evidence in Mr. Nelson's favor. In that light, there is sufficient evidence from which a reasonable jury could conclude that the investigations were not reasonably calculated to end the harassment, particularly in light of the dispute about the December complaints and, to some extent, in light of disputes surrounding the handling of the shotgun shell incident. Accordingly, Crane's motion for summary judgment on Plaintiff's discrimination and harassment claims (Counts 1, 3, 5, and 6) will be denied.

## B.    Retaliation (Counts 2 and 4)

### 1.    Constructive Discharge

To establish constructive discharge, Plaintiff must be able to establish objective intolerability of the working conditions. *Chapman v. Oakland Living Center*, Inc., 48 F.4th 222, 235 (4th Cir. 2022) (*citing EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017); *Green v. Brennan*, 578 U.S. 547, 560 (2016)). "'Intolerability' is not

established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign . . . Rather[,] '[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' that is, whether he would have had *no choice* but to resign." *Dones v. Donahoe*, 987 F. Supp. 2d 659, 668 (D. Md. 2013) (quoting *Blistein v. St. John's Coll.,* 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998)) (emphasis in original) (internal citations omitted). "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019).

In *Amirmokri*, the Fourth Circuit held that almost daily epithets about the plaintiff's Iranian descent and attempts to embarrass him in public created a genuine issue of material fact about intolerability. 60 F.3d at 1132. However, in *Evans*, the Fourth Circuit held that a few offensive comments spread out over months, although frustrating and unpleasant, were insufficient to rise to the level of intolerability. 936 F.3d at 188, 193–94.

Here, considering the evidence in the light most favorable to Mr. Nelson, a reasonable jury could find that he has reached the threshold for "intolerability" based on his testimony that he experienced near daily racial epithets either directed at him or said in his presence regarding him, that employees brandished their weapons at him, and that, after the shotgun shell casing incident, he expressed a fear for his life if he were not assigned to another location, but Crane assigned him to the same location anyway.

Accordingly, the Court finds that Crane is not entitled to summary judgment on this claim.

### 2.      Whether Mr. Nelson has established that he was subject to an adverse employment action

"To make a prima facie claim of retaliation, a plaintiff must show: (1) that [he] engaged in protected activity, (2) that the employer took a materially adverse action against [him] and (3) there is a causal connection between the protected activity and the adverse action." *Evans*, 936 F.3d at 195 (citing *Burlington N. & S.F.R. Co. v. White,* 548 U.S. 53, 61–68 (2006); *King v. Rumsfeld*, 328 F.3d 145, 150–51 (4th Cir. 2003)). "[A]n employee may prove an adverse employment action by showing actual or constructive discharge." *Madock v. McHugh*, Case No. 10-cv-2706-ELH, 2011 WL 3654460, *21 (D. Md. Aug. 18, 2011). "No specific words or acts are required in order to show an actual discharge . . . .  Rather, 'an actual discharge occurs when the employer, by words or acts, manifests a clear intention to dispense with an employee's services.'" *Id.* (quoting *Payne v. Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977)). "An employer cannot avoid a finding of an adverse employment action by unilaterally declaring that certain employee actions will be deemed a resignation." *McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 721 (10th Cir. 2011).

Crane argues that it is entitled to summary judgment on Mr. Nelson's retaliation claim because there is no evidence that Crane imposed on him an adverse employment action. ECF No. 80-1 at 29. Mr. Nelson responds by arguing that Crane terminated his employment on February 28, 2023, and that, even if he resigned, such resignation constitutes constructive discharge. There is no genuine dispute that Mr. Nelson submitted a resignation on that date: his message to Crane that day stated, "I'm turning

in my letter of resignation/quitting the job with Crane Service because of intolerable work conditions and or treatment." ECF No. 82-9 at 2. But as discussed above, there *are* genuine disputes of fact sufficient to permit Mr. Nelson's constructive discharge theory to proceed to a trial.[6] *See* § III.B, *infra*. Accordingly, Crane's motion for summary judgment on Mr. Nelson's retaliation claim (Counts 2 and 4) will be denied.

### C.    Damages

Finally, Crane argues that emotional distress or lost wages that Mr. Nelson suffered were the result of Mr. Nelson's mental health and criminal history prior to his employment with Crane. ECF No. 80-1 at 29. Crane does have what appears to be a strong argument that, even if Mr. Nelson was constructively discharged and even if it is liable for discrimination or retaliation, any claim for compensatory damages is minimal. After all, although it appears undisputed that Mr. Nelson has not worked any job since his last day at Crane, damages for lost wages and benefits are limited to what the employee would have received absent the discriminatory conduct. *E.E.O.C. v. Key Mgmt. Partners, Inc.*, Case No. 21-cv-02496-PX, 2024 WL 4569875, at *2 (D. Md. Oct. 24, 2024). And Mr. Nelson had a duty to mitigate any damages. *See, e.g.*, *E.E.O.C. v. Consol. Energy, Inc.*, 860 F. 3d 131, 148 (4th Cir. 2017) (citing *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231–32 (1982); *Brady v. Thurston Motor Lines, Inc.*, 753 F. 2d 1269, 1273 (4th Cir. 1985)). That means to obtain any economic damages at trial he will have to persuade the jury not only that he has taken all reasonable steps since 2023 to

---

[6] Because there are genuine disputes regarding Mr. Nelson's constructive discharge theory such that summary judgment is precluded as to the retaliation claim, the Court need not decide at the summary judgment stage whether Crane's "Notice of Employee Separation" constituted actual discharge based on Mr. Nelson's other theory of retaliation.

find a new job, but also that any period of unemployment was caused by Crane's alleged discriminatory or retaliatory termination. Given those legal standards, it is unclear whether Mr. Nelson will have any likelihood of obtaining a judgment for economic damages beyond perhaps a few months of lost salary. But these potential gaps in Plaintiff's evidence related to damage go to the *amount* of damages for which Crane may be liable; Crane has not shown that the undisputed evidence establishes that Plaintiff is entitled to a damages award of $0. Accordingly, Crane's damages-based argument is not a basis for summary judgment, at least based on the summary judgment record.

## IV.    CONCLUSION

For the aforementioned reasons, Crane's motion for summary judgment, ECF No. 80, will be denied. A separate order follows.

Date: January 15, 2026                    _____/s/_____
                                          Adam B. Abelson
                                          United States District Judge